IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ORCHESTRATEHR, INC., ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | No. 3:13-cv-2110-P |
| | § | |
| ANTHONY L. TROMBETTA, ET AL., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER ON
## PLAINTIFFS' MOTIONS FOR SANCTIONS AND TO COMPEL

Plaintiffs OrchestrateHR, Inc. and Vivature, Inc. have filed a Motion for Sanctions Against All Defendants [Dkt. No. 232], a Motion for Sanctions Against Anthony L. Trombetta for Spoliation of Evidence [Dkt. No. 240], and an Emergency Motion for Sanctions [Dkt. Nos. 245 & 251]. Chief Judge Jorge A. Solis has referred these motions to the undersigned United States magistrate judge, *see* Dkt. Nos. 242 & 250, and the undersigned held a hearing on the motions on February 18, 2016, *see* Dkt. Nos. 274 & 285.

Plaintiffs then filed a Motion to Compel and for Sanctions Against All Defendants, *see* Dkt. No. 281, which Chief Judge Solis also referred to the undersigned magistrate judge, *see* Dkt. No. 283.

For the reasons and to the extent explained below, the Court GRANTS in part and DENIES in part the Motion for Sanctions Against All Defendants [Dkt. No. 232], except for the portion of the motion concerning civil contempt for alleged violations of

the Agreed Temporary Injunction and Agreed Temporary Restraining Orders, which is addressed in the Findings, Conclusions, and Recommendation of the United States Magistrate Judge dated March 28, 2016 [Dkt. No. 299]; DENIES the Motion for Sanctions Against Anthony L. Trombetta for Spoliation of Evidence [Dkt. No. 240]; GRANTS the Emergency Motion for Sanctions [Dkt. Nos. 245 & 251]; and GRANTS in part and DENIES in part the Motion to Compel and for Sanctions Against All Defendants [Dkt. No. 281]. *See generally Brown v. Bridges*, No. 3:12-cv-4947-P, 2015 WL 410062, at *1-*4 (N.D. Tex. Jan. 30, 2015) (explaining that, when a district judge refers a motion for sanctions to a magistrate judge, the sanction chosen by the magistrate judge, rather than the sanction sought by the party, governs the determination of whether Federal Rule of Civil Procedure 72(a) or 72(b) applies and that, when the magistrate judge finds that dismissal or another sanction disposing of a claim or defense in unwarranted, the motions should be characterized as non-dispositive and may be ruled on by the magistrate judge).

## Background

Defendant Borden-Perlman Insurance Agency, Inc. ("BP") has previously been sanctioned twice under Federal Rule of Civil Procedure 37(a)(5) in this litigation. *See* Dkt. Nos. 196 & 237. Although Plaintiffs have argued for additional sanctions previously under Rule 37 or the Court's inherent powers, the Court has to this point declined to order sanctions beyond awards of fees and expenses mandated by Rule 37(a)(5). *See* Dkt. Nos. 170, 192, & 193.

Plaintiffs now seek additional sanctions in a series of motions.

First, Plaintiffs seek sanctions against Defendants Anthony L. Trombetta, BP, Kelly Myers, and Dave Icenhower and their counsel, Sandra Liser, for Ms. Liser's contacts and attempted contacts with current employees and former employees whom she knew or should have known are represented by Plaintiffs' attorneys. Plaintiffs seek both $50,000 in monetary damages plus expenses and an order prohibiting Defendants' counsel from any further attempts to contact Plaintiffs' current and former employees, requiring Defendants' counsel to provide a detailed summary of all contacts by the attorneys or by anyone (such as private investigation firms) acting at the attorneys' directions, and stating that all information or evidence gathered as a result of the improper contacts with Plaintiffs' employees and former employees is deemed inadmissible. *See* Dkt. Nos. 245 & 251.

Second, Plaintiffs seek sanctions in the form of an adverse inference jury instruction based on Defendant Anthony Trombetta's destruction of emails shortly before he terminated his employment with Plaintiffs and began working for BP. *See* Dkt. No. 240.

Third, in an omnibus motion, Plaintiffs seek sanctions for false deposition testimony by Mr. Trombetta and BP corporate representative Jeff Perlman; for Mr. Myers's preparing documents that contain false information, which Mr. Perlman used at his deposition; for providing to the Court affidavits by Ms. Liser and Mr. Myers that contained false statements; for Defendants' violating the Court's prior discovery order, the July 15, 2015 Order on Pending Discovery Motions [Dkt. No. 170]; for Defendants' violating the Agreed Temporary Restraining Orders and Agreed Temporary Injunction;

3

and for several "other obstreperous acts." Plaintiffs seek $100,000 in monetary sanctions plus expenses and an order allowing a third-party vendor to forensically locate, capture, and copy electronically stored information from both BP and from Mr. Trombetta's personal Hotmail account. Plaintiffs also ask the Court to hold Defendants in civil contempt for violations of the Agreed Temporary Restraining Orders and the Agreed Temporary Injunction. *See* Dkt. No. 232.

Fourth, Plaintiffs move to compel document production from Defendants in response to Plaintiffs' most recently served requests for production and seek sanctions for Defendants' failure to provide responsive documents and complete responses, including not only attorneys' fees and expenses but also a "significant monetary sanction meant to stop further discovery abuse by Defendants" and "a jury instruction advising the jury that the Court was forced to intervene and order Defendants to respond to discovery and produce documents." Plaintiffs assert that Defendants failed to produce any documents in response to their most recently served requests, that Defendants' responses consist of boilerplate objections, and that Defendants' responses violate the Court's July 15, 2015 Order on Pending Discovery Motions [Dkt. No. 170]. *See* Dkt. No. 281.

## Legal Standards and Analysis

### I.  Emergency Motion for Sanctions and Request for Order

Plaintiffs seek sanctions against Defendants and their counsel, Sandra Liser, for hiring a private investigation firm to contact Plaintiffs' current and former employees to attempt to obtain confidential and privileged information from those

4

employees after being informed that Plaintiffs' counsel represented former employees and despite an agreement not to contact them. *See* Dkt. Nos. 245 & 251. Plaintiffs contend that Ms. Liser's conduct was unethical and violated the rules of professional responsibility.

A.    Legal Standards

Case law in the Fifth Circuit addressing an attorney's alleged violations of rules of professional responsibility typically arises in the context of motions to disqualify counsel or disciplinary proceedings for attorney misconduct. *See, e.g.*, *In re Am. Airlines, Inc.*, 972 F.2d 605 (5th Cir. 1992); N.D. TEX. L. CIV. R. 83.8(e) (defining "Unethical Behavior" as "conduct undertaken in or related to a civil action in this court that violates the Texas Disciplinary Rules of Professional Conduct" for purposes of attorney discipline).

For the reasons discussed below, the Court will not analyze Plaintiffs' request for sanctions under the rubric of a violation of a rule of professional responsibility but rather as an allegation of conduct in the course of this litigation that is sanctionable under the Court's inherent power.

"A district court has the inherent authority to impose sanctions in order to control the litigation before it." *Positive Software Solutions, Inc. v. New Century Mortg. Corp.*, 619 F.3d 458, 460 (5th Cir. 2010) (internal quotation marks omitted). This includes "the power to levy sanctions in response to abusive litigation practices." *In re Stone*, 986 F.2d 898, 902 (5th Cir. 1993). Accordingly, "[a] district court has inherent power to sanction attorneys for bad faith conduct in litigation." *Crowe v. Smith*, 261

F.3d 558, 563 (5th Cir. 2001).

But these inherent powers "ought to be exercised with great caution" and are reserved for "conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 44-45 (1991) (internal quotation marks omitted). "The threshold for the use of the inherent power sanction is high." *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 86 F.3d 464, 467 (5th Cir. 1996).

Although "the inherent power extends to a full range of litigation abuses," the United States Supreme Court has cautioned that, "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44, 46. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44-45.

"A court may assess attorney's fees under its inherent powers when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons" but "must make a specific finding that the sanctioned party acted in bad faith in order to impose such sanctions." *Matta v. May*, 118 F.3d 410, 416 (5th Cir. 1997). And any sanctions ordered should be "the least severe sanctions adequate to accomplish the purpose for which the sanction was imposed." *Topalian v. Ehrman*, 3 F.3d 931, 938 (5th Cir. 1993); *accord Toon v. Wackenhut Corr. Corp.*, 250 F.3d 950, 952-53 (5th Cir. 2001).

B.     Analysis

The evidence before the Court shows that, on August 10 and 16, 2015, Ms. Liser contacted Plaintiffs' counsel about requested depositions, including the deposition of Janey Brown, and, after being informed that Ms. Brown is no longer an employee,

asked, "[s]ince Ms. Brown no longer works for Orchestrate, may I contact her directly to schedule her deposition?" Dkt. No. 246 at 13-14. Plaintiffs' counsel responded that "[a]ll contact with Ms. Brown will need to be through my office. As I am sure you know, the privilege extends to her communications while she worked for Orchestrate, even though she no longer works there." *Id.* at 12. Ms. Liser responded: "I will not call Ms. Brown." *Id.*

On January 26, 2016, Plaintiffs' counsel notified Ms. Liser that "we are going to need to take the deposition of Beth Andrews. It is my understanding she is no longer an employee of BP. May I reach out to her directly, or will you be representing her?" Dkt. No. 246 at 9. Ms. Liser responded that "I will be representing her and will contact her about a deposition." *Id.*

On January 26, 2016, Mouzon Bass III, President of OrchestrateHR, Inc., testified in his deposition that OrchestrateHR, Inc. owns Employers Direct Health, Inc. and that Employers Direct Health, Inc. is a subsidiary of OrchestrateHR, Inc. *See* Dkt. No. 269 at 4, 6. Ms. Liser represented Defendants at the deposition. *See id.* at 6.

At approximately 7:45 p.m. on February 3, 2016, Sabrina Hooten was contacted via telephone at her home by Darryl D. Joy of M&M Investigations. In response to Ms. Hooten's questions, Mr. Joy stated that he had been hired by Defendants' counsel. *See* Dkt. No. 246 at 4; Dkt. No. 259 at 17-18 (Affidavit of Darrel D. Joy). In an affidavit, Mr. Joy testified that "I informed Ms. Hooten I understood she used to be employed by OrchestrateHR. Ms. Hooten informed me she was still employed by Orchestrate HR." Dkt. No. 259 at 18. Ms. Hooten told Mr. Joy that she would not speak to him and then

notified Mr. Bass, who notified his counsel. *See* Dkt. No. 246 at 4.

At 8:38 p.m., Plaintiffs' counsel contacted Mr. Joy by telephone, who confirmed that he had been engaged to contact Plaintiffs' employees by the law firm of Naman Howell Smith & Lee, PLLC and, specifically, by Sandra Liser. Plaintiffs' counsel advised Mr. Joy that Plaintiffs' employees were represented by counsel and should not be contacted directly. Plaintiffs' counsel also asked Mr. Joy which other employees he had been hired to contact, but Mr. Joy stated that he would not give that information and hung up the phone. *See id.*

Plaintiffs' counsel then sent an email to four attorneys representing Defendants in this case, advising them to immediately cease and desist from contacting Plaintiffs' employees and demanding that they contact Mr. Joy and any other persons retained by them to contact Plaintiffs' employees and advise them to stop immediately. *See id.* at 4, 6. Plaintiffs' counsel also requested copies of any emails from Defendants' counsel to Mr. Joy or his company. *See id.* And Plaintiffs' counsel emailed Mr. Joy and advised him to immediately stop contacting Plaintiffs' employees. *See id.* at 6.

On February 4, 2016, Ms. Liser responded that she asked Mr. Joy to contact Ms. Hooten after being informed that Ms. Hooten was not employed by OrchestrateHR, Inc. or Vivature, Inc. She also stated that Mr. Joy contacted Ms. Liser after he located and contacted Ms. Hooten and informed Ms. Liser that he immediately terminated his conversation with Ms. Hooten when Ms. Hooten advised him that she was still employed by OrchestrateHR. *See* Dkt. No. 252 at 7.

Ms. Liser then sought confirmation of the name of Ms. Hooten's current

employer. *See id.* Plaintiffs' counsel responded that "Ms. Hooten is an employee of my clients. I am not certain which entity she receives her actual check from. Regardless of whose name is on the check, I am advised that she is my clients Comptroller. As you know, my clients maintain several wholly owned subsidiaries from which they share employees." Dkt. No. 252 at 14. Plaintiffs' counsel also informed Ms. Liser that he would be the contact person for scheduling Mr. Hooten's deposition. *See id.* at 20.

In subsequent emails on February 4, 2016, Defendants' counsel would not agree to stop attempting to contact Ms. Hooten unless Plaintiffs' counsel confirmed that Ms. Hooten was employed by a 100% owned subsidiary of Plaintiffs. *See id.* at 10-12.

That same day, Plaintiffs filed an Emergency Motion for Sanctions and Request for Order, *see* Dkt. No. 245, and Plaintiffs then filed a supplement to the motion on February 5, 2016, *see* Dkt. No. 251. Defendants filed a response, *see* Dkt. No. 258, Plaintiffs filed a reply, *see* Dkt. No. 265, and the Court set the motion for hearing on February 18, 2016, *see* Dkt. No. 253.

Immediately before the February 18, 2016 hearing started, Defendants' counsel handed Plaintiffs' counsel documents in response to his request for all documents sent to Mr. Joy or his investigative firm. *See* Dkt. No. 285 at 4-5, 8. Included in those documents is a January 13, 2016 email from Ms. Liser to Mr. Joy providing the names of two former employees of OrchestrateHR – Janey Brown and Chrystal Blackshear. Ms. Liser also provided Mr. Joy with Ms. Brown's residential address and the name of Ms. Blackshear's current employer. Ms. Liser instructed Mr. Joy to "confirm you have located them," and, after Mr. Joy informed Ms. Liser that he had "found both," Ms.

Liser emailed Mr. Joy on January 15, 2016, explaining that "I have attached my proposed list of questions for Ms. Brown and Ms. Blackshear." Ms. Liser further instructed Mr. Joy: "Assuming the witness is not represented, please ask if they would be willing to talk to me."

The list of questions begins with the following:

**Advise them that you are working for clients that have been sued by Orchestrate HR and Vivature. Tell them the name of the clients are Borden Perlman Insurance Agency, Tony Trombetta, Dave Icenhower and Kelly Myers.**

Q:   Have you spoken to an attorney about this case?

Q:   Are you represented by an attorney in connection with anything related to Orchestrate or Vivature?

Q:   Have you ever spoken to Jose Portela or Blake Beckham (attorneys representing Orchestrate)?

Q:   Have you retained them as your attorneys?

**IF SO, WHAT IS THE NAME OF THE ATTORNEY SO WE CAN DIRECT ANY FURTHER INQUIRY TO THE ATTORNEY REPRESENTING YOU AND ADVISE THEM THAT YOU CANNOT ASK THEM ANY FURTHER QUESTIONS.**

If they tell you they are not represented by an attorney, ask them the following:

Q:   Have any attorneys contacted you to discuss your employment with Orchestrate?

Q:   If so:
   Who has contacted you?
   How did they contact you? In writing? By phone? In person? Any other contact?
   How many times they you [sic] communicate with them?
What did they tell you?
What did you tell them?

Any follow-up communication with them?

Q:    Has anyone contacted you on behalf of Orchestrate or Vivature?

Q:    If so:
       Who has contacted you?
       How did they contact you? In writing? By phone? In person? Any
       other contact?
       How many times they you [sic] communicate with them?
       What did they tell you?
       What did you tell them?
       Any follow-up communication with them?

Q:    How long did you work for Orchestrate[?]

Dkt. No. 278 at 7-20. The list of questions also seeks information about Muzzy Bass,

Lance Wilson, Mr. Trombetta, Mr. Icenhower, BP, and other claims or lawsuits.

Plaintiffs assert that Ms. Liser's contact with Ms. Hooten through the

investigator violated Texas Disciplinary Rule of Professional Conduct 4.02. According

to Plaintiffs, Ms. Hooten is the Comptroller of both OrchestrateHR, Inc. and Vivature,

Inc., receives the unredacted invoices for the bills in this case, is in direct receipt of

attorney-client privileged information, and, as a result of her position with Plaintiffs,

has received additional privileged information and has knowledge of significant

confidential information. *See* Dkt. No. 245 at 3; Dkt. No. 269 at 8-9 (Affidavit of

Mouzon Bass, III).

Defendants respond that Ms. Hooten is employed by Employers Direct Health,

Inc. and that, despite several requests, Plaintiffs' attorneys have failed to confirm that

Employers Direct Health, Inc. is a 100% owned subsidiary of Plaintiffs. During the

February 18, 2016 hearing, Defendants also argued that there was no violation of

11

Texas Disciplinary Rule of Professional Conduct 4.02 because Mr. Joy only asked Ms.

Hooten if she was represented by counsel and did not ask her anything about this case.

This is not an attorney disciplinary proceeding, and the Court concludes there

is no basis to impose sanctions based on whether there has been a violation of Texas

Disciplinary Rule of Professional Conduct 4.02 or ABA Model Rule of Professional

Conduct 4.2. Rule 4.02(a) of the Texas Disciplinary Rules of Professional Conduct,

titled "Communication with One Represented by Counsel," provides:

> In representing a client, a lawyer shall not communicate or cause or
> encourage another to communicate about the subject of the
> representation with a person, organization or entity of government the
> lawyer knows to be represented by another lawyer regarding that subject,
> unless the lawyer has the consent of the other lawyer or is authorized by
> law to do to so.

TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 4.02(a) ("Texas Rule 4.02"), *reprinted in*

Tex. Gov't Code Ann., tit. 2, subtit. G, app. A (West 2005) (Tex. State Bar R. art. 10, §9,

Rule 4.02(a)). The parallel rule in the ABA Model Rules of Professional Conduct

contains substantially similar provisions:

> In representing a client, a lawyer shall not communicate about the
> subject of the representation with a person the lawyer knows to be
> represented by another lawyer in the matter, unless the lawyer has the
> consent of the other lawyer or is authorized to do so by law or a court
> order.

MODEL RULES OF PROF'L CONDUCT R. 4.2 (2015) ("Model Rule 4.2").

The Court notes that both rules have been interpreted not to cover former

employees. *See, e.g.*, *In re RSR Corp.*, 475 S.W.3d 775, 781 (Tex. 2015) ("Even the Texas

Disciplinary Rules of Professional Conduct allow an attorney to contact the former

12

employees of the opposing party."); *United States Equal Employment Opportunity Comm'n v. Placer ARC*, ___ F. Supp. 3d ____, No. 2:13-CV-0577-KJM-EFB, 2015 WL 7571535, at *9 (E.D. Cal. Nov. 25, 2015) (explaining that the majority of court decisions dealing with efforts to interview a corporate party's former employees ex parte have held that Model Rule 4.2 does not prohibit such contacts and that the same is true when an attorney interviews former members of management). And there is no evidence that the investigator actually communicated with Ms. Hooten about the subject of her representation by Plaintiffs' counsel in this action.

Accordingly, it is not clear, on this record, that Defendants' counsel actually violated the so-called non-contact rule in connection with Ms. Wooten, Ms. Brown, or Ms. Blackshear. *See generally United States v. Villanueva-Diaz*, 634 F.3d 844, 851 (5th Cir. 2011) (noting that "[t]he rule that contact with a represented party should be through his lawyer is so well established in American jurisprudence that attorneys are generally prohibited by ethical rules from contact with the opposing party if represented by counsel" (citing MODEL RULES OF PROF'L CONDUCT R. 4.2 (2002); TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 4.02(a) (2002)).

But the Court concludes that that is not properly the issue here. Nor is the issue whether Ms. Hooten was employed by OrchestrateHR or its subsidiary.

Instead, the issue is whether Ms. Liser, as Defendants' counsel, engaged in conduct that is sanctionable under the Court's inherent powers as a violation of the standards set by this Court for attorneys' conduct in litigation before it. And the Court determines that she has.

The evidence establishes that Ms. Liser had previously communicated with Plaintiffs' counsel concerning the legal representation and scheduling of depositions of current or former employees. Under this practice, Ms. Liser had been informed on at least one occasion that Plaintiffs' counsel represented one of Plaintiffs' former employee, and Ms. Liser specifically stated that she would not contact that former employee – Ms. Brown. But then she did just that and retained and directed a private investigator to contact Ms. Brown, inquire whether she was represented, and, if Ms. Brown did not report that she was represented, ask her questions concerning this case.

The Court notes that Ms. Liser's co-counsel explained during the hearing that, when he discovered that there was an attempt to contact Ms. Brown, knowing that there was the previous email between Plaintiffs' counsel and Ms. Liser discussed above, he instructed that it stop. *See* Dkt. No. 285 at 14-16. And he explained that this is why Ms. Liser advised Mr. Joy on January 19, 2016: "Please do not contact [Ms.] Brown until you hear otherwise from me." Dkt. No. 278 at 6.

And, at the hearing, Defendants' counsel represented to the Court that Defendants, through their counsel, will not contact any known or perceived current or former employees of Plaintiffs or their subsidiaries without having first contacted Plaintiffs' counsel. *See* Dkt. No. 285 at 17-18, 23.

The Court finds that Ms. Liser, as Defendants' counsel, engaged in bad-faith litigation conduct when she instructed a private investigator to contact Janey Brown despite having expressly told Plaintiffs' counsel that she would not contact Ms. Brown after Plaintiffs' counsel told Ms. Liser that "[a]ll contact with Ms. Brown will need to

14

be through my office. As I am sure you know, the privilege extends to her communications while she worked for Orchestrate, even though she no longer works there." Dkt. No. 246 at 12. Notably, whatever Texas Rule 4.02 or Model Rule 4.2 may permit generally as to former employees, the rules prohibit contact with a person known to be represented by another lawyer in the matter – and Plaintiffs' counsel previously informed Ms. Liser that Ms. Brown would be represented in this matter.

The Court finds that Ms. Liser has acted in a manner that abused the judicial process and the standards expected of attorneys "as members of a learned profession whose unswerving duty is to the public they serve and to the system of justice in which they practice." *Dondi Properties Corp. v. Commerce Sav. & Loan Ass'n*, 121 F.R.D. 284, 288 (N.D. Tex. 1988). That Ms. Liser's co-counsel stopped her from going through with having Mr. Joy contact Ms. Brown does not resolve the matter from the Court's perspective, nor does Ms. Liser's instructing Mr. Joy to ask Ms. Brown about a matter (whether she was represented in connection with this case) that Plaintiffs' counsel had already confirmed.

This Court has adopted "standards to which we expect litigation counsel to adhere." *Id.* at 287. These include that "[a] lawyer owes, to opposing counsel, a duty of courtesy and cooperation, the observance of which is necessary for the efficient administration of our system of justice and the respect of the public it serves"; that "[a] lawyer unquestionably owes, to the administration of justice, the fundamental duties of personal dignity and professional integrity"; and that "[l]awyers should treat each other, the opposing party, the court, and members of the court staff with courtesy and

civility and conduct themselves in a professional manner at all times." *Id.* at 287-88. The en banc Court in *Dondi* explained that "the standards we now adopt ... are appropriately established to signal our strong disapproval of practices that have no place in our system of justice and to emphasize that a lawyer's conduct, both with respect to the court and to other lawyers, should at all times be characterized by honesty and fair play." *Id.* at 288-89.

Ms. Liser's conduct falls below these standards to the level of bad-faith abuse of the judicial process and warrants "an appropriate response from the court." *Id.* at 288.

Plaintiffs request the following relief:

A.   "An order prohibiting Defendants, Defendants' counsel, or anyone acting at their direction or in concert with them from contacting any current or former employees of Plaintiffs. Any such contact should be coordinated through Plaintiffs' Counsel and done pursuant to the discovery process contained in the Fed. R. Civ. P. Given that Defendants and their counsel have already violated this Court's orders, this order should also provide for specific sanctions against Defendants and their counsel for any future breach of the order."

B.   "An order requiring Defendants' counsel to provide a detailed summary of all of their contact, or contacts made by anyone at their direction such as M&M Investigation, with Plaintiffs' employees or former employees since this suit was filed on May 31, 2013. This summary should include the time, date, method of contact, who made the contact, who was contacted, and other information identifying the nature and contents of the contact."

C.   "An order stating that any information or evidence gathered as a result of the contacts described in (b) above be deemed inadmissible."

D.   "An order requiring Defendants' counsel to produce copies of their communications with M&M Investigation or Mr. Joy individually."

E.   "Monetary sanctions against Defendants and their counsel in the amount of no less than $50,000."

F.   "Expense sanctions against Defendants and their counsel in the amount of no

less than $5,000."

Dkt. No. 245 at 5-6.

The Court determines that most of these requested sanctions do not fit the sanctionable conduct that the Court has found and are not the least severe sanctions adequate to accomplish the purpose for which a sanction will be imposed.

But the Court determines that, whatever the requirements imposed by Model Rule 4.2 or Texas Rule 4.02, under the circumstances here, an appropriate sanction is to prohibit Defendants, Defendants' counsel, or anyone acting at their direction or in concert with them from contacting any current or former employees of Plaintiffs or their subsidiaries without first coordinating that contact through Plaintiffs' counsel. The Court additionally orders Defendants' counsel to produce to Plaintiffs' counsel – to the extent they have not already completely done so – a copy of any communications by Defendants' counsel with M&M Investigations or Mr. Joy individually in connection with this case. Further, the Court orders Defendants' counsel to pay the attorneys' fees that Plaintiffs incurred in briefing their Emergency Motion for Sanctions [Dkt. No. 245], including the supplement to that motion and reply in support of it, and in preparing for and participating in the hearing of that motion. This is, collectively, narrowly tailored as a just and appropriate sanction to address the conduct at issue.

Northern District of Texas Local Civil Rule 7.1 requires that parties confer before filing an application for attorneys' fees. Plaintiffs' counsel and Defendants' counsel are therefore directed to meet face-to-face and confer about the reasonable amount of these attorneys' fees to be awarded. This face-to-face requirement is not

17

satisfied by a telephonic conference. Any attorney refusing to appear for this meeting or to confer as directed will be subject to sanctions.

By no later than **May 2, 2016**, the parties must file a joint status report notifying the Court of the results of the conference. If all disputed issues as to the amount of attorneys' fees to be awarded to Plaintiffs have been resolved, Plaintiffs' counsel must also send an agreed proposed order to the Court at Horan_Orders@txnd.uscourts.gov by **May 2, 2016**.

If the parties do not reach an agreement as to the amount of attorneys' fees to be awarded to Plaintiffs, Plaintiffs must, by no later than **May 6, 2016**, file an application for attorneys' fees that is accompanied by supporting evidence establishing the amount of the reasonable attorneys' fees and costs (as described above) to be awarded. The fee application must be supported by documentation evidencing the "lodestar" calculation, including affidavits and detailed billing records, and citations to relevant authorities and shall set forth the itemized number of hours expended in connection with the recoverable attorneys' fees described above as well as the reasonable rate(s) requested.

If an application is filed, Defendants may file a response by **May 27, 2016**, and Plaintiffs may file a reply by **June 10, 2016**.

Plaintiffs' Emergency Motion for Sanctions [Dkt. Nos. 245 & 251] is GRANTED for the reasons and to the extent explained above.

II.     Motion for Sanctions Against Anthony L. Trombetta for Spoliation of Evidence

Plaintiffs seek sanctions against Mr. Trombetta for spoliation of evidence.

"Spoliation of evidence 'is the destruction or the significant and meaningful alteration of evidence.'" *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (quoting *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co.*, 73 F.3d 546, 569 (5th Cir. 1996)). Plaintiffs contend that Mr. Trombetta spoliated critical evidence in this case by deleting emails that would have been unfavorable to him in this lawsuit when he knew he was about to resign from Orchestrate and begin employment with BP, and Plaintiffs seek an adverse inference jury instruction as a sanction. *See* Dkt. No. 240. Specifically, Plaintiffs request that the jury be instructed that (1) Mr. Trombetta "intentionally spoliated evidence in order to conceal evidence that was unfavorable to him and would have shown that Trombetta breached his contracts with Plaintiffs"; (2) Mr. Trombetta "intentionally spoliated evidence in order to conceal evidence that was unfavorable to him and would have shown that Trombetta was conspiring with Defendants"; and (3) Mr. Trombetta's "intentional destruction of emails indicates that introduction of those emails would have been unfavorable to Trombetta's case." *Id.* at 15.

Defendants filed a response, *see* Dkt. No. 260, and Plaintiffs filed a reply, *see* Dkt. No. 267.

A.     Legal Standards

"Under the spoliation doctrine, a jury may draw an adverse inference 'that a party who intentionally destroys important evidence in bad faith did so because the contents of those documents were unfavorable to that party.'" *Whitt v. Stephens County*, 529 F.3d 278, 284 (5th Cir. 2008) (quoting *Russell v. Univ. of Tex.*, 234 F. App'x

195, 207 (5th Cir. 2007)). The United States Court of Appeals for the Fifth Circuit "permits an adverse inference against the spoliator or sanctions against the spoliator only upon a showing of 'bad faith' or 'bad conduct.'" *Guzman*, 807 F.3d at 713 (quoting *Condrey v. SunTrust Bank of Ga.*, 431 F.3d 191, 203 (5th Cir. 2005)). "A party's duty to preserve evidence comes into being when the party has notice that the evidence is relevant to the litigation or should have known that the evidence might be relevant." *Id.* (citing *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 615-16 (S.D. Tex. 2010)). "Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence." *Id.* (citing *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir. 1998)).

Spoliation of evidence is among the range of conduct for which a court may assess sanctions using its inherent powers. *See Hodge v. Wal-Mart Stores*, Inc., 360 F.3d 446, 449 (4th Cir. 2004) ("The imposition of a sanction ... for spoliation of evidence is an inherent power of federal courts."); *accord Union Pump Co. v. Centrifugal Technology Inc.*, 404 F. App'x 899, 905 (5th Cir. 2010). But the conduct at issue in this motion is covered by Federal Rule of Civil Procedure 37 as amended effective December 1, 2015, to provide sanctions against a party for the failure to preserve electronically stored information. *See* FED. R. CIV. P. 37(e) ("If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court: (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to

cure the prejudice; or (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may: (A) presume that the lost information was unfavorable to the party; (B) instruct the jury that it may or must presume the information was unfavorable to the party; or (C) dismiss the action or enter a default judgment.").

Under 28 U.S.C. § 2074(a) and an order of the United States Supreme Court, Rule 37(e) as amended governs all civil cases commenced after December 1, 2015 and, "insofar as just and practicable, all proceedings then pending." http://www.supremecourt.gov/orders/courtorders/frcv15(update)_1823.pdf. The Court finds that applying the standards of Rule 37(e) as amended to Plaintiffs' motion is both just and practicable. Accordingly, insofar as Plaintiffs seek as a sanction for the Court to "instruct the jury that it may or must presume the information was unfavorable to" Mr. Trombetta, Plaintiffs' must show, and the Court must find, "that the party acted with the intent to deprive another party of the information's use in the litigation." FED. R. CIV. P. 37(e).

B.    Analysis

Mr. Trombetta was deposed on September 16, 2013. *See* Dkt. No. 241 at 4. During the deposition, Mr. Trombetta testified that he deleted emails shortly before he resigned from Orchestrate:

Q:    And then you showed your guilt by deleting the e-mails, or thinking you had covered your tracks, you went back and deleted this so we couldn't catch you, right?

A:    I may have.

Q:      Oh, answer it truthfully. You know for a fact you deleted massive amounts of e-mails, so admit it.

A:      I may have.

Q:      No. Tell the truth unequivocally to this judge: I went back and deleted stuff to cover my tracks, right?

A:      I may have deleted stuff.

Q:      No, no. Unequivocally, admit it.
        ...

Q:      You intentionally deleted e-mails to cover you tracks on the way out the door, correct?

A:       On some of them, I may have.

*Id.* at 6 (p. 124, L. 1-13, 16-19).

Q:      So, sir, did you delete e-mail off of the Orchestrate e-mail server to cover your tracks? Yes, no, or I don't remember?

A:      I don't remember off the – off the server.

Q:      Did you delete them somewhere else that you do remember?

A:      I deleted some e-mails.

*Id.* at 7 (p. 125, L. 7-13).

Mr. Trombetta also testified that he anticipated litigation when he resigned from

Orchestrate and when he deleted the emails at issue:

Q:      For example, one thing that you – that resignation letter, you practiced it, you did a bunch of drafts of it and you were trying to set up defenses for a potential lawsuit, right?

A:      No.

Q:      You didn't practice it?

22

> A:    No.
>
> Q:    You didn't have several drafts of it?
>
> A:    I had different drafts.

*Id.* at 10 (p. 143, L. 8-16).

> Q:    All right. Okay. So back on your resignation. You certainly were concerned that your new career path might – might, not would – might cause you to get sued?
>
> A:    I may have thought that.
>
> ...
>
> Q:    Okay. So when you were consider – you were considering that as you went through the multiple drafts of your resignation letter, correct?
>
> A:    Yes.

*Id.* at 11 (p. 147, L. 8-11, 14-16).

> Q:    Okay. So let's put it this way. While you were doing the multiple drafts of your e-mail, you knew you might get sued. Can we at least agree on that?
>
> A:    I – I might have been sued.

*Id.* at 13 (p. 179, L. 19-22).

In response to the spoliation motion, Mr. Trombetta submitted a declaration [Dkt. No. 260-1 at 4-7] in which he states that it was his understanding that Orchestrate used a secure server to backup all emails; that he had no access to the server; and that, if the emails were backed up, he would have been incapable of deleting them from the server. Mr. Trombetta also states that Orchestrate's IT

department could access his email account both during and after his employment and that, after he resigned from Orchestrate, his emails were forwarded to Lance Wilson.

Mr. Trombetta also states that, while working for Orchestrate, during the normal court of business, he deleted emails on a regular basis unless there was a specific business reason to keep them. He asserts that "I did not know or anticipate that any of the e-mails I deleted within the normal course of my work for Orchestrate would be used in a lawsuit against me or anyone else." He also states that emails that he deleted in the normal course of his work for Orchestrate would have related solely to his work at Orchestrate and would not have discussed his resignation from Orchestrate or his work for BP.

In his Declaration, Mr. Trombetta states that, during approximately the seven days before he left his job at Orchestrate, he forwarded approximately ten to fifteen emails from his Orchestrate work email account to a private Hotmail email account owned by him. According to Mr. Trombetta, during this litigation, either he or someone working with or on behalf of attorneys representing Mr. Trombetta or BP retrieved all of those emails, and it is his understanding that they have been produced to Plaintiffs. Mr. Trombetta further states that, after forwarding these emails to his private Hotmail email account, he may have deleted these emails from the "sent" and "deleted items" folders in his Orchestrate work email account but that he has no specific recollection of deleting those emails from either the "sent" or "deleted items" folders.

Mr. Trombetta also states that, after he left his job at Orchestrate on April 8, 2013, he no longer had access to his Orchestrate work email account but that

24

Orchestrate and its employees did. As a result of his lack of access, Mr. Trombetta is unable to verify whether the ten to fifteen emails that he forwarded from his Orchestrate work email account to his private Hotmail email account were removed from either the "sent" or "deleted items" folders. Mr. Trombetta asserts that he does not know what happened to his email account after he left Orchestrate, who had access to the account, or how it was handled after April 8, 2013. Mr. Trombetta also states that Orchestrate would have been the only entity with access to his Orchestrate email account after April 8, 2013.

In his declaration, Mr. Trombetta also states that he never removed or deleted an email from Orchestrate's servers. And, other than the emails deleted in the regular course of his work for Orchestrate and the ten to fifteen emails that he forwarded from his Orchestrate email account to his private Hotmail account, Mr. Trombetta is not aware of and has no specific recollection of any other email that has ever been deleted or removed from any folder in his Orchestrate email account.

In reply, Plaintiffs submitted the Affidavit of Murugesan Jambukesan. *See* [Dkt. No. 268 at 6-8]. Mr. Jambukesan is the Chief Information Officer of Plaintiff Vivature, Inc., and his duties include oversight of Vivature's data center, network security, and email servers. As part of his duties, Mr. Jambukesan is familiar with Vivature's email system and backup policy. Mr. Jambukesan understands that Defendants are claiming that Plaintiffs failed to explain why Mr. Trombetta's deleted emails are not retrievable from Plaintiffs' backup servers and are questioning whether any attempt was made to retrieve Mr. Trombetta's deleted emails.

25

In his affidavit, Mr. Jambukesan states that he participated in the unsuccessful attempt to recover Mr. Trombetta's emails from the backup servers and explains some reasons why the attempt was unsuccessful. Mr. Jambukesan explains that Vivature's servers automatically back up emails starting at 7:00 p.m. every night. If an email, either sent or received, is deleted from a user's account before the next backup runs the following day at 7:00 p.m., the email will not be retained on the server or on a backup and will be lost forever. Mr. Jambukesan also explains that, when the backup runs, emails are backed up to tapes. When the backup is complete, the backup tape is overwrite protected for five days. After five days, the tape is eligible to be overwritten by a new backup. At any given point in time, Vivature has the ability to access backup copies from the previous five days.

In his affidavit, Mr. Jambukesan also states that Vivature preserves a monthly backup tape at the first of every month, for twelve months. The monthly backup shows a snapshot of a user's email account when the backup was run. This monthly backup only contains the email folders and emails that are present on the day of the backup. Because Mr. Jambukesan was not alerted to the possibility that Mr. Trombetta had deleted emails until May 2013, the backups that Vivature had at that time would not have captured emails deleted in March 2013.

Attached to Mr. Jambukesan's affidavit are an email from Mr. Trombetta's email dated March 21, 2013 from his Vivature account to his Hotmail account that was produced by Mr. Trombetta in this case, *see id.* at 10-21 (Bates Stamped TROMBETTA_ORCHESTRATE 0000035-0000046), and a screen shot from the

monthly backup kept after March 2013 that shows what Mr. Trombetta left undeleted from his sent box, *see id.* at 9. The email is not listed in the screen shot. According to Mr. Jambukesan, "[t]his confirms that Trombetta did delete emails, including emails which he sent to his Hotmail account, which Plaintiffs have no record of and are not able to recover. Despite our backup systems, these emails are irretrievable by Plaintiffs' system no matter what further efforts are made by Plaintiffs." *Id.* at 8.

The evidence establishes that Mr. Trombetta was aware of potential litigation at the time that he deleted the emails and that he knew or should have known that emails on certain subjects, such as his leaving Orchestrate to go work for BP, might be relevant to the litigation. And it appears that the deleted emails may, at least in part, have been relevant, as demonstrated by the email attached to Mr. Jambukesan's affidavit. The deleted email, a sales status report update by Mr. Trombetta, discusses, in part, the "change in relationship" between BP and Cleveland State, which could be relevant to Mr. Trombetta's alleged attempts to divert business from Orchestrate to BP. *See* Dkt. No. 268 at 7-21.

But it is less clear whether Mr. Trombetta acted in bad faith or with the intent to deprive another party of the information's use in the litigation because there is only equivocal evidence about his state of mind at the time that he deleted the emails. In his deposition, Mr. Trombetta admitted that he deleted emails and that he "may" have done so to "cover his tracks." In his declaration, however, he states that he deleted emails in the ordinary course of business only, and, even though he admits that he forwarded some emails to his personal Hotmail account, he testifies that those emails

27

have been produced to Plaintiffs in this litigation.

Considering the totality of the circumstances concerning Mr. Trombetta's deletion of emails on the eve of his departure from Orchestrate, including Mr. Trombetta's conflicting and (even considering only his deposition) equivocal testimony on the issue, the Court finds that Plaintiffs have failed to show that Mr. Trombetta destroyed any emails in bad faith or with the requisite intent to deprive Plaintiffs of the use of them in this litigation. Even though the evidence is troubling – Mr. Trombetta gave evasive answers at his deposition, only to provide more definite statements in a later-created declaration – because the supporting evidence of intent or bad faith is not sufficient, the Court concludes that sanctions should not, as Plaintiffs request, be imposed.

Plaintiffs' Motion for Sanctions Against Anthony L. Trombetta for Spoliation of Evidence [Dkt. No. 240] is DENIED.

III.   <u>Motion for Sanctions Against All Defendants</u>

Plaintiffs filed an omnibus motion in which they seek sanctions against Defendants for providing false deposition testimony and exhibits, providing false affidavits, violating the Court's Order on Pending Discovery Motions [Dkt. No. 170], violating agreed temporary restraining orders and an agreed temporary injunction, and "other obstreperous acts." *See* Dkt. No. 232.

Plaintiffs seek a monetary sanction of at least $100,000, plus at least $25,000 for fees and costs incurred by Plaintiffs "in having to deal with the sanctionable conduct described" in this motion, and additional monetary sanctions for fees and costs

related to the motion. Plaintiffs also seek an order for the parties to select a mutually agreeable third-party electronic discovery vendor to forensically locate, capture, and copy electronically stored information from BP and from Mr. Trombetta's personal Hotmail account. And Plaintiffs ask the Court to hold Defendants in civil contempt for violating the agreed temporary injunction and agreed temporary restraining orders.

Defendants filed a response to the motion, *see* Dkt. No. 257, and Plaintiffs filed a reply, *see* Dkt. No. 262.

For the reasons and to the extent explained below, the Court GRANTS in part and DENIES in part the Motion for Sanctions Against All Defendants [Dkt. No. 232].

A.    <u>False deposition testimony and exhibits</u>

Plaintiffs seek sanctions based on Mr. Trombetta's admissions concerning false deposition testimony and false evidence prepared for and used during depositions. Plaintiffs deposed Mr. Trombetta for the second time on January 6, 2016. During the deposition, Mr. Trombetta admitted that he had provided false testimony in the course of this second deposition and that BP's designated corporate representative Jeff Perlman provided false testimony during a court-ordered Federal Rule of Civil Procedure 30(b)(6) deposition and that Mr. Myers provided false documents to be used during the depositions.

1.    Legal Standards

As explained above, courts have inherent powers to sanction litigants for a full range of litigation abuses. *See Chambers*, 501 U.S. at 44, 46. And Federal Rule of Civil Procedure 37(b)(2), which authorizes sanctions for violation of a court's discovery order,

may also provide a basis for imposing sanctions against a litigant who gives false testimony at a deposition, despite the absence of a court order. *See McLeod, Alexander, Powel & Apfel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990) (holding that an order is not always a prerequisite to the imposition of sanctions, and sanctions can be imposed under Federal Rule of Civil Procedure 37(b)(2) even without an existing motion to compel).

        2.    Analysis

On July 15, 2015, the Court granted Plaintiffs' Motion to Compel a Rule 30(b)(6) deposition after BP had twice produced corporate representative Kelly Myers, who was not prepared to testify and had not been prepared to testify on designated topics. *See* Dkt. No. 170. The Court ordered BP to produce a fully-prepared designated corporate representative other than Mr. Myers for deposition. BP designated Mr. Perlman as its corporate representative, and he was deposed on September 29, 2015.

Mr. Perlman relied on documents for his testimony concerning Mr. Trombetta's contacts with Plaintiffs' former clients. Those documents included Perlman Exhibit 152, which was prepared by attorney Sandra Liser, and Perlman Exhibit 178, which was prepared by Mr. Myers. Mr. Perlman had not reviewed the exhibits before the deposition and assumed that they were accurate. *See* Dkt. No. 233-1 at 76, 83.

Mr. Trombetta was subsequently deposed on January 6, 2016. Mr. Trombetta was instructed on the definition of perjury from Webster's online dictionary at the beginning of his deposition. *See* Dkt. No. 257-1 at 5-6. Specifically, Mr. Trombetta was told that perjury is "[t]he crime of telling a lie in a court of law after promising to tell

30

the truth" and "[t]he voluntary violation of an oath or a vow either by swearing to what is untrue or by omission." *Id.*

Later, after being confronted with documentary evidence (including his own emails) contradicting his testimony, Mr. Trombetta testified that he had committed perjury, as previously defined, during the deposition. *See* Dkt. No. 233-1 at 30 (p. 265, l. 1-5); 32 (p. 269, l. 2-13); 33-34 (p. 280, l. 25-p. 281, l.2); 36-37 (p. 287, l.22-p. 288, l. 1); 37-38 (p. 288, l. 22-p. 289, l. 7); 38 (p. 289, l. 16-24), 40 (p. 292, l. 1-4).

Mr. Trombetta also testified that Mr. Perlman, as BP's designated corporate representative, committed perjury during the court-ordered Rule 30(b)(6) deposition, *see id.* at 11 (p. 201, l. 14-18; 12 (p. 213, l. 16-19); 13 (p. 214, l. 12-20); 14 (p. 232, l. 4-17); 27 (p. 262, l. 20-24), 29 (p. 264, l. 17-25); 31 (p. 268, l. 23-p. 269, l. 1); 38 (p. 289, l. 25-p. 290, l. 18); 40 (p. 292, l. 16-20), and that Mr. Myers provided documents containing false statements for use in the deposition, *see id.* at 37 (p. 288, L.10-13), 38 (p. 298, L. 12-15), 39 (p. 290, L. 20-23), 40 (p. 292, l. 21-25). Mr. Trombetta originally testified that both Perlman Exhibit 152 and Perlman Exhibit 178 were accurate, but, later, after being confronted with his own controverting emails, he testified that the two exhibits contained false information and that Mr. Perlman committed perjury in his deposition in testimony based on the two exhibits. *See* Dkt. No. 233-1 at 10 (p. 209, L. 2-6), 11 (p. 210, L. 4-23), 12 (p. 214, L.9-19), 14 (p. 232, L.4-17), 27 (p. 262, L. 20-24), 31-32 (p. 268, L. 19-p. 269, L. 1), 33-34 (p. 280, L. 20-p. 281, L.5, 35 (p. 283, L. 10-12), 39 (p. 290, L. 10-18).

And Mr. Trombetta testified that both Defendants' attorney Sandra Liser filed

an affidavit with the court that contained false statements, *see id.* at 21 (p. 240, L. 2-18), 21-22 (p. 240, L. 24-p. 241, L. 9), 22-23 (p. 241, L. 22-p. 242, L. 5), and that he had violated the Agreed Temporary Restraining Order and both his written employment agreement and confidentiality agreement with Plaintiffs, *see id.* at 6 (p. 191, L. 12-17), 25-26 (p. 259, L. 15-p. 260, L. 9), 28 (p. 263, L. 3-15), 31 (p. 268, L. 7-15).

In their response to the motion for sanctions, *see* Dkt. No. 257, Defendants challenge Mr. Trombetta's admissions of perjury on the basis that the definition given to Mr. Trombetta did not include a "willful intent" element. *See United States v. Perez-Solis*, 709 F.3d 453, 469 (5th Cir. 2013) ("A witness testifying under oath or affirmation [commits perjury] if she gives [1] false testimony concerning [2] a material matter with [3] the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."). But Plaintiffs reply that they seek sanctions for false testimony, not for what legally qualifies as perjury.

Defendants also argue that there is no evidence of willfulness. They contend instead that Mr. Trombetta's admissions of false testimony were due to mistake or faulty memory. And, Defendants argue, because Mr. Perlman was relying on documents prepared by others, he did not willfully provide false testimony or do so in a manner that was intentionally deceitful and in bad faith.

Mr. Perlman's lack of independent knowledge of the facts contained in the two exhibits does not excuse the conduct of those with relevant knowledge who prepared them for his use as BP's corporate representative. Defendants respond that all of the information provided in Perlman Exhibit 178 came from Mr. Trombetta – because

32

Perlman Exhibit 178 consists of Mr. Myers's handwritten notes about what Mr. Trombetta reported during a September, 2015 conference call, after and based on which Perlman Exhibit 152 was created to provide a listing of various schools, information regarding BP's previous relationship with those schools, and information about BP's contact with those schools. Defendants contend that Mr. Trombetta is therefore the only witness who would be capable of testifying about the accuracy of the facts and statements contained in Perlman Exhibit 178, and that, according to Defendants, is precisely what he did at his deposition. Defendants assert that Perlman Exhibit 178 would only be inaccurate in a manner that would justify sanctions if Plaintiffs could show that Mr. Myers wrongly recorded the information that Mr. Trombetta told him during that conference call and did so intentionally.

Defendants also argue that Plaintiffs set traps for Mr. Trombetta by asking him questions before showing him his own emails that contradicted his answers. But, as Plaintiffs point out in reply, there would have been no "trap" if Mr. Trombetta had answered truthfully.

And Defendants argue that there was no harm because Mr. Trombetta's testimony was corrected during the deposition. Although Plaintiffs vigorously assert otherwise, that is a relevant consideration as to what, if any, sanctions may be appropriate. *See, e.g.*, *Morris v. McMaster-Carr Supply Co.*, No. 01 C 6349, 2002 WL 1290390, at *3 (N.D. Ill. June 10, 2002). But the Court also cannot ignore Mr. Trombetta's false testimony simply because Plaintiffs' counsel became aware of it and successfully confronted him during the deposition.

There is a line – perhaps at times a fine line – between a mistake or oversight that leads to inaccurate or incorrect testimony and a falsehood or intentional omission. Part of what defines that line is a matter of intent or willfulness. That is also what distinguishes discovery conduct that is sanctionable under the Court's inherent powers from that which is not properly subject to sanctions. As explained above, the threshold for imposing inherent power sanctions is high, and the Court must make a specific finding that the sanctioned party acted in bad faith to impose sanctions.

To be sure, "'[f]alse testimony in a formal proceeding is intolerable. We must neither reward nor condone such a 'flagrant affront' to the truth-seeking function of adversary proceedings.'" *3M Innovative Props. Co. v. Tomar Electronics*, No. 05-7576(MJD/AJB), 2006 WL 2670038, at *6 (D. Minn. Sept. 18, 2006) (quoting *ABF Freight Sys., Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994)). On the other hand, courts have understandably concluded that, absent evidence of intentional or willful false testimony, sanctions are not warranted, and, "if [a party] disagrees with deposition testimony given by witnesses, he is free to challenge that testimony through his own factual assertions, impeach it through other evidence, and cross-examine the witnesses vigorously at trial." *Taylor v. AFS Techs., Inc.*, No. CV-09-2567-PHX-DGC, 2010 WL 4955166, at *1 (D. Ariz. Dec. 1, 2010)

The Court is presented with very unusual facts. Regardless of the legal definition of perjury, Mr. Trombetta repeatedly testified that – based on the definition that he was provided – he had either "lie[d] in a court of law after promising to tell the truth" or "voluntar[ily] violat[ed] ... an oath or a vow either by swearing to what is

34

untrue or by omission" in his deposition and at other times and that Mr. Myers and Mr. Perlman did so as well.

That is, Mr. Trombetta, using the definition of "perjury" that Plaintiffs' counsel supplied, testified to making incorrect or false statements under oath and to Mr. Perlman's doing so as well – but not to either his or Mr. Perlman's acting intentionally, willfully, or in bad faith in doing so. As Defendants point out, Plaintiffs' counsel's pattern of questioning consisted of confirming that the witness previously credited the accuracy or truthfulness of a statement or document, showing another document that demonstrated that to be incorrect, and then getting Mr. Trombetta to agree that he or Mr. Perlman therefore committed perjury (as defined) in originally affirming the truth or accuracy of the incorrect or false statement. As Defendants note, Plaintiffs will have ample opportunities in this case to attempt to use these inaccuracies, inconsistencies, and contradictions to impeach these witnesses and impugn their credibility.

Yet the Court is left to guess why, when, "[p]rior to Jeff Perlman's deposition, in September, 2015, Perlman, Trombetta, Kelly Myers, David Icenhower, and others from BP got together on a joint meeting/conference call to discuss some of the topics that Perlman would be deposed about during his 30(b)(6) deposition on September 29, 2015," the documents that were created out of that call – including Perlman Exhibit 152 and Perlman Exhibit 178 – reflected or contained inaccurate or false statements regarding Mr. Trombetta's contacts with certain schools. Dkt. No. 257 at 7.

Defendants suggest "the evidence points more towards a faulty memory and innocent mistakes." *Id.* at 10-11. That puts matters in the best possible light.

The evidence may also suggest that at least BP and Mr. Trombetta, if not others, failed to take reasonable steps – such as reviewing emails that were available to them – to ensure that Defendants would provide complete and accurate information in discovery. *See, e.g.*, *Morris*, 2002 WL 1290390, at *2. It may reflect a lack of thorough preparation and a failure to conduct a reasonable investigation to ensure the accuracy of information that Mr. Trombetta testified is relevant to "a pretty important issue in this case." Dkt. No. 257-1 at 21 (p. 269, l. 6-13). Or it may, as Plaintiffs would have the Court infer, reflect an intentional, coordinated effort to withhold or conceal information that would be damaging to Defendants' efforts to avoid liability on Plaintiffs' claims.

But, despite Mr. Trombetta's remarkable admissions of "perjury," the record presently before the Court does not support a finding that inherent power sanctions are warranted here. Accordingly, the Court denies the motion for sanctions on this ground.

The Court does not lightly reach this determination, faced with this kind of testimony from Mr. Trombetta – a defendant and witness who, as noted above, in his first deposition, gave evasive deposition answers only to provide more definite statements in a later-created declaration – and faced with this kind of troubling evidence in connection with Mr. Myers – a defendant and witness who, as a Rule 30(b)(6) corporate representative, was repeatedly so unprepared to testify on designated topics that the Court took the unusual step of ordering BP not to designate him for the ensuing Rule 30(b)(6) deposition necessitated by his deficient testimony (or lack thereof). And the Court does not lightly deny sanctions here in the face of

36

Defendants' other conduct at issue in Plaintiffs' various sanctions motions and the Court's prior orders, including as recounted above, and where the Court has, on multiple occasions, previously declined to find more serious sanctions warranted. *See* Dkt. No. 170 at 10; Dkt. No. 193 at 60-64.

At the February 18, 2016 hearing, Plaintiffs' counsel urged the Court to impose stiff sanctions because, in his view, without the Court's intervention, Defendants will continue to get away with doing things in this case that they should not be doing and because the sanctions imposed to date do not appear to faze them.

As to that concern, the Court wishes to leave no doubt. Chief Judge Solis has already warned Defendants that, "[i]n the future, the Court may be less inclined to overlook errors that would not have occurred had due care been exercised." Dkt. No. 255 at 1. If Defendants take from this decision that any of them somehow got away with something and can expect to provide false testimony or false statements or engage any manner of discovery or litigation abuse in the future without adverse consequences, that would be a serious mistake.

B.    <u>False statements in Affidavits of Kelly Myers and Sandra Liser</u>

Plaintiffs seek sanctions for false statements made in the affidavits of BP's Vice President Kelly Myers and Defendants' counsel Sandra Liser.

1.    Legal Standards

Federal Rule of Civil Procedure 11 authorizes a court to impose sanctions on a party who files a pleading for an improper purpose, such as to harass the opposing party, delay the proceedings, or increase the expense of litigation. *See* FED. R. CIV. P.

11(b)-(c). Sanctions under Rule 11 may be appropriate if the Court finds that a document has been presented for an improper purpose, *see* FED. R. CIV. P. 11(b)(1); the claims or defenses of the signer are not supported by existing law or by a good-faith argument for an extension of change in existing law, *see* FED. R. CIV. P. 11(b)(2); or the allegations and other factual statements lack evidentiary support or are unlikely to do so after a reasonable opportunity for investigation, *see* FED. R. CIV. P. 11(b)(3). The purpose of Rule 11 is to "deter baseless filings in district court," *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990), and "'to spare innocent parties and overburdened courts from the filing of frivolous lawsuits,'" *Cappa Fund III, L.L.C. v. Actherm Holding, A.S.*, No. 3:10-cv-897-L, 2011 WL 817384, at *2 (N.D. Tex. Feb. 21, 2011) (quoting *Kurkowski v. Volcker*, 819 F.2d 201, 204 (8th Cir. 1987)), *rec. adopted*, 2011 WL 816861 (N.D. Tex. Mar. 9, 2011).

After notice and opportunity to respond, courts finding a Rule 11(b) violation may impose appropriate sanctions. *See* FED. R. CIV. P. 11(c)(1). These may include monetary and injunction sanctions, *see Farguson v. MBank Houston, N.A.*, 808 F.2d 358, 359-60 (5th Cir. 1986), and even dismissal, *see Cappa Fund*, 2011 WL 817384, at *2. Courts have a duty to impose the least severe sanction that is sufficient to deter future conduct. *See Mendoza v. Lynaugh,* 989 F.2d 191, 196 (5th Cir. 1993); FED. R. CIV. P. 11(c)(4). A sanction under Rule 11 is "an extraordinary remedy, one to be exercised with extreme caution." *Laughlin v. Perot*, No. 3:95-cv-2577-R, 1997 WL 135676, at *8 (N.D. Tex. Mar. 12, 1997).

Under Rule 11, a motion for sanctions may not be filed until at least 21 days

after service of the motion on the offending party. *See* FED. R. CIV. P. 11(c)(2). If, during this period, the alleged violation is withdrawn or appropriately corrected, the motion should not be filed with the court. These provisions are intended to provide a type of "safe harbor" against motions under Rule 11 in that a party will not be subject to sanctions on the basis of another party's motion unless, after receiving the motion, it refuses to remedy the improper paper, claim, defense, contention, or denial. *See id.*; *see also Elliott v. Tilton*, 64 F.2d 213, 216 (5th Cir. 1995). The safe-harbor provision is strictly construed, and substantial compliance and informal notice and opportunity to withdraw are not sufficient. *See Reyes v. Kroger Texas, LP*. No. 3:10-cv-922-B, 2010 WL 4316084, at *4 (N.D. Tex. Oct. 2, 2010) (citing *In re Pratt*, 524 F.3d 580, 586-88 (5th Cir. 2008)), *rec. adopted*, 2010 WL 4321585 (N.D. Tex. Oct. 25, 2010). A Rule 11 motion for sanctions is properly denied when the movant fails to comply with the safe-harbor provision. *See Tompkins v. Cyr*, 202 F.3d 770, 788 (5th Cir. 2000). The movant has the burden to show compliance. *See Reyes*, 2010 WL 4316084, at *4 (citing *Harris v. Auxilium Pharms., Inc.*, 664 F. Supp. 2d 711, 724 (S.D. Tex. 2009)).

2.    Analysis

Defendants filed the Affidavit of Kelly Myers [Dkt. No. 233-2 at 48-52; *also at* Dkt. No. 204-2 at 20-24] in support of their motion for summary judgment. Mr. Myers states that he is the Vice-President/Account Executive for BP and that the information contained in the affidavit is based on his personal knowledge. *See* Dkt. No. 233-2 at 48. Mr. Myers also states that "Borden-Perlman was not aware Orchestrate or Vivature entered into any written contracts with any of the relevant schools" and that

"Orchestrate never provided Borden-Perlman a copy of the contracts which were ultimately signed by any of the schools and never provided Borden-Perlman any of the specific terms of those contracts." *Id.* at 49.

During Mr. Trombetta's January 6, 2016 deposition, Mr. Trombetta testified that, during 2012-13, he personally sent copies of contracts between Vivature and some of the relevant schools to BP representatives and that any statements by BP that BP had not seen any of the written contracts that Plaintiffs had with the relevant schools would be false. *See* Dkt. No. 233-1 at 5 (p. 179, L. 5-24).

During Mr. Icenhower's January 12, 2016 deposition, Mr. Icenhower also testified that the statements made by Mr. Myers in his affidavit were false statements. *See id.* at 71-72 (p. 311, L. 1-p. 312, L. 23); 47-48 (p. 117, L. 14-p. 118, L. 11). He stated that he knew that they were false statements because he was personally aware of the contracts between Plaintiffs and two of the relevant schools, Rider University and Providence. *See id.* at 47-48 (p. 117, L. 14-p. 118, L. 11); 250 (p. 65, L. 19-22).

The record also includes emails demonstrating that, in 2012, Mr. Myers personally received copies of contracts between Plaintiffs and some of the relevant schools. *See* Dkt. No. 264 at 45-63.

Defendants filed the Affidavit of Sandra Liser [Dkt. No. 233-2 at 54-59; *also at* Dkt. No. 220-1 at18-23] in support of their response to Plaintiffs' motion for continuance. At paragraph six of the affidavit, Ms. Liser states:

> I ceased representing Defendant Anthony Trombetta in February 2015.
> Mr. Trombetta's deposition with his new counsel was scheduled in May
> 2015 and was cancelled due to the death of the father of Mr. Trombetta's

attorney. Since that date until December 2015, I have received no communications from Plaintiffs' attorney requesting the deposition of Mr. Trombetta. During that same time period, I have not been copied on any written communications from Plaintiffs' counsel to James Stanton, who was then representing Mr. Trombetta, requesting the deposition of Mr. Trombetta. I have requested Mr. Portela provide me copies of those communications to document his requests for the deposition and Mr. Portela has refused to provide them.

Dkt. No. 233-2 at 56. Plaintiffs attached to their reply in support of their motion for continuance six different emails showing that, during the time period between February 2015 and December 2015, Ms. Liser received or was copied on communications requesting Mr. Trombetta's deposition. *See* Dkt. No. 221-1.

Plaintiffs provided Ms. Liser with a copy of the motion for sanctions on January 18, 2016 and specifically addressed the two affidavits submitted by Mr. Myers and Ms. Liser. Plaintiffs' counsel stated "[p]lease note that the Motion makes it clear that we are not currently seeking sanctions for the false affidavits. This position will change once the time period allotted under FRCP 11 expires." Dkt. No. 264 at 65.

On January 21, 2016, Defendants filed a motion for leave to file an amended affidavit of Sandra Liser. *See* Dkt. No. 234. On February 7, 2016, Chief Judge Solis granted the motion and admonished Ms. Liser as follows:

Defendants acknowledge that Ms. Liser's affidavit contained incorrect statements and want to correct them. The Court is satisfied that the incorrect statements in Ms. Liser's original affidavit were due to carelessness and were not intentional. ... However, the Court cautions the Parties that the kind of carelessness exhibited by Ms. Liser falls below the standard of professionalism expected of attorneys practicing in this Court. In the future, the Court may be less inclined to overlook errors that would not have occurred had due care been exercised.

Dkt. No. 255 at 1.

Defendants have not sought leave to amend Mr. Myers's affidavit.

The Affidavit of Kelly Myers and the original Affidavit of Sandra Liser include demonstrably incorrect statements. But Plaintiffs' premature filing of the motion for sanctions did not strictly comply with Rule 11(c)(2).

Rule 11(c)(2) provides: "The motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service." FED. R. CIV. P. 11(c)(2). Rule 11's plain language provides that the movant must file with Court, after the expiration of the safe-harbor period, the motion that was served upon the adversary. *See Hyman v. Borack & Assocs.*, No. 8:12-cv-1088-T-23TGW, 2012 WL 6778491, at *2 (M.D. Fla. Dec. 17, 2012), *rec. adopted*, 2013 WL 68534 (M.D. Fla. Jan. 4, 2013); *see also Roth v. Green*, 466 F.3d 1179, 1192 (10th Cir. 2006) ("[t]he plain language ... requires a copy of the actual motion for sanctions to be served on the persons(s) accused of sanctionable behavior at least twenty-one days prior to the filing of that motion").

Defendants provided Plaintiffs with a copy of the motion for sanctions on January 18, 2016, the same day that they filed the motion. Three days later, Sandra Liser sought leave to amend her affidavit, which was granted, and Ms. Liser's Amended Affidavit was filed on February 7, 2017.

Accordingly, the Court denies Defendants' request for sanctions based on the false statements in the Affidavit of Kelly Myers and the original Affidavit of Sandra Liser because Plaintiffs filed the motion for sanctions during the Rule 11 safe-harbor

period.

C.   <u>Violation of the Court's discovery order</u>

Plaintiffs assert that Defendants have violated the Court's July 15, 2015 Order on Pending Discovery Motions [Dkt. No. 170], as proven by documents prepared and produced by Defendants.

1.   Legal Standards

Rule 37(b)(2)(A) provides that, "[i]f a party ... fails to obey an order to provide or permit discovery ... the court where the action is pending may issue further just orders," including, among other sanctions, directing that matters embraced in the order or other designated facts be taken as true, prohibiting the disobedient party from introducing designated matters in evidence, and/or staying further proceedings until the order is obeyed." FED. R. CIV. P. 37(b)(2)(A)(I)-(vi). Sanctions available under Rule 37(b) are appropriate where there is willful disobedience or gross indifference but not where failure to comply was outside the party's control. *See Dorsey v. Acad. Moving & Storage, Inc.*, 423 F.2d 858, 860 (5th Cir. 1970). Rule 37(b)(2)(C) further requires that, "[i]nstead of or in addition to the orders [described under Rule 37(b)(2)(A)], the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(b)(2)(C).

"The primary purpose of sanctions is to deter frivolous litigation and abusive tactics." *Topalian v. Ehrman*, 84 F.3d 433, No. 94-20567, 1996 WL 248995, at *4 (5th

Cir. Apr.12, 1996). Rule 37(b) "is designed to empower the court to compel production of evidence by the imposition of reasonable sanctions." *Dorsey*, 423 F.2d at 860. "Sanctions under Rule 37 serve the dual function of reimbursing the moving party and deterring the violator of the discovery orders (as well as other potential violators)." *Day v. Allstate Ins. Co.*, 788 F.2d 1110, 1114 (5th Cir. 1986). The sanction imposed must be "the least severe sanction adequate to achieve the desired result." *Scaife v. Associated Air Ctr. Inc.*, 100 F.3d 406, 412 (5th Cir. 1996).

2.    Analysis

Plaintiffs contend that Perlman Exhibit 152 demonstrates that Defendants have violated of the Court's July 15, 2015 Order on Pending Discovery Motions [Dkt. No. 170].

In that order, the Court ordered BP to amend its responses to requests for production and to, wherever it had stated that it had previously produced the documents in another production, provide the bates numbers for the responsive documents by July 31, 2015. On July 31, 2015, BP produced 9 pages of documents.

The Court also ordered BP to produce all responsive documents it had not previously produced by August 7, 2015. BP produced additional documents on January 4, 2016, one day before Mr. Trombetta's deposition.

Among the documents that Defendants were required to produce, or provide bates numbers for if already produced, are all contracts with and all proposals made to any schools listed in Exhibit A, which is a list of the schools at issue in this case. *See* Dkt. No. 170; Dkt. No. 233-1 at 93 (Requests for Production Nos. 2 & 3).

44

Perlman Exhibit 152 is a spreadsheet prepared by Defendants' attorney Sandra Liser. It lists the existing Orchestrate or Vivature clients with which BP has an agreement. *See* Dkt. No. 233-1 at 76. The spreadsheet has ten columns, including those labeled "Agreements" and "Proposals provided by BP to any current or former clients of PLF since April 8, 2013." Dkt. No. 278 at 117-126.

BP supplemented its responses to Plaintiffs' requests for production and referred Plaintiffs to documents bates stamped BP_ORCHESTRATE 178716-178847. *See* Dkt. No. 233-1 at 91, 93. Plaintiffs' counsel compared those documents with the list of schools contained on Perlman Exhibit 152 and determined that, according to the exhibit, BP had contracts and proposals with schools that had not been produced. *See id.* at 98-100. Plaintiffs' counsel detailed his findings in a December 17, 2015 email to Ms. Liser and listed 26 bids, proposals, or contracts from15 schools within the bates-number range of produced documents. He also listed 52 schools included on Perlman Exhibit 152 for which bids, proposals, or contracts have not been produced. For some schools, the missing production included multiple documents for multiple years. *See id.*

Plaintiffs' counsel and Ms. Liser engaged in a two-week email exchange about the missing documents. *See id.* at 102 -131; Dkt. No. 233-2 at 2-46. On December 18, 2015, Ms. Liser took the position that all documents had been produced. She also stated that there were "many more proposals and contracts than listed in your email" that had been produced and that BP would supplement its formal discovery response to provide that information. *Id.* at 106. On December 21, 2015, Ms. Liser stated that

45

"I have located 183 proposals in the documents which were already produced but which I failed to include in the last written supplementation. I will supplement that today." *Id.* at 118. On December 22, 2015, Ms. Liser stated "I have located some of the 'missing documents.'" She then listed bates numbers to identify where those documents were previously produced. *See id.* at 125-26.

Plaintiffs' counsel responded that Ms. Liser's list "is even missing multiple years of responsive documents for the schools you have listed" and identified some examples. *Id.* at 125. On January 1, 2, and 3, 2016, Plaintiffs' counsel inquired about the promised supplementation, which he had not yet received. *See* Dkt. No. 233-2 at 2, 9, 16. On January 4, 2016, after Plaintiffs' counsel's "final attempt to conference with you on a Motion for Sanctions for your clients' violation of Judge Horan's order," *id.* at 24, Ms. Liser acknowledged that BP had not supplemented its document production as promised, *see id.* at 32.

Thereafter, on January 4, 2016, Defendants produced what they claim are all documents responsive to the two requests for production. But the password provided to Plaintiffs' counsel was incorrect, and Plaintiffs were not able to access the documents until January 5, 2016 – which was one day before Mr. Trombetta's second deposition.

Defendants argue that the delay in complying the Court's July 31, 2015 and August 7, 2015 deadlines is excused because Defendants objected to the Court's July 15, 2015 Order on Pending Discovery Motions [Dkt. No. 170] on July 29, 2015. *See* Dkt. No. 178. But that argument is belied by an email from Ms. Liser herself. Chief Judge

46

Solis overruled Defendants' objections to the July 15, 2015 Order on Pending Discovery

Motions [Dkt. No. 170] on December 16, 2015. *See* Dkt. No. 222. Plaintiffs' counsel then

inquired of Ms. Liser whether Defendants would be producing any new documents:

> Given [Chief Judge Solis' order overruling the objections], I would
> imagine that there are new documents which your client should produce
> pursuant to Judge Horan's Court order. I assume that you were not just
> asserting this objection for delay purposes and that your client withheld
> production of documents based on your objection and the arguments
> contained therein.

Dkt. No. 264 at 67. Ms. Liser responded:

> No, as I informed you in the past, because Judge Horan's order was
> binding pending the appeal, we did our document search and production
> on the entire list of Orchestrate's "clients" including the medical care
> facilities, the high schools and the professional sports teams. I think the
> rules required me to comply with Judge Horan's order since Judge Solis
> did not rule before Judge Horan's deadline for production. I know of no
> way to know Judge Solis would not be able to rule on our appeal before
> the deadline for the production when I filed the appeal or that he might
> not stay that portion of Judge Horan's order to give him time to consider
> the appeal.

*Id.*

By her own admission*,* Ms. Liser acknowledges that Defendants were required

to comply with the Court's July 15, 2015 Order on Pending Discovery Motions [Dkt. No.

170] within the deadlines established by that order and that Defendants were not

withholding the production of documents pending a ruling on their objections.

Perlman Exhibit 152, and Ms. Liser's emails concerning the exhibit, show that

Defendants failed to produce documents, failed to supplement their requests for

production by providing the bates numbers for any documents that they contend were

previously produced, and failed to produce documents by the court-ordered deadlines.

Accordingly, the undersigned determines that Defendants have violated the Court's July 15, 2015 Order on Pending Discovery Motions [Dkt. No. 170] and done so with at least gross indifference and will grant sanctions under Rule 37(b) based on those violations.

The Court has considered the seriousness of the sanctionable conduct described above and the purposes of sanctions under Rule 37(b), including to deter future sanctionable conduct. The Court determines that a just and appropriate sanction under Rule 37(b) for Defendants' violation of the Court's July 15, 2015 Order on Pending Discovery Motions [Dkt. No. 170] – and the least severe sanction adequate to achieve the desired result of deterrence – is an award to Plaintiffs of their attorneys' fees and costs incurred in connection with their Motion for Sanctions Against All Defendants [Dkt. No. 232], and, more specifically, all fees and costs incurred in drafting and filing the portion of both the motion and the reply as to the violation of the Order on Pending Discovery Motions [Dkt. No. 170] and in connection with preparing for and participating in the hearing as to that portion of the motion.

Northern District of Texas Local Civil Rule 7.1 requires that parties confer before filing an application for attorneys' fees. Plaintiffs' counsel and Defendants' counsel are therefore directed to meet face-to-face and confer about the reasonable amount of these attorneys' fees and costs to be awarded under Rule 37(b). This face-to-face requirement is not satisfied by a telephonic conference. Any attorney refusing to appear for this meeting or to confer as directed will be subject to sanctions.

By no later than **May 2, 2016**, the parties must file a joint status report

48

notifying the Court of the results of the conference. If all disputed issues as to the amount of attorneys' fees and costs to be awarded to Plaintiffs have been resolved, Plaintiffs' counsel must also send an agreed proposed order to the Court at Horan_Orders@txnd.uscourts.gov by **May 2, 2016**.

If the parties do not reach an agreement as to the amount of attorneys' fees and costs to be awarded to Plaintiffs, Plaintiffs must, by no later than **May 6, 2016**, file an application for attorneys' fees and costs that is accompanied by supporting evidence establishing the amount of the reasonable attorneys' fees and costs (as described above) to be awarded under Rules 37(b). The fee application must be supported by documentation evidencing the "lodestar" calculation, including affidavits and detailed billing records, and citations to relevant authorities and shall set forth the itemized number of hours expended in connection with the recoverable attorneys' fees described above as well as the reasonable rate(s) requested.

If an application is filed, Defendants may file a response by **May 27, 2016**, and Plaintiffs may file a reply by **June 10, 2016**.

D.    Violations of Temporary Injunction and Temporary Restraining Orders

Plaintiffs contend that Defendants should be held in civil contempt for violations of the Agreed Temporary Injunction [Dkt. No. 30] and Agreed Temporary Restraining Orders [Dkt. Nos. 9, 15, 17, 18, 21, 25 & 26]. *See* Dkt. No. 233 at 19-24, 26. Those claims are addressed in the Findings, Conclusions, and Recommendation of the United States Magistrate Judge entered on March 28, 2016. *See* Dkt. No. 299.

49

E.     "Other Obstreperous Acts"

Plaintiffs finally seek sanctions for "other obstreperous acts."

Plaintiffs complain that Mr. Icenhower "had been so overly prepared to not provide any useful testimony" "that he actually testified [during his deposition] that he could not remember things like the year he graduated from college, the year he started his first job, and other facts." Dkt. No. 233-1 at 44 (p. 22, L. 6-13); 45 -46 (p. 26, L. 24-p. 27, L. 1). Plaintiffs also contend that, in the middle of questioning, Defendants' counsel Brad Douglas "picked up an exhibit, highlighted it, and showed it to Icenhower." *See id.* at 66-70 (p. 298, L. 17-p. 302, L. 6).

The Court does not condone any obstructionist behavior by witnesses or attorneys, *see generally Dondi*, 121 F.R.D. at 284, but does not find that Mr. Icenhower's memory lapse or Mr. Douglas's alleged prompting amount to sanctionable conduct.

Plaintiffs also complain about Defendants' one-year delay in producing the recording of a January 23, 2013 meeting made by Mr. Myers. The recording was produced on September 14, 2015. According to Plaintiffs, the recording helps rebut some of Defendants' defenses in this case. Plaintiffs also allege the meeting was secretly recorded and was made in the state of Pennsylvania, which requires two-party consent. Plaintiffs fail to direct the Court to evidence supporting these arguments, and the Court will not order sanctions on this basis.

Plaintiffs also allege that Mr. Icenhower was present at the secretly-recorded meeting but that, during his deposition, he pleaded the Fifth Amendment and refused

to answer questions about the meeting. *See* Dkt. No. 233-1 at 49-61 (p. 119, L. 15-p. 131, L. 11); 62 (p. 200, L. 18-p. 202, L. 11). The Court will not sanction Defendants for Mr. Icenhower's assertion of his Fifth Amendment rights.

IV.    <u>Plaintiffs' Motion to Compel and For Sanctions Against All Defendants</u>

Plaintiffs served Defendants BP, Mr. Trombetta, Mr. Myers, and Mr. Icenhower with requests for production ("RFPs") of documents on January 21, 2016. *See* Dkt. No. 282 at 5-25 (BP), 50-66 (Trombetta), 80-96 (Myers), 112-129 (Icenhower). Defendants served objections and responses on February 23, 2016 but did not produce any documents. *See* Dkt. No. 281; Dkt. No. 282 at 27-48 (BP), 68-78 (Trombetta), 98-110 (Myers), 131-143 (Icenhower). After a series of communications concerning the allegedly deficient discovery responses, *see* Dkt. No. 282 at 145-158, Plaintiffs filed their Motion to Compel and for Sanctions Against All Defendants on February 29, 2016, *see* Dkt. No. 281.

Defendants filed a response notifying the Court that they had served supplemental responses that same day but otherwise did not respond to the motion to compel. *See* Dkt. Nos. 295, 296 at 5-103 (BP), 105 -254 (Myers), 256-405 (Icenhower), 407-412 (Trombetta). Plaintiffs have filed a reply. *See* Dkt. No. 297.

A.    Legal Standards

Federal Rule of Civil Procedure 37(a) governs motions to compel discovery responses. Rule 37(a)(3)(B) provides that a party seeking discovery may move for an order compelling production against another party when the latter has failed to produce documents requested under Federal Rule of Civil Procedure 34. *See* FED. R.

51

CIV. P. 37(a)(3)(B)(iv). For purposes of Rule 37(a), "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." FED. R. CIV. P. 37(a)(4).

Federal Rules of Civil Procedure 26(b) and 34(b) have been amended, effective December 1, 2015. Rule 26(b)(1) now provides that, "[u]nless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." FED. R. CIV. P. 26(b)(1).

The amendments to Rule 26 govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, in all proceedings then pending. The Court finds that applying the standards of Rule 26(b)(1), as amended, to Plaintiffs' motion to compel is both just and practicable. Plaintiffs' Motion to Compel takes the position that it seeks documents relevant to the claims and defenses in this action, *see* Dkt. No. 281, and neither party addresses whether the amended rules should apply.

Further, for the reasons the Court has recently explained, the Court concludes that the amendments to Rule 26 do not alter the burdens imposed on the party resisting discovery discussed above. *See Carr v. State Farm Mut. Auto. Ins. Co.*, 312

F.R.D. 459, 463-69 (N.D. Tex. 2015). Rather, just as was the case before the December 1, 2015 amendments, under Rules 26(b)(1) and 26(b)(2)(C)(iii), a court can – and must – limit proposed discovery that it determines is not proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit – and the court must do so even in the absence of a motion. *See Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 264 (5th Cir. 2011).

But a party seeking to resist discovery on these grounds still bears the burden of making a specific objection and showing that the discovery fails the proportionality calculation mandated by Rule 26(b) by coming forward with specific information to address – insofar as that information is available to it – the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

The party seeking discovery, to prevail on a motion to compel or resist a motion for protective order, may well need to make its own showing of many or all of the proportionality factors, including the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, and the importance of the discovery in resolving the issues, in

opposition to the resisting party's showing. And the party seeking discovery is required to comply with Rule 26(b)(1)'s proportionality limits on discovery requests; is subject to Rule 26(g)(1)'s requirement to certify "that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry: ... (B) with respect to a discovery request..., it is: (I) consistent with these rules and warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law, or for establishing new law; (ii) not interposed for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; and (iii) neither unreasonable nor unduly burdensome or expensive, considering the needs of the case, prior discovery in the case, the amount in controversy, and the importance of the issues at stake in the action"; and faces Rule 26(g)(3) sanctions "[i]f a certification violates this rule without substantial justification." FED. R. CIV. P. 26(g)(1)(B), 26(g)(3); *see generally Heller v. City of Dallas*, 303 F.R.D. 466, 475-77, 493-95 (N.D. Tex. 2014).

But the amendments to Rule 26(b) and Rule 26(c)(1) do not alter the basic allocation of the burden on the party resisting discovery to – in order to successfully resist a motion to compel – specifically object and show that the requested discovery does not fall within Rule 26(b)(1)'s scope of relevance (as now amended) or that a discovery request would impose an undue burden or expense or is otherwise objectionable. *See McLeod*, 894 F.2d at 1485; *Heller*, 303 F.R.D. at 483-93.

Federal Rule of Civil Procedure 37(a)(5)(A) provides that, if a motion to compel is granted, "the court must, after giving an opportunity to be heard, require the party

... whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees," except that "the court must not order this payment if: (I) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(a)(5)(A).

Rule 37(a)(5)(B)-(C) further provide in pertinent part that, "[i]f the motion is denied, the court ... must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party ... who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees," "[b]ut the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust," and that, "[i]f the motion is granted in part and denied in part, the court may issue any protective order authorized under Rule 26(c) and may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." FED. R. CIV. P. 37(a)(5)(B)-(C).

B.      Analysis

In their responses to Plaintiffs' most recently served RFPs, Defendants asserted objections, including general objections; stated that documents had been produced but failed to identify the bates numbers of the previously-produced documents, despite the Court's order requiring such identification in connection with previously served discovery requests, *see* Dkt. No. 170 at 17; and did not produce any documents, even

in response to RFPs to which no objection was asserted.

In their supplemental responses, which are over 400 pages long, Defendants provide lists of bates numbers of documents that are purportedly responsive but do not indicate whether these are previously-produced documents or new documents, and Defendants state that they will provide additional, supplemental responses by April 11, 2016. The Court has not been informed whether that has happened.

Plaintiffs contend that the supplemental responses are false or misleading. According to Plaintiffs, "[t]he lists provided often list documents which have nothing to do with the request being asked, show a complete lack of actual attempt to identify responsive documents, are in some places just cut and paste lists for different questions which clearly call for different responsive documents, and overall appear to be meant to fool the Court into believing that Defendants have now answered these requests." Dkt. No. 297 at 2-3.

1.   Waiver of Objections

Defendants offer nothing in support of any of their objections, specific or general, in response to Plaintiffs' motion to compel. Instead, Defendants' response to the motion simply states that Defendants concurrently supplemented their responses to the RFPs and will supplement them again by April 11, 2016. Defendants do not in any way attempt to amend the original responses, withdraw the objections, argue in support of the objections, or address any of Plaintiffs' arguments in the motion to compel.

The party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable. *See McLeod*, 894 F.2d at 1485. And a party

who has objected to a discovery request must, in response to a motion to compel, urge and argue in support of his objection to a request, and, if he does not, he waives the objection. *See Dolquist v. Heartland Presbytery*, 221 F.R.D. 564, 568 (D. Kan. 2004); *Cotracom Commodity Trading Co. v. Seaboard Corp.*, 189 F.R.D. 655, 662 (D. Kan. 1999). A party resisting discovery must show how the requested discovery was overly broad, burdensome, or oppressive by submitting affidavits or offering evidence revealing the nature of the burden. *See Merrill v. Waffle House, Inc.*, 227 F.R.D. 475, 477 (N.D. Tex. 2005); *see also S.E.C. v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006) ("A party asserting undue burden typically must present an affidavit or other evidentiary proof of the time or expense involved in responding to the discovery request.").

Defendants make general objections to most of the RFPs. For example, all four Defendants repeatedly assert the following objection:

> Subject to the preceding objections to the immediate Request and General Objections, including but not limited to Defendant's right to assert privileges and exemptions, Defendants will produce responsive documents, if any, that are relevant to the claims and defenses in this case, and to the extent reasonably able, without undue burden and expense, to determine that such documents are responsive and within its possession, custody, and control to the extent they have not previously been produced.

Defendants also repeatedly assert that the

> request fails to reasonably specify a relevant set of documents, in that "all documents which show" – which Plaintiffs have defined to include even mere allusion – ... are not material to this case or likely to lead to relevant evidence.

And all four Defendants also repeatedly assert that the RFPs are overly broad, unduly burdensome, and expensive or do not seek documents that are relevant to any claim.

As the Court explained in *Heller v. City of Dallas*, 303 F.R.D. 466 (N.D. Tex. 2014), general objections like these are invalid. Objections to discovery must be made with specificity, and the responding party has the obligation to explain and support its objections. *See id.* at 483. Amended Federal Rule of Civil Procedure 34(b)(2) effectively codifies this requirement, at least in part: "An objection must state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a request must specify the part and permit inspection of the rest." FED. R. CIV. P. 34(b)(2)(C).

Here, Defendants' reference to "the right to assert privileges and exemptions" does not affirmatively assert or identify any specific privilege, as required by Federal Rule of Civil Procedure 26(b)(5), or any exemption. Nor have Defendants supported any objection to relevance or undue burden and expense. Instead, this and all other general objections asserted by Defendants, such as objections that the RFPs are overly broad, are unduly burdensome, or seek information that is not relevant and not likely to lead to the discovery of relevant evidence, are invalid and, in any event, waived for failure to press and support the objections in response to the motion to compel.

Defendants also raised a few specific objections, but they do not support those objections in response to the motion to compel. Because Defendants failed to press and support their objections in response to the motion to compel, all of Defendants' objections, both specific and general, are waived.

### 2.    The Responses and Supplemental Responses

Defendants refuse to produce documents concerning their net worth because

they claim that Plaintiffs' claims for punitive damages are invalid as a matter of law and that they will prevail on summary judgment on claims supporting an award of punitive damages. *See* BP's response to RFP No. 17; Myers' response to RFP No. 16; Icenhower's response to RFP No. 16. This is not a valid objection or basis to withhold production of responsive documents. "[A] party cannot refuse to produce a requested document or information simply because it is relevant to a claim or defense on which the producing party believes that it will prevail." *Heller*, 303 F.R.D. at 48.

Defendants assert the attorney-client privilege and work-product protection in response to requests for documents showing payments for invoices or bills from their current or former attorneys in the case. *See* RFP No. 20 to BP. But Defendants have not served a privilege log of documents withheld from production on the basis of privilege or as work product.

And Defendants refuse to produce documents that they claim are in Plaintiffs' possession or equally available to Plaintiffs, such as "[a]ll communications between [BP] and the Plaintiffs in this case." *See, e.g.*, BP's response to RFP No. 41. But Defendants, again, have not supported this objection, and the Court does not find the request to be improper under Rule 26(b)(1) without some showing by Defendants.

Defendants also state in their supplemental responses that they will provide additional supplemental responses in the future. Plaintiffs requested "[a]ll documents which provide the underlying support or basis for the information contained in" Exhibits Perlman 152, 153, 154, 155, 157, 158, 159, 160, 161, 162, 163, 165, and 178 from the Rule 30(b)(6) deposition of BP's corporate representative. *See* RFPs Nos. 24-36

to BP. Plaintiffs requested "[a]ll document which show that [Kelly Myers] had knowledge of the contracts between Plaintiffs and any of the Schools listed in Exhibit B" and "[c]opies of all emails [Kelly Myers] received from Tony Trombetta's Hotmail account prior to May 30, 2013." *See* RFP Nos. 8 & 17 to Myers. Plaintiffs requested "[a]ll communications between [Dave Icenhower] and any non-party, excluding communications with your attorney, regarding this lawsuit or the facts or claims of this lawsuit." *See* RFP No. 24 to Icenhower. And Mr. Trombetta states that he will provide supplemental responses to RFPs Nos. 2, 3, 4, 5, 6, 7, 8, 9, 13, 14, 15, 17, and 20. Although Defendants simply stated that they would provide responsive documents on or before April 11, 2016, they failed to explain why they could not have produced the documents in a timely manner sooner or why they need additional time to produce them.

Mr. Trombetta asserts that requested documents have previously been produced in supplemental responses Nos. 10, 12, 14, and 22, but he fails to identify the bates numbers of those documents.

The remainder of BP's, Mr. Myers's, and Mr. Icenhower's supplemental responses provide lengthy lists of bates numbers, presumably for documents that had been produced previously, and it is unclear from the supplemental responses whether any new documents were produced. Plaintiffs assert that the identified document numbers for previously-produced documents are not responsive to the requests for which they are provided.

For example, RFP No. 2 to BP requests "all checks sent to Plaintiffs by [BP]." In

the supplemental response, BP provides the bates numbers for ten documents, but, according to Plaintiffs, only one of those documents is a check. The rest of the documents are emails, and none of those documents were produced by BP.

RFP No. 6 to BP requests "[a]ll communications between [BP] and Arch which relate to any decision by [BP] or by Arch to stop, in any way, doing business with each other." In its supplemental response, BP lists every document previously produced by Arch in this litigation, which includes over 3,206 pages of documents. According to Plaintiffs, many of the documents are not communications between BP and Arch, and BP fails to identify a single document produced by BP or to produce any new documents. Instead, BP refers to a voluminous amount of documents and implies that there are responsive documents in there somewhere. BP repeats this list of documents in response to RFP No. 9, which requests "[a]ll documents showing complaints you received about ARCH," and RFP No. 10, which requests "[a]ll documents showing complaints [BP] received about Plaintiffs."

RFP No. 7 to BP requests "[a]ll documents showing complaints [BP] received about ACI." Plaintiffs' counsel reports that a cursory review of the 500 documents identified in the supplemental response shows that "this list contains a myriad of random documents that are absolutely not responsive."

RFP No. 22 to BP requests "[all] documents showing any complaints about you, or services that you provide, received from any of the Schools listed in Exhibit A." In its supplemental response, BP provides a list of numbers for over 2,000 documents, but, again, Plaintiffs report that their counsel's review of those documents shows that

almost all of them are non-responsive.

This is the first request for production of documents to Mr. Myers. But Mr. Myers submits the same lists of document numbers submitted by BP in its responses to requests for production to RFPs that are tailored to him. For example, in response to RFP No. 2, which asks for "[a]ll communications between you and any School listed on Exhibit A," Mr. Myers responds with the same list BP provided in response to RFP No. 22 to BP, which requests "[a]ll document showing any complaints about you, or services that you provide, received from any of the Schools listed in Exhibit A." Mr. Myers makes similar responses to RFP Nos. 3, 4, 5, 6, 7, 10, 11, 12, 13, 14, 15, and 19.

In RFP No. 3, Plaintiffs request "[a]ll document between [Kelly Myers] and any potential co-broker which reference any of the Schools listed in Exhibit A." Mr. Myers provides a list of over 1,000 documents, but, according to Plaintiffs, it omits the communications between Mr. Myers and the broker that are the subject of the motion for civil contempt and sanctions for violation of the Court's Temporary Injunction.

This is also the first request for production of documents to Mr. Icenhower. And, like Mr. Myers, Mr. Icenhower submits the same lists of document numbers submitted by BP in its responses to requests for production to RFPs that are tailored to him. Mr. Icenhower's supplemental responses are identical to Mr. Myers's supplement responses to RFPs Nos. 1-23.

Plaintiffs argue that they cannot justify the expense of going through all 400 pages of Defendants' supplemental responses to determine if the identified documents are responsive when a cursory review demonstrates that they are not.

The Court agrees. It is Defendants' responsibility to provide meaningful responses to the requests for production, and it is Defendants' responsibility to review the voluminous documents to identify those that are responsive to specific requests.

At the February 18, 2016 hearing, Defendants' counsel informed the Court that his firm now has eight attorneys working on the case and that "[w]e are serious, we are sincere, and we are determined to make sure that anything that was of previous concern to the Court does not happen again." Dkt. No. 285 at 16, 101.

But, while Plaintiffs are clearly (to say the least) frustrated with their dealings with Defendants' counsel, there is not sufficient evidence of bad faith here to justify inherent power sanctions in connection with this motion to compel. *See Chambers*, 501 U.S. at 50 (explaining that a court must "exercise caution" in invoking its inherent powers and should "ordinarily" rely on a rule or statute rather than its inherent powers, such that, "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power," although, "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power"). Rather, Rule 37(a)(5)(A) provides the remedy for Defendants' failures to comply with their discovery obligations in connection with these latest discovery requests.

And the Court determines, based on the record before it, that Plaintiffs attempted in good faith to obtain the discovery at issue without court action before filing, *see, e.g.*, Dkt. No. 281 at 25, and that Defendants' supplementing their response

without having to be ordered to do so by the Court does not render an award of expenses under Rule 37(a)(5) inappropriate. Further, the Court finds that Defendants have not established that their nondisclosure, responses, or objections at issue were substantially justified or that other circumstances make an award of expenses under Rule 37(a)(5) unjust.

Accordingly, the Court ORDERS that Defendants BP, Anthony Trombetta, Kelly Myers, and Dave Icenhower must fully respond and produce all nonprivileged documents responsive to all requests for production of documents served on each of them on January 21, 2016 and must do so, or list the specific bates ranges of previously-produced documents that are responsive to each specific request, by **April 28, 2016**. To support withholding any responsive documents or electronically stored information on the basis of privilege or work-product protection, each Defendant must also, by **April 28, 2016**, describe the withheld documents or electronically stored information in a privilege log submitted to Plaintiffs' counsel in compliance with Federal Rule of Civil Procedure 26(b)(5)(A), which requires that "[w]hen a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must: (I) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."

The Court further ORDERS that, pursuant to Rule 37(a)(5), counsel for

64

Defendants Anthony L. Trombetta, The Borden-Perlman Insurance Agency, Inc., Kelly Myers, and Dave Icenhower is required to pay Plaintiffs OrchestrateHR, Inc. and Vivature, Inc. their reasonable attorneys' fees and costs incurred in making their Plaintiffs' Motion to Compel and for Sanctions Against All Defendants [Dkt. No. 281], including specifically their reasonable attorneys' fees and costs incurred in drafting and filing the motion and the reply in support and reviewing Defendants' response to the motion. But this award does not include any attorneys' fees or costs that Plaintiffs incurred prior to the deadline for Defendants to serve objections and responses, including in connection with Plaintiffs' counsel's preparing and propounding the discovery requests at issue.

Northern District of Texas Local Civil Rule 7.1 requires that parties confer before filing an application for attorneys' fees. Plaintiffs' counsel and Defendants' counsel are therefore directed to meet face-to-face and confer about the reasonable amount of these attorneys' fees and costs to be awarded under Rule 37(a)(5)(A). This face-to-face requirement is not satisfied by a telephonic conference. Any attorney refusing to appear for this meeting or to confer as directed will be subject to sanctions.

By no later than **May 2, 2016**, the parties must file a joint status report notifying the Court of the results of the conference. If all disputed issues as to the amount of attorneys' fees and costs to be awarded to Plaintiffs have been resolved, Plaintiffs' counsel must also send an agreed proposed order to the Court at Horan_Orders@txnd.uscourts.gov by **May 2, 2016**.

If the parties do not reach an agreement as to the amount of attorneys' fees and

costs to be awarded to Plaintiffs, Plaintiffs must, by no later than **May 6, 2016**, file an application for attorneys' fees and costs that is accompanied by supporting evidence establishing the amount of the reasonable attorneys' fees and costs (as described above) to be awarded under Rules 37(a)(5). The fee application must be supported by documentation evidencing the "lodestar" calculation, including affidavits and detailed billing records, and citations to relevant authorities and shall set forth the itemized number of hours expended in connection with the recoverable attorneys' fees described above as well as the reasonable rate(s) requested. *See Tollett v. City of Kemah*, 285 F.3d 357, 367 (5th Cir. 2002) (using the "lodestar" method to award attorney's fees under Rule 37).

If an application is filed, Defendants may file a response by **May 27, 2016**, and Plaintiffs may file a reply by **June 10, 2016**.

Any request to supplement or amend expert designations or for additional deposition time must be made by a separate motion after Plaintiffs' counsel is able to assess whether any such relief is required based on Defendants' productions in compliance with this order.

Accordingly, the Court GRANTS Plaintiffs' Motion to Compel and for Sanctions Against All Defendants [Dkt. No. 281] to the extent explained above but otherwise DENIES the other sanctions or relief requested in this motion.

### Conclusion

As Chief Judge Solis has observed in connection with another case, "[t]he parties in this case have had a hard time getting along." *Brown*, 2015 WL 410062, at *7

(internal quotation marks omitted). This case – like that one – has been marked by discovery disputes and motions for sanctions. The sanctions imposed here should, the Court expects, be sufficient to bring an end to any conduct that needs to cease as discovery comes to a close. But the Court nevertheless reminds counsel that "[a] client has no right to demand that counsel abuse the opposite party or indulge in offensive conduct"; that, "[i]n adversary proceedings, clients are litigants and though ill feeling may exist between clients, such ill feeling should not influence a lawyer's conduct, attitude, or demeanor towards opposing lawyers"; that "[e]ffective advocacy does not require antagonistic or obnoxious behavior and members of the Bar will adhere to the higher standard of conduct which judges, lawyers, clients, and the public may rightfully expect"; and that "[m]alfeasant counsel can expect ... that their conduct will prompt an appropriate response from the court." *Dondi*, 121 F.R.D. at 288

To the extent and for the reasons explained above, the Court:

- GRANTS in part and DENIES in part Plaintiffs' Motion for Sanctions Against All Defendants [Dkt. No. 232], except for the portion of the motion concerning civil contempt for alleged violations of the Agreed Temporary Injunction and Agreed Temporary Restraining Orders, which is addressed in the Findings, Conclusions, and Recommendation of the United States Magistrate Judge dated March 28, 2016 [Dkt. No. 299];

- DENIES Plaintiffs' Motion for Sanctions Against Anthony L. Trombetta for Spoliation of Evidence [Dkt. No. 240];

- GRANTS Plaintiffs' Emergency Motion for Sanctions and Request for Order

[Dkt. Nos. 245 & 251]; and

• GRANTS in part and DENIES in part Plaintiffs' Motion to Compel and For

Sanctions Against All Defendants [Dkt. No. 281].

SO ORDERED.

DATE: April 18, 2016

_____

DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE