TAB A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ORCHESTRATEHR, INC. and material VIVATURE, INC. | § § § § § | |
| Plaintiffs, | § § | |
| v. | § | CIVIL ACTION NO. 3:13 CV-2110-P |
| ANTHONY L. TROMBETTA, THE BORDEN-PERLMAN INSURANCE AGENCY, INC., KELLY MYERS, and DAVE ICENHOWER, | § § § § § § | |
| Defendants. | § § | |

## DECLARATION OF MOUZON BASS, III

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

**BEFORE ME**, the undersigned notary, on this day appeared **Mouzon Bass, III**, and after being duly sworn, did state as follows:

1. My name is Mouzon Bass, III. I am the President of Plaintiff Orchestrate HR, Inc., ("Orchestrate HR") and Plaintiff Vivature, Inc., ("Vivature"), (collectively, "Orchestrate"). Both are Texas corporations with their principal places of business in Dallas County, Texas. I have held the position of President of Orchestrate and Vivature at all times relevant to the claims made in this lawsuit.

2. Orchestrate's business is national in character. Orchestrate engages in nationwide marketing and sales efforts, and has competition from similar businesses throughout the country. Any non-compete agreement between Trombetta and Orchestrate HR did not impose a greater restraint than was necessary to protect Orchestrate's goodwill and other business interests as any lesser restraint would have allowed Trombetta to use confidential and proprietary information he was given by Orchestrate to directly compete in the very specific and limited industry which is the subject matter of this suit.

DECLARATION OF MOUZON BASS, III                                                                    PAGE 1

3. When this lawsuit was filed, it was focused on stopping Orchestrate's former employee, Anthony Trombetta ("Trombetta"), from the outright breach of his contracts with Orchestrate, including exploiting Orchestrate's confidential information, in which Orchestrate has invested substantial resources, as well as stealing Orchestrate's customers. At the time of the filing of this suit, Orchestrate believed that the Borden-Perlman Insurance Agency ("BP") was conspiring with Trombetta.

4. Less than a month later, Orchestrate discovered that Trombetta and BP were in fact using Orchestrate's Confidential Information, which Trombetta obtained during his employment with Orchestrate and that Defendants were openly violating Trombetta's contracts with Orchestrate and intentionally pursuing Orchestrate's clients. Furthermore, Defendants BP and Kelly Myers ("Myers") made numerous false and fraudulent representations, including that Orchestrate's confidential information would not be used against Orchestrate and that BP would not attempt to steal Orchestrate's clients.

5. On or about October 9, 2012, BP entered into an agreement with Orchestrate that BP would not steal Orchestrate's clients or use Orchestrate's confidential information to Orchestrate's detriment.[1] Myers further represented that he would not use Orchestrate's confidential information against it and that Myers would not attempt to steal Orchestrate's clients. Orchestrate attached substantial importance to Defendants' representation that they would not use Orchestrate's confidential information against it and that Defendants would not attempt to steal Orchestrate's clients and relied on those representations in proceeding to deal with Defendants, providing Defendants with Orchestrate's confidential information, and jointly marketing its services with BP. Orchestrate would not have continued to deal with Defendants had they not represented that Orchestrate's information would be kept confidential and that Defendants would not steal Orchestrate's clients, or had Defendants disclosed that their true plan was to obtain Orchestrate's confidential information for the purpose of disclosing it to third parties with the intent of interfering with and stealing Orchestrate's business. The fact that Defendants have flagrantly disregarded even the Orders of this Court that were designed to protect Orchestrate's confidential information, and that Trombetta began pursuing Orchestrate's clients for the benefit of BP almost immediately upon his resignation from Orchestrate, demonstrates that Defendants knew their representation that Orchestrate's information would be kept confidential and that Defendants would not steal Orchestrate's clients was false, and that Defendants made that false representation with the intent that Orchestrate rely on it in continuing to deal with Defendants.

---

[1] See Exhibit 1, Non-Disclosure Agreement.

**DECLARATION OF MOUZON BASS, III**                                     **PAGE 2**

6.    Orchestrate's claims against Defendant Trombetta, and certain claims pled against BP and the other Defendants, relate to any source of lost or stolen revenue, not just one damage model or a limited group of 24 or 26 schools, as contended by BP.

7.    I understand that Defendants Borden-Perlman Insurance Agency, Inc., ("BP") Kelly Myers ("Myers"), and Dave Icenhower ("Icenhower") (collectively "Defendants") have challenged various elements of Orchestrate's claims with respect to twenty-six schools: (1) Christopher Newport; (2) Cleveland State; (3) Cuesta College; (4) Davis & Elkins; (5) Delta State; (6) Glenville University; (7) High Point; (8) Los Rios University; (9) Oklahoma Baptist University; (10) Peralta; (11) Pine Bluff; (12) Providence; (13) Rider; (14) Sam Houston; (15) Samford; (16) San Joaquin Delta; (17) Slippery Rock; (18) Southern Methodist University; (19) TCU; (20) Tiffin; (21) Union; (22) University of Louisiana-Lafayette; (23) University of Maryland; (24) University of Southern Indiana; (25) Valdosta, and (26) Youngstown, hereinafter ("Schools").

8.    Prior to BP's interference and defamation, Orchestrate had an established business relationship with every School. In addition to written contracts, Orchestrate also had oral contracts for repricing claims and for the provision of certain other services with numerous other Schools. Orchestrate had written contracts with Christopher Newport, Cleveland State, Davis & Elkins, Delta State, Glenville University, High Point, Oklahoma Baptist University, Providence, Rider, Sam Houston, Samford, Slippery Rock, Southern Methodist University, TCU, Tiffin, Union, Valdosta, Youngstown, Pine Bluff, San Joaquin Delta, and the University of Maryland.  Orchestrate had oral contracts with Cuesta College, Los Rios University, the University of Southern Indiana, the University of Louisiana-Lafayette, and Peralta.

9.    Orchestrate provides four areas of service: (1) re-pricing claims; (2) software; (3) billing; and (4) primary insurance.  Accordingly, even if a School was using Orchestrate's re-pricing services, for example, that School would still be a prospective client of Orchestrate's with respect to software, billing, primary insurance, and for any additional contract years on any service.

10.    I have personally been involved in the creation of the damages models provided by the Orchestrate in this case. Those models are all based directly on data received as a result of subpoenas issued to third parties in this case or Orchestrate's own records. Although the model will continue to evolve as fact discovery continues, it is a fair and reasonable calculation of certain of Orchestrate's damages which result directly from the improper actions of Defendants. I base that statement on my analysis of the actual data produced in this case as well as the evidence which has been brought forth in discovery, specifically but not limited to the deposition testimony obtained in this case.  OHRI 653970- OHRI

653977 is Orchestrate's current damages model ("Damages Model"),[2] which specifically shows the damages to Orchestrate resulting from lost repricing revenue, software revenue, billing revenue, and other collegiate sports insurance revenue. Orchestrate suffered these damages as a direct result of the actions taken by Defendants, specifically but not limited to providing false information to our clients and Arch Insurance. Several colleges have already testified that they stopped doing business with Orchestrate as a direct result of the statements made to them by Defendants. The Damages Model is currently composed of one page per school for which Orchestrate suffered certain damages as a result of Defendants' actions. Each page reflects a total amount of damages per school based on certain terms and lines of business. Each page is essentially split into 2 parts. The top part contains the repricing and software damages suffered by Orchestrate. While there are 2 damage columns per page, the second damage column is just the total numbers for all of the schools contained in the damage model. The first 8 lines of the page are based on data received as a result of the subpoenas issued to 3rd parties in this case. This is actual claims data for Orchestrate's clients. The next 4 lines contained under the heading "Vivature Repriced Data" is data obtained from Orchestrate's own records. Once again this data is actual claims data for Orchestrate'a clients. Accordingly every number or calculation contained in these 12 lines is actual data, or a mathematical calculation based on that data, and does not contain any estimates.

11. The next 4 lines, starting with "Repricing Fees owed to Vivature" is a calculation of repricing fee damage. Once again, this calculation is based on actual data and shows payments which are due to Orchestrate, as a result of repricing, for which Orchestrate was never paid. Orchestrate has then subtracted certain costs from the revenue amount to obtain the "Fees Due to Vivature."

12. The "Payments Made" section simply documents the payments received by Orchestrate as payment for the repricing services listed above. This is actual data and not an estimate.

13. The "Annual and Fixed Cost" section reflects damages which Orchestrate suffered by not receiving payments for certain items. These are also actual damages and not estimates. The total for that section is labeled "Damages before diversion Claims."

14. The next two lines reflect a mathematical calculation of multiplying the "Avg % Savings", listed above, times the "Total Known Claim Dollars Elig. For Re-Pricing" listed above. That calculation is then multiplied by 25% as that is the contractual amount each school agreed to pay to Orchestrate as a result of these savings from repricing.

15. The "Annual Damages" calculation is a mathematical calculation of adding the various damage amounts listed above. The "Past and Future Damages based on only 2 Years" line

---

[2] Exhibit 2, OHRI 653970- OHRI 653977.

**DECLARATION OF MOUZON BASS, III**                                        **PAGE 4**

is a calculation of 2 years' worth of these damages. Given Orchestrate's contracts, both oral and written, with these schools this is a conservative calculation of lost repricing and software damages. In the first place, the majority of the contracts with these schools were for terms longer than 2 years. Additionally, Orchestrate's contracts with schools all contain renewal clauses. Based on my experience with Orchestrate's clients, the renewals, and the longevity of business which Orchestrate has experienced in the past, this 2-year calculation is far from speculative and is more than reasonable. Orchestrate rarely loses clients, other than those clients lost as a result of Defendants' improper actions. Orchestrate cultivates a good relationship with their clients, and as a result, Orchestrate's clients predominately stay a client of Orchestrate's for the duration of their contract term and longer.

16. The next part of the Damages Model is a calculation of lost revenue from the loss of selling certain insurance policies and providing certain billing services to the schools. These calculations are based on actual revenues received from current clients of Orchestrate's. For each school, a comparison was done in order to ensure that an accurate amount of damages was calculated. That comparison focused on the division the school was in as well as the number of athletes the school had. The final factor considered was whether or not the school had a football program as generally if a school has a football program the school experiences a larger amount of athletic injuries. Once these 3 factors were analyzed, Orchestrate then compared those factors and matched them to current school clients with similar factors. Once a match was found, Orchestrate then utilized actual data from those current clients to calculate the damages in this part. A calculation was then made based on 5 years of damages. Once again, based on my experience, as described above, this calculation is reasonable, fair, and accurate. When it comes to billing, our clients are exceptionally impressed with our services as we are creating a way for an athletic department to create an entirely new revenue stream. The capture of additional revenue is always a major priority for these athletics departments. As a result of Orchestrate billing services for other schools, Orchestrate has enabled schools to generate millions of dollars of revenue.

17. As reflected on the Damages Model, with respect to Cuesta College, Christopher Newport, Cleveland State, Davis & Elkins, Delta State, Glenville University, High Point, Los Rios University, Oklahoma Baptist University, Peralta, Pine Bluff, Providence, Sam Houston, Samford, Slippery Rock, Southern Methodist University, Tiffin, Union, and San Joaquin Delta, University of Louisiana-Lafayette, University of Maryland, University of Southern Indiana, Valdosta, and Youngstown, Defendants' defamation and interference has caused damage in the form of lost revenue and profits from (1) re-pricing; (2) software; (3) billing; and (4) primary insurance. With respect to Rider and TCU, Defendants' defamation and interference has caused damage in the form of lost revenue and profits from re-pricing.

18. Orchestrate has provided BP a copy of contracts which were sent to and some which were ultimately signed by the schools. Further, the fact that Orchestrate did perform certain

**DECLARATION OF MOUZON BASS, III**                                                          **PAGE 5**

services, as is shown in the Damages Model, to certain schools is proof that oral agreements existed with those schools. Otherwise, the schools would never have provided Orchestrate with the information that was necessary to perform those services. I personally made BP aware of the contracts between Orchestrate and the schools Orchestrate serviced as part of the business agreement which was reached with BP. Many of those contracts were circulated between BP and Orchestrate before they were presented to the schools. This happened as a direct result of the business arrangement between BP and Orchestrate.

19.     As noted, due to Orchestrate's 15+ year history in the insurance industry, reputation, and track record of client satisfaction with its services, Orchestrate typically keeps its clients much longer than any initial term.  Attached hereto is a document, produced to Defendants, showing that more than 90% of Orchestrate's current clients have contract terms of two years or more.[3]  Historically, Orchestrate has also been exceptionally successful in converting existing contracts to those for additional services. Approximately 80% of the schools to whom Orchestrate has sold software convert to using Orchestrate's direct billing services. One School has already testified that because of Defendants' interference, it cut off negotiations to purchase additional insurance services through Orchestrate, and two others have testified that due to Defendants' negative statements, the Schools stopped doing business with Orchestrate.[4]  Based on Orchestrate's history and track record of success, and the fact that multiple Schools stopped doing business with Orchestrate due to Defendants' negative statements and interference, it was reasonably probable that Orchestrate would have entered into an additional business relationship had Defendants not interfered.

20.     Orchestrate HR was the contracting party on the majority of the written repricing contracts, and Orchestrate HR was the party entitled to receive proceeds under all of the contracts. Furthermore, Orchestrate HR was also the contracting party on the verbal contracts with numerous schools for which Orchestrate seeks damages.  In addition, Plaintiffs have recently produced a financial document to Defendants which shows that all profits and losses from Vivature flow directly to Orchestrate.[5] I have reviewed the written contracts between Orchestrate and the schools Orchestrate serviced.  On all but a handful of the contracts, Orchestrate HR is the contracting party.  On the few contracts for which Orchestrate HR is not the named contracting party, Orchestrate HR is referenced in the contract, or Orchestrate HR participated in the performance of the contract, including by receiving proceeds under the contract, and Orchestrate HR was subject to the rights and obligations under the contract.  Furthermore, the numerous verbal contracts with these and additional schools were consistent to the extent that the contracting party was Orchestrate

---

[3] Exhibit 3, OHRI 85493.

[4] Exhibits 4 and 5, Tim Lengle Depo., Vol. 2, March 30, 2016; 230:1-25; 231:1-25; 232:1-16; Affidavits of Tim Lengle, Thomas Sheldon, David Maldonado.

[5] This document, OHRI 688472-688477, has been designated as "Confidential Attorneys' Eyes Only," but should any dispute arise as to this document, it will produced *in camera* for review by the Court.

**DECLARATION OF MOUZON BASS, III**                                              **PAGE 6**

HR, Orchestrate HR participated in and received funds under the contracts, and Orchestrate HR was subject to the rights and obligations under the contracts. Furthermore, BP was not the broker for all of Arch Insurance Company's ("Arch's") insureds with whom Orchestrate had contractual relationships.

21.     As a result of facts learned during discovery, Plaintiffs confirmed that Trombetta and BP were colluding against Orchestrate, even while Trombetta was still employed by Orchestrate HR. Further, BP breached its contract with Orchestrate. Before the contract between BP and Orchestrate ended, BP had been attempting to steal Orchestrate's clients, going so far as to allowing, encouraging, and causing third parties breach their contracts with Orchestrate. Orchestrate has also learned that BP's employees Myers and Dave Icenhower ("Icenhower") personally participated in BP's breaches and have, among other things defamed Orchestrate to many of Orchestrate's clients. Due to BP's, Myers', and Icenhower's (collectively Defendants') active concealment of their wrongful acts, including by lying at depositions, Orchestrate has been unable to discover the full nature of Defendants' tortious activity and are now being forced to have to take the depositions of over 20 schools spread out across the United States.

22.     Orchestrate's claims against Myers and Icenhower arose out of the same conduct, transactions, and occurrences set forth in Plaintiff's Original Petition, filed in Dallas County, Texas, on May 31, 2013.

23.     On or about September 2014, a face-to-face meeting between the parties was held, where I, Trombetta, Icenhower, Myers, Lance Wilson, and counsel for the parties were present to discuss the parties' claims and damages. At this meeting, a February 1, 2013, e-mail between Icenhower and Occupational Health Networks, concerning redirecting Orchestrate's claims and obtaining Myers' approval, was circulated.

24.     With respect to the contract between Orchestrate and BP, Orchestrate provided a benefit to BP by allowing BP's employees to access Orchestrate's confidential information. Furthermore, Trombetta was given access to Orchestrate's pricing policies, negotiation strategies, agreements with numerous third parties, as well as other confidential and proprietary information that Orchestrate developed over decades of being in business. Orchestrate disputes BP's claim that Orchestrate breached any contract with BP. Had all schools' claims been submitted to Orchestrate for repricing, as the schools' contracts mandated, Orchestrate would have paid the repricing revenue to BP under the terms of the contract. However, as Orchestrate has learned in part and confirmed through discovery, BP intentionally interfered with those schools' contracts and redirected their business away from Orchestrate. Orchestrate also does not believe BP paid its portion of the repricing revenue owed to Orchestrate for 2012, and Orchestrate requires additional discovery to confirm this. It is also notable that Defendants made no communication to Orchestrate that Orchestrate had breached any contract, made no demand in writing for any monies owed

DECLARATION OF MOUZON BASS, III                                                          PAGE 7

until the filing of their counterclaim in this suit, and have offered no evidence of the money they claims they are owed. Additionally, the contract could have been performed in one year, and in fact, it was breached by BP in less than one year.

25. For the schools they service, Orchestrate receives the demographic information of a school's athletes along with the primary insurance information before any claim is even received from a school. Orchestrate then loads that information into the NExTT software system. This process takes 3 days on average. Orchestrate has a dedicated staff (approximately 20 employees in this department) that handles this type of information daily. Orchestrate then enrolls the uninsured athlete into the repricing network – this typically takes 7 days to result in an update. Orchestrate then receives a claim for repricing, and it is routed through the repricing network – this process typically takes no longer than 14 business days. This workflow and the associated times were shared with BP and defined from the very beginning with the schools and BP. Orchestrate would receive claims for repricing and would process them per these timeframes in a timely manner. This is something that even today Orchestrate still adheres to for its over 200 collegiate sports clients that utilize repricing, not to mention thousands of its other clients. These time frames could be exceeded if a school, provider, or other party failed to provide necessary or required information. This would not be a case of Orchestrate failing to timely repricing claims, but instead part of the normal process of issues that can arise in the repricing of claims that Orchestrate is not responsible for nor were they expected to be held accountable for. Defendants' attempt to justify their actions by making this claim is misplaced and is no excuse for the false and defamatory statements they made to Orchestrate's clients.

26. Furthermore, I have personally been involved in a review of the claims handled by Orchestrate. Orchestrate did not fail to properly adjudicate any claims. First, the definition of "adjudication" is vague and susceptible to many different interpretations. Orchestrate properly processed claims for repricing. The audits that took place came as a direct result of the false information provided by BP to Arch and its agents. The loss of business resulted directly from BP's defamatory statements and attempts to steal Orchestrate's business, as is shown by three affidavits given by three different schools' employees.

27. The proprietary NExTT software has always, and still does have, all the fields necessary to capture and handle student accident claims regardless of the insurance company that may be involved. These fields have always included the accident injury date and date of service as well as any other fields necessary to handle these claims. It is a completely false statement by BP that the NExTT software system did not, at any point in time, capture the information required by any insurance company. Had this been the case, that insurance company could have contacted Orchestrate, and Orchestrate could have modified the NExTT entry fields and simply added a field to capture whatever alleged missing information was needed. Defendants' claim to schools that the NexTT software did not

**DECLARATION OF MOUZON BASS, III**                                      **PAGE 8**

capture the necessary information is false and hurt Orchestrate's business relationship with these schools.

28.    I was personally involved in the discussions with Arch as to the actions Orchestrate was allowed to perform. Arch authorized and allowed Orchestrate to handle school claims underneath the aggregate deductible. Arch instructed Administrative Concepts ("ACI") to only become involved in handling a schools claims once it was believed the aggregate deductible had been met. While Arch did not specifically authorize Orchestrate to be an agent third party administrator to handle claims once the aggregate deductible had been met, this is radically different than the actions which were taken by Orchestrate.

29.    I am very familiar with Orchestrate's handling of claims and the NExTT system. The NExTT system is specifically designed to generate useable claim forms. This is a key component of the system. Orchestrate has used this system to generate claims forms for multiple insurance companies both before and since its relationship with BP. The evidence has shown that BP's own employees were incompetent and did not understand how to properly use the NExTT system, even after being instructed on how to do so. Jen Park, the NAGHA representative who complained about this, actually admitted that she never even attended the training session that Orchestrate offers for the NExTT system. I have personal knowledge of her failure to attend. Interestingly, Orchestrate is able to show that at least one NAGHA employee utilized the NExTT system over 40 different times. This is just another example of a false statement made by BP, to Orchestrate's clients, designed to steal business away from Orchestrate.

30.    I have personally been involved in responding to the audits which resulted from BP's improper actions. I have been able to determine that it was BP's own employees who provided incorrect information to Arch's agents which resulted in Arch requesting audits. Orchestrate's claims system captured and retained sufficient information in order to respond to the audits. These audits took place well after BP began its campaign to defame and steal business from Orchestrate.

31.    Even if Arch made a decision to stop using Orchestrate's services, BP was not forced to interfere with the contracts between the schools and Orchestrate. It was not the only option left for these schools to violate their contracts with Orchestrate. As just one example of a viable alternative, the schools could have challenged Arch on whether or not Arch even had the authority to control who a school used as a repricer or who would handle the school's funds before Arch's policy came into play.

32.    When Myers told numerous Schools to visit an internet link with supposed language about Orchestrate's embezzlement in it, Myers did not tell the Schools that what he was referring to was an order denying the relief requested, and the Judge had just been reciting the facts

DECLARATION OF MOUZON BASS, III                                                    PAGE 9

pled. Instead, Myers gave the false impression that the Judge had found the allegations against Orchestrate to be true.

33.    Among other things, Defendants informed numerous Schools that they were not allowed to send claims to Orchestrate for repricing; that Orchestrate's discounts were not any good; that Orchestrate's software and claims forms did not work; and that no insurance company vendor would do business with Orchestrate or accept Orchestrate's claim forms. Defendants redirected claims to other repricers and refused to send monies to Orchestrate that the Schools thought Orchestrate had been holding—Defendants repeatedly lied to those Schools, inferring that Orchestrate had kept the money, which caused lots of problems with the administrators.   Furthermore, Defendants told numerous Schools that Orchestrate was the sole cause of delay in getting claims paid, that AIG was refusing to accept any claims which were repriced by Orchestrate, and that Orchestrate was not providing claim forms.   Additionally, Defendants implied that Orchestrate was an unlicensed third-party administrator, illegally writing checks for the schools.   These statements created numerous false impressions, as Defendants intentionally failed to put any of these statements in a proper context. Defendants were aware that NAHGA and ACI were causing delays in claims. Defendants did not tell the Schools that Defendants had already been redirecting claims, and, therefore, the delays did not even involve Orchestrate. With respect to the statement that Orchestrate's repricing was not good, Defendants did not tell the Schools that Defendants had redirected claims away from Orchestrate, so the Schools were not even getting the benefit of Orchestrate's repricing. With respect to the suggestion that Arch refused to allow Orchestrate to deal with Schools' claims in any way, Defendants knew that Arch did not have the authority to force the Schools to breach their contracts with Orchestrate. Defendants did not tell the Schools that Defendants had lied and said that the Schools did not have contracts with Orchestrate, nor did Defendants tell the schools that Defendants and Orchestrate were already in a dispute at the time these statements were made.  With respect to the statement that no insurance company would do business with Orchestrate, Defendants did not tell the Schools that other than Arch, not a single insurance company had taken this position. With respect to the suggestion that Orchestrate had to be a licensed TPA to reprice claims, Defendants were falsely telling Schools it did not know where their money was, and Defendants did not disclose that they had redirected the money away from Orchestrate.   With respect to the statement that Orchestrate was not cooperating with NAHGA and ACI, Defendants did not tell the Schools that ACI refused to use Orchestrate'a software and NAHGA had an antiquated system that could not interface with Orchestrate's advanced system. In addition, specifically with respect to the University of Maryland, Defendants told the new trainer and athletic director that Orchestrate did not have authority to pay non-sports-related injury claims. Defendants continue to take that position in this lawsuit, despite that BP was fully aware of the University's discretionary account.

**DECLARATION OF MOUZON BASS, III**                                    **PAGE 10**

34.    I am the custodian of records for Orchestrate in the above action, and as such I am the custodian of the records of Orchestrate attached hereto.  Furthermore, I incorporate by reference as if fully stated herein my affidavit dated May 20, 2013, attached to Plaintiffs' Original Petition, filed May 31, 2013, in the 192nd Judicial District of Dallas County, Texas, and all records attached thereto.  These records are kept by Orchestrate in the regular course of business.  It was the regular course of business for an employee or representative of Orchestrate with knowledge of the act, event, condition, or opinion recorded to: (i) file such documents when received, or (ii) to make the records, or (iii) to transmit information thereof to be included in such record.  The records were received, transmitted, or made at or near the time of the act, event, condition, or opinion recorded, or reasonably soon thereafter.  The records are the originals or exact duplicates of the originals.  All of the above referenced documents have been maintained in the files of Orchestrate in the regular course of business.

35.    I declare under penalty of perjury that the foregoing is true and correct.


Mouzon Bass, III


I:\EDH\BP\Pleadings 3 13-cv-02110\declaration_bass_042716.docx


DECLARATION OF MOUZON BASS, III                                                           PAGE 11

Pls.' App. 012

# EXHIBIT 1

Pls.' App. 013

**From:**   Muzzy Bass <muzzy@orchr.com>
**To:**      1. Kelly Myers <kmyers@bordenperlman.com>
            2. Lance Wilson <lwwilson@orchr.com>
**Subject:** Fwd: Generic version - NDA
**Sent:**    10/9/2012 3:09:06 AM +00:00
**Attachments** 1. Non Disclosure Agreement - Generic Version.doc
**:**        2. ATT00001.htm
Here is our generic NDA thx


Begin forwarded message:

**From:** "Chris Harrison" <csharrison@ebenconcepts.com>
**Date:** October 8, 2012 11:05:47 PM EDT
**To:** "Muzzy Bass" <muzzy@orchr.com>
**Subject: Generic version - NDA**

Here you go... ...




Chris Harrison, President

EbenConcepts

921-C S. McPherson Church Road

Fayetteville, NC 28303

(910) 323-0290 ext. 303

(910) 308-6865 Cell Phone

(910) 323-1731 Fax

csharrison@ebenconcepts.com


CONFIDENTIAL

BP_ORCHESTRATE0012793


Pls.' App. 014

## MUTUAL NONDISCLOSURE AGREEMENT

This Mutual Nondisclosure Agreement (this "**Agreement**") between _____, a Texas corporation, and **Dental Medical Economics, Employers Direct Health, Orchestrate HR, and EbenConcepts Company**, all Texas Corporations (each a "**Party**" and collectively, the "**Parties**"), is dated as of the latest date set forth on the signature page hereto.

1.      General. In connection with the consideration of a possible negotiated transaction (a "**Possible Transaction**") between the Parties and/or their respective subsidiaries (each such Party being hereinafter referred to, collectively with its subsidiaries, as a "**Company**"), each Company (in its capacity as a provider of information hereunder, a "**Provider**") is prepared to make available to the other Company (in its capacity as a recipient of information hereunder, a "**Recipient**") certain "**Evaluation Material**" (as defined in Section 2 below) in accordance with the provisions of this Agreement, and to take or abstain from taking certain other actions as hereinafter set forth.

2.      Definitions.

(a)      The term "**Evaluation Material**" means information concerning the Provider which has been or is furnished to the Recipient or its Representatives in connection with the Recipient's evaluation of a Possible Transaction, including its business, financial condition, operations, assets and liabilities, and includes all notes, analyses, compilations, studies, interpretations or other documents prepared by the Recipient or its Representatives which contain or are based upon, in whole or in part, the information furnished by the Recipient hereunder. The term Evaluation Material does not include information which (i) is or becomes generally available to the public other than as a result of a disclosure by the Recipient or its Representatives in breach of this Agreement, (ii) was within the Recipient's possession prior to its being furnished to the Recipient by or on behalf of the Provider, provided that the source of such information was not bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, the Provider with respect to such information, or (iii) is or becomes available to the Recipient on a non-confidential basis from a source other than the Provider or its Representatives, provided that such source is not bound by a confidentiality agreement with, or other contractual, legal or fiduciary obligation of confidentiality to, the Provider with respect to such information.

(b)      The term "**Representatives**" shall include the directors, officers, employees, agents, partners or advisors (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors) of the Recipient or Provider, as applicable.

(c)      The term "**Person**" includes the media and any corporation, partnership, group, individual or other entity.

3.      Use of Evaluation Material. Each Recipient shall, and it shall cause its Representatives to, use the Evaluation Material solely for the purpose of evaluating a Possible Transaction, keep the Evaluation Material confidential, and, subject to Section 5, will not, and will cause its Representatives not to, disclose any of the Evaluation Material in any manner

HLG 225802

1

CONFIDENTIAL

BP_ORCHESTRATE0012794

Pls.' App. 015

whatsoever, provided, however, that any of such information may be disclosed to the Recipient's Representatives who need to know such information for the sole purpose of helping the Recipient evaluate a Possible Transaction. Each Recipient agrees to be responsible for any breach of this Agreement by any of such Recipient's Representatives. This Agreement does not grant a Recipient or any of its Representatives any license to use the Provider's Evaluation Material except as provided herein.

4.    Non-Disclosure of Discussions. Subject to Section 5, each Company agrees that, without the prior written consent of the other Company, such Company will not, and it will cause its Representatives not to, disclose to any other Person (i) that Evaluation Material has been exchanged between the Companies, (ii) that discussions or negotiations are taking place between the Companies concerning a Possible Transaction or (iii) any of the terms, conditions or other facts with respect thereto (including the status thereof).

5.    Legally Required Disclosure. If a Recipient or its Representatives are requested or required (by oral questions, interrogatories, other requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose any of the Evaluation Material or any of the facts disclosure of which is prohibited under Section 4 above, such Recipient shall provide the Provider with prompt written notice of any such request or requirement together with copies of the material proposed to be disclosed so that the Provider may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. If, in the absence of a protective order or other remedy or the receipt of a waiver by the Provider, a Recipient or its Representatives are nonetheless legally compelled to disclose Evaluation Material or any of the facts disclosure of which is prohibited under Section 4 or otherwise be liable for contempt or suffer other censure or penalty, such Recipient or its Representatives may, without liability hereunder, disclose to such requiring Person only that portion of such Evaluation Material or any such facts which the Recipient or its Representatives is legally required to disclose, provided that the Recipient and/or its Representatives cooperate with the Provider to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded such Evaluation Material or such facts by the Person receiving the material.

6    Return or Destruction of Evaluation Material. If either Company decides that it does not wish to proceed with a Possible Transaction, it will promptly inform the other Company of that decision. In that case, or at any time upon the request of a Provider for any reason, a Recipient will, and will cause its Representatives to, within five business days of receipt of such notice, destroy or return all Evaluation Material in any way relating to the Provider or its products, services, employees or other assets or liabilities, and no copy or extract thereof (including electronic copies) shall be retained. The Recipient shall provide to the Provider a certificate of compliance with the previous sentence signed by an executive officer of the Recipient. Notwithstanding the return or destruction of the Evaluation Material, the Recipient and its Representatives will continue to be bound by such Recipient's obligations hereunder with respect to such Evaluation Material.

HLG 325802

2

CONFIDENTIAL

BP_ORCHESTRATE0012795

7.     No Solicitation-Employment.  Neither Recipient will, within two years from the date of this Agreement, directly or indirectly solicit the employment or consulting services of or employ or engage as a consultant any of the officers or employees of the Provider, so long as they are employed by the Provider and for six months after they cease to be employed by Provider, nor any current or past customer of the Provider for a period of three (3) years after the expiration of the term of this Agreement.  A Recipient is not prohibited from soliciting by means of a general advertisement not directed at (i) any particular individual or (ii) the employees of the Provider generally.

8.     Maintaining Privileges.  If any Evaluation Material includes materials or information subject to the attorney-client privilege, work product doctrine or any other applicable privilege concerning pending or threatened legal proceedings or governmental investigations, each Company understands and agrees that the Companies have a commonality of interest with respect to such matters and it is the desire, intention and mutual understanding of the Companies that the sharing of such material is not intended to, and shall not, waive or diminish in any way the confidentiality of such material or its continued protection under the attorney-client privilege, work product doctrine or other applicable privilege.  All Evaluation Material provided by a Company that is entitled to protection under the attorney-client privilege, work product doctrine or other applicable privilege shall remain entitled to such protection under these privileges, this Agreement, and under the joint defense doctrine.

9.     Not a Transaction Agreement.  Each Company understands and agrees that no contract or agreement providing for a Possible Transaction exists between the Companies unless and until a final definitive agreement for a Possible Transaction has been executed and delivered, and each Company hereby waives, in advance, any claims (including, without limitation, breach of contract) relating to the existence of a Possible Transaction unless and until both Companies shall have entered into a final definitive agreement for a Possible Transaction.  Each Company also agrees that, unless and until a final definitive agreement regarding a Possible Transaction has been executed and delivered, neither Company will be under any legal obligation of any kind whatsoever with respect to such Possible Transaction by virtue of this Agreement except for the matters specifically agreed to herein.  Neither Company is under any obligation to accept any proposal regarding a Possible Transaction and either Company may terminate discussions and negotiations with the other Company at any time.

10.     No Representations or Warranties; No Obligation to Disclose.  Each Recipient understands and acknowledges that neither the Provider nor its Representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of the Evaluation Material furnished by or on behalf of such Provider and shall have no liability to the Recipient, its Representatives or any other Person relating to or resulting from the use of the Evaluation Material furnished to such Recipient or its Representatives or any errors therein or omissions therefrom.  As to the information delivered to the Recipient, each Provider will only be liable for those representations or warranties which are made in a final definitive agreement regarding a Possible Transaction, when, as and if executed, and subject to such limitations and restrictions as may be specified therein.  Nothing in this Agreement shall be construed as obligating a Company to provide, or to continue to provide, any information to any Person.

DC 225802

3

BP_ORCHESTRATE0012796

11.   Modifications and Waiver. No provision of this Agreement can be waived or amended in favor of either Party except by written consent of the other Party, which consent shall specifically refer to such provision and explicitly make such waiver or amendment. No failure or delay by either Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or future exercise thereof or the exercise of any other right, power or privilege hereunder.

12.   Remedies. Each Company understands and agrees that money damages would not be a sufficient remedy for any breach of this Agreement by either Company or any of its Representatives and that the Company against which such breach is committed shall be entitled to equitable relief, including injunction and specific performance, as a remedy for any such breach or threat thereof. Such remedies shall not be deemed to be the exclusive remedies for a breach by either Company of this Agreement, but shall be in addition to all other remedies available at law or equity to the Company against which such breach is committed.

13.   Legal Fees. In the event of litigation relating to this Agreement, if a court of competent jurisdiction determines that either Company or its Representatives has breached this Agreement, then the Company which is, or the Company whose Representatives are, determined to have so breached shall be liable and pay to the other Company the reasonable legal fees and costs incurred by the other Company in connection with such litigation, including any appeal therefrom.

14.   Governing Law. This Agreement is for the benefit of each Company and shall be governed by and construed in accordance with the laws of the State of Texas applicable to agreements made and to be performed entirely within such State.

15.   Severability. If any term, provision, covenant or restriction contained in this Agreement is held by any court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants or restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and if a covenant or provision is determined to be unenforceable by reason of its extent, duration, scope or otherwise, then the Companies intend and hereby request that the court or other authority making that determination shall only modify such extent, duration, scope or other provision to the extent necessary to make it enforceable and enforce them in their modified form for all purposes of this Agreement.

16.   Construction. The Companies have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Companies and no presumption or burden of proof shall arise favoring or disfavoring either Company by virtue of the authorship at any of the provisions of this Agreement.

17.   Term. This Agreement shall terminate five years after the date of this Agreement.

HOU 225802

4

CONFIDENTIAL

BP_ORCHESTRATE0012797

Pls.' App. 018

# EXHIBIT 2

Pls.' App. 019

## Damage Speedsheet

| Orchestrate HR Contract | | 2012-2013 | |
|---|---|---|---|
| | | Sam Houston "NAHGA" | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | unknown | |
| ACI/NAHGA Total number of Known Claims: | | unknown | |
| Total Known Claims dollars diverted from Vivature: | | unknown | |
| Total Known Claims diverted from Vivature: | | unknown | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | | 134,858.75 | $ 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 169 | 1649 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | | 54,633.54 | $ 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 40.5% | 45% |
| **Vivature Repriced Data** | | | |
| Number of Claims | | 2 | 1058 |
| Avg Billed Charge | $ | 261.50 | $ 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 140.40 | $ 28,426.74 |
| Vivature Avg % Savings | | 54% | 50% |
| Repricing fees owed to Vivature | $ | 30.68 | $ 52,159.99 |
| Network Fees | $ | 8.53 | $ 25,804.80 |
| Varible Cost Plus Commission | $ | 3.29 | $ 9,963.38 |
| **Fees Due to Vivature** | $ | 18.65 | $ 56,401.91 |
| **Payments Made** | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | | $ 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | | $ 19,791.70 |
| **Annualized Sunk Cost** | | | |
| Scanner Cost | $ | | $ 1,350.00 |
| Ipad Cost | $ | | $ 11,200.00 |
| Set Up Fee | $ | 3,000.00 | $ 48,000.00 |
| Annual NExTT Fee | $ | 3,500.00 | $ 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ - |
| **Damages before diversion Claims** | $ | 6,518.65 | $ 162,451.91 |
| **Estimated Lost Re-Pricing Savings** | $ | 72,406.00 | $ 1,019,529.59 |
| **Lost Repricing Revenue** | $ | 18,101.50 | $ 254,882.40 |
| **Annual Damages** | $ | 24,620.15 | $ 417,334.31 |
| Past and Future Damages based on only 2 Year | $ | 46,291.85 | $ 1,008,032.55 |

| Revenue Generation Years | | 2013-2018 | |
|---|---|---|---|
| | | Sam Houston | TOTAL |
| **School Division** | | DIV I (FCS) | |
| **# of Athletes** | | 350-450 | |
| **Football (YES/NO)** | | Yes | |
| Estimated Annual Billing Revenue | $ | 65,606.00 | $ 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ 202,500.00 |
| Annual Total | $ | 78,106.00 | $ 1,529,372.00 |
| **5 Year Billing Damages** | $ | 390,530.00 | $ 7,646,860.00 |
| **Re-Pricing Damages** | $ | 46,291.85 | $ 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 436,821.85 | $ 8,654,892.55 |

Similar School (Current Billing Client)          SFA

CONFIDENTIAL

OHRJ 653970

Pls.' App. 020

## Damage Speedsheet

| Orchestrate HR Contract | | 2011-2012 | | 2012-2013 | | |
|---|---|---|---|---|---|---|
| | | Youngstown "ACI" | | Youngstown "ACI" | | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | $ | 271,070.20 | $ | 17,359.97 | | |
| ACI/NAHGA Total number of Known Claims: | | 254 | | 43 | | |
| | | | | | | |
| Total Known Claims dollars diverted from Vivature: | $ | 53,008.49 | $ | 719.87 | | |
| Total Known Claims diverted from Vivature: | | 63 | | 22 | | |
| | | | | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | $ | 28,685.90 | $ | 719.87 | $ | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 46 | | 22 | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | $ | 475.30 | $ | - | $ | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 1.7% | | 0.0% | | 45% |
| | | | | | | |
| ***Vivature Repriced Data*** | | | | | | |
| Number of Claims | | 61 | | 44 | | 1058 |
| Avg Billed Charge | $ | 1,880.54 | $ | 2,994.17 | $ | 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 1,109.80 | $ | 1,273.99 | $ | 28,426.74 |
| Vivature Avg % Savings | | 59% | | 43% | | 50% |
| | | | | | | |
| Repricing fees owed to Vivature | $ | 17,957.34 | | | $ | 92,159.99 |
| Network Fees | $ | 5,028.06 | | | $ | 25,808.90 |
| Varible Cost Plus Commission | $ | 1,939.39 | | | $ | 9,993.28 |
| Fees Due to Vivature | $ | 10,989.89 | | | $ | 56,401.91 |
| | | | | | | |
| **Payments Made** | | | | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | | $ | | $ | 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to | | | | | | |
| claims. Need more info to reconcile. | $ | | $ | | $ | 19,791.70 |
| | | | | | | |
| **Annual and Fixed Cost** | | | | | | |
| Scanner Cost | $ | | $ | | $ | 1,350.00 |
| Ipad Cost | $ | | $ | | $ | 11,200.00 |
| Set Up Fee | $ | | $ | | $ | 48,000.00 |
| Annual NExTT Fee | $ | | $ | | $ | 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ | - | $ | - |
| Damages before diversion Claims | $ | 10,989.89 | $ | | $ | 162,451.91 |
| Estimated Lost Re-Pricing Savings | $ | 16,928.97 | $ | 306.30 | $ | 1,019,529.59 |
| Lost Repricing Revenue | $ | 4,232.24 | $ | 76.57 | $ | 254,882.40 |
| | | | | | | |
| **Annual Damages** | $ | 15,222.14 | $ | 76.57 | $ | 417,334.31 |
| | | | | | | |
| Past and Future Damages based of only 2 Years | $ | 36,378.83 | $ | 14,167.04 | $ | 1,008,032.55 |

| Revenue Generation Years | | 2011-2012 | | | |
|---|---|---|---|---|---|
| | | Youngstown St | | | TOTAL |
| ***School Division*** | | DIV I (FCS) | | | |
| ***# of Athletes*** | | 350-450 | | | |
| ***Football (YES/NO)*** | | Yes | | | |
| Estimated Annual Billing Revenue | $ | 65,606.00 | | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | | $ | 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | | $ | 202,500.00 |
| Annual Total | $ | 78,106.00 | | $ | 1,529,372.00 |
| ***5 Year Billing Damages*** | $ | 390,530.00 | | $ | 7,646,860.00 |
| ***Re-Pricing Damages*** | $ | 36,378.83 | $ | 14,167.04 | $ | 1,008,032.55 |
| ***GRAND TOTAL DAMAGES*** | $ | 426,908.83 | $ | 14,167.04 | $ | 8,654,892.55 |

Similar School (Current Billing Client)                SFA

CONFIDENTIAL

OHRI 653971

## Damage Speedsheet

| Orchestrate HR Contract | | 2011-2012 | | 2012-2013 | | |
|---|---|---|---|---|---|---|
| | | Delta "ACI" | | Delta "ACI" | | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | $ | 188,068.78 | $ | 295,421.40 | | |
| ACI/NAHGA Total number of Known Claims: | | 133 | | 307 | | |
| | | | | | | |
| Total Known Claims dollars diverted from Vivature: | $ | 97,818.73 | $ | 225,961.09 | | |
| Total Known Claims diverted from Vivature: | | 57 | | 246 | | |
| | | | | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | $ | 21,036.73 | $ | 61,256.62 | $ | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 41 | | 117 | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | $ | - | $ | 2,914.88 | $ | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 0.0% | | 4.8% | | .45% |
| | | | | | | |
| **Vivature Repriced Data** | | | | | | |
| Number of Claims | | 69 | | 94 | | 1058 |
| Avg Billed Charge | $ | 1,059.35 | $ | 2,387.83 | $ | 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 498.59 | $ | 867.38 | $ | 28,426.74 |
| Vivature Avg % Savings | | 47% | | 36% | | 50% |
| Repricing fees owed to Vivature | $ | | $ | 16,124.14 | $ | 92,159.99 |
| Network Fees | $ | | $ | 4,514.76 | $ | 25,804.80 |
| Varible Cost Plus Commission | $ | - | $ | 1,741.41 | $ | 3,953.28 |
| Fees Due to Vivature | $ | - | $ | 8,867.97 | $ | 56,405.91 |
| | | | | | | |
| **Payments Made** | | | | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | | $ | - | $ | 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | | $ | | $ | 19,791.70 |
| | | | | | | |
| **Annual and Fixed Cost** | | | | | | |
| Scanner Cost | $ | | $ | | $ | 1,350.00 |
| Ipad Cost | $ | | $ | | $ | 11,200.00 |
| Set Up Fee | $ | - | $ | - | $ | 48,000.00 |
| Annual NExTT Fee | $ | - | $ | - | $ | 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ | - | $ | - |
| Damages before diversion Claims | $ | | $ | 8,867.97 | $ | 162,451.91 |
| | | | | | | |
| Estimated Lost Re-Pricing Savings | $ | 9,901.07 | $ | 22,251.49 | $ | 1,019,529.59 |
| Lost Repricing Revenue | $ | 2,475.27 | $ | 5,562.87 | $ | 254,882.40 |
| | | | | | | |
| **Annual Damages** | $ | 2,475.27 | $ | 15,430.85 | $ | 417,334.31 |
| | | | | | | |
| Past and Future Damages based on only 2 Years | $ | 13,551.21 | $ | 41,377.15 | $ | 1,008,032.55 |

| Revenue Generation Years | | | | 2013-2014 | | |
|---|---|---|---|---|---|---|
| | | | | Delta St | | TOTAL |
| **School Division** | | | | Division II | | |
| **# of Athletes** | | | | 250-350 | | |
| **Football (YES/NO)** | | | | Yes | | |
| Estimated Annual Billing Revenue | $ | | $ | 42,969.00 | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | | $ | 5,000.00 | $ | 110,000.00 |
| Annual Service Fee | $ | | $ | 7,500.00 | $ | 202,500.00 |
| Annual Total | $ | | $ | 55,469.00 | $ | 1,529,372.00 |
| **5 Year Billing Damages** | $ | - | $ | 277,345.00 | $ | 7,646,860.00 |
| **Re-Pricing Damages** | $ | 13,551.21 | $ | 41,377.15 | $ | 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 13,551.21 | $ | 318,722.15 | $ | 8,654,892.55 |

Similar School (Current Billing Client)                    NWMSU

CONFIDENTIAL

OHRI 653972

## Damage Speedsheet

| Orchestrate HR Contract | | 2011 2012 | | 2012 2013 | | |
|---|---|---|---|---|---|---|
| | | TCU "NAHGA" | | TCU "NAHGA" | | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | unknown | | unknown | | |
| ACI/NAHGA Total number of Known Claims: | | unknown | | unknown | | |
| | | | | | | |
| Total Known Claims dollars diverted from Vivature: | | unknown | | unknown | | |
| Total Known Claims diverted from Vivature: | | unknown | | unknown | | |
| | | | | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | $ | 190,136.19 | $ | 83,755.53 | $ | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 101 | | 43 | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | $ | 85,777.65 | $ | 50,058.18 | | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 44.1% | | 59.8% | | 45% |
| | | | | | | |
| ***Vivature Repriced Data*** | | | | | | |
| Number of Claims | | 14 | | 80 | | 1058 |
| Avg Billed Charge | $ | 2,799.43 | $ | 3,694.80 | $ | 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 1,839.81 | $ | 2,391.14 | $ | 28,426.74 |
| Vivature Avg % Savings | | 66% | | 65% | | 50% |
| **Repricing fees owed to Vivature** | $ | | $ | | $ | 92,159.99 |
| Network Fees | $ | | $ | | $ | 25,804.80 |
| Varible Cost Plus Commission | $ | - | $ | | $ | 9,953.28 |
| **Fees Due to Vivature** | $ | | $ | | $ | 56,401.91 |
| | | | | | | |
| **Payments Made** | | | | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | 6,264.57 | $ | 17,125.04 | $ | 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | 75.68 | $ | 4,224.33 | $ | 19,791.70 |
| | | | | | | |
| **Annual and Fixed Cost** | | | | | | |
| Scanner Cost | $ | 150.00 | $ | | $ | 1,350.00 |
| Ipad Cost | $ | 700.00 | $ | | $ | 11,200.00 |
| Set Up Fee | $ | | $ | | $ | 48,000.00 |
| Annual NExTT Fee | $ | 3,500.00 | $ | 3,500.00 | $ | 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ | - | $ | - |
| **Damages before diversion Claims** | $ | 4,350.00 | $ | 3,500.00 | $ | 162,451.91 |
| | | | | | | |
| **Estimated Lost Re-Pricing Savings** | $ | 124,959.18 | $ | 54,205.47 | $ | 1,019,529.59 |
| **Lost Repricing Revenue** | $ | 31,239.79 | $ | 13,551.37 | $ | 254,882.40 |
| | | | | | | |
| **Annual Damages** | $ | 35,589.79 | $ | 17,051.37 | $ | 417,334.31 |
| | | | | | | |
| **Past and Future Damages based to only 2 Years** | $ | 76,768.92 | $ | 81,925.54 | $ | 1,008,032.55 |

| Revenue Generation Years | | | | TOTAL |
|---|---|---|---|---|
| **School Division** | | | | |
| **# of Athletes** | | | | |
| **Football (YES/NO)** | | | | |
| | | | | |
| Estimated Annual Billing Revenue | $ | $ | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | $ | $ | 110,000.00 |
| Annual Service Fee | $ | - | $ | 202,500.00 |
| Annual Total | $ | $ | $ | 1,529,372.00 |
| **5 Year Billing Damages** | $ | - | $ | 7,646,860.00 |
| **Re-Pricing Damages** | $ | 76,768.92 | $ | 81,925.54 | $ | 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 76,768.92 | $ | 81,925.54 | $ | 8,654,892.55 |

Similar School (Current Billing Client)

CONFIDENTIAL

OHRI 653973

## Damage Speedsheet

| Corporate HR Contract | 2012-2013 | | |
|---|---|---|---|
| | | Los Rios "NAHGA" | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | unknown | |
| ACI/NAHGA Total number of Known Claims: | | unknown | |
| Total Known Claims dollars diverted from Vivature; | | unknown | |
| Total Known Claims diverted from Vivature: | | unknown | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | $ | 277,389.83 | $ 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 69 | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | | 101,796.74 | $ 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 36.7% | 45% |
| **Vivature Repriced Data** | | | |
| Number of Claims | | 28 | 1058 |
| Avg Billed Charge | $ | 11,166.00 | $ 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 7,156.92 | $ 28,426.74 |
| Vivature Avg % Savings | | 64% | 50% |
| Repricing fees owed to Vivature | $ | 43,836.38 | $ 92,159.99 |
| Network Fees | $ | 13,274.18 | $ 25,804.80 |
| Variable Cost Plus Commission | $ | 4,734.93 | $ 9,953.28 |
| Fees Owed to Vivature | $ | 76,527.87 | $ 56,401.91 |
| **Payments Made** | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | 13,812.65 | $ 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | | $ 19,791.70 |
| **Annual and Fixed Cost** | | | |
| Scanner Cost | $ | - | $ 1,350.00 |
| Ipad Cost | $ | - | $ 11,200.00 |
| Set Up Fee | $ | 12,000.00 | $ 48,000.00 |
| Annual NExTT Fee | $ | - | $ 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ - |
| Damages before diversion Claims | $ | 38,327.87 | $ 162,451.91 |
| Estimated Lost Re-Pricing Savings | $ | 177,794.81 | $ 1,019,529.59 |
| Lost Repricing Revenue | $ | 44,448.70 | $ 254,882.40 |
| **Annual Damages** | $ | 83,276.57 | $ 417,334.31 |
| Past and Future Damage - based on only 2 Years | $ | 177,823.71 | $ 1,008,032.55 |

| Revenue Generation Years | 2013-2014 | | |
|---|---|---|---|
| | | Les Rios District | TOTAL |
| **School Division** | | California CC | |
| **# of Athletes** | | 200-300 | |
| **Football (YES/NO)** | | No | |
| Estimated Annual Billing Revenue | $ | 137,156.00 | $ 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | - | $ 110,000.00 |
| Annual Service Fee | $ | 30,000.00 | $ 202,500.00 |
| Annual Total | $ | 167,156.00 | $ 1,529,372.00 |
| **5 Year Billing Damages** | $ | 835,780.00 | $ 7,646,860.00 |
| **Re-Pricing Damages** | $ | 177,823.71 | $ 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 1,013,603.71 | $ 8,654,892.55 |

Similar School (Current Billing Client)         LeTourneau

CONFIDENTIAL

OHRI 653974

## Damage Speedsheet

### Orchestrate HR Contract

| | 2012-2013 | |
|---|---|---|
| | San Joaquin Delta | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | unknown | |
| ACI/NAHGA Total number of Known Claims: | unknown | |
| | | |
| Total Known Claims dollars diverted from Vivature: | unknown | |
| Total Known Claims diverted from Vivature: | unknown | |
| | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | | $ 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | | $ 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 45% |

**Vivature Repriced Data**

| | | |
|---|---|---|
| Number of Claims | 15 | 1058 |
| Avg Billed Charge | $ 397.80 | $ 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ 92.99 | $ 28,426.74 |
| Vivature Avg % Savings | 23% | 50% |

### Repricing fees owed to Vivature

| | | |
|---|---|---|
| Network Fees | $ 57.52 | $ 92,159.99 |
| Varible Cost Plus Commission | $ 16.11 | $ 25,804.80 |

### Fees Due to Vivature

| | | |
|---|---|---|
| | $ 6.21 | $ 9,953.28 |
| | $ 35.28 | $ 56,401.91 |

### Payments Made

| | | |
|---|---|---|
| Checks received from ACI/NAHGA paid to Vivature | | $ 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ 218.45 | |
| | $ | $ 19,791.70 |

### Annual and Fixed Cost

| | | |
|---|---|---|
| Scanner Cost | $ | $ 1,350.00 |
| Ipad Cost | $ | $ 11,200.00 |
| Set Up Fee | $ 3,000.00 | $ 48,000.00 |
| Annual NExTT Fee | $ - | $ 45,500.00 |
| Claim funds fronted and owed to Vivature | | $ |

### Damages before diversion Claims

| | | |
|---|---|---|
| | $ 1,035.20 | $ 162,451.91 |
| Estimated Lost Re-Pricing Savings | | |
| Lost Repricing Revenue | $ | $ 1,019,529.59 |
| | $ | $ 254,882.40 |
| **Annual Damages** | $ 3,035.20 | $ 417,334.31 |

### Past and Future Damages Over Primary 5 Years

| | | |
|---|---|---|
| | $ 3,383.91 | $ 1,008,032.55 |

### Revenue Generation Years

| | 2013-2018 | |
|---|---|---|
| | San Joaquin Delta | TOTAL |
| **School Division** | California Cr. | |
| **# of Athletes** | 200-300 | |
| **Football (YES/NO)** | No | |
| Estimated Annual Billing Revenue | | |
| Commission on Primary/Short-Term Medical | $ 34,289.00 | $ 1,216,872.00 |
| Annual Service Fee | $ | $ 110,000.00 |
| Annual Total | $ 7,500.00 | $ 202,500.00 |
| **5 Year Billing Damages** | $ 41,789.00 | $ 1,529,372.00 |
| **Re-Pricing Damages** | $ 208,945.00 | $ 7,646,860.00 |
| | $ 3,383.91 | $ 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ 212,328.91 | $ 8,654,892.55 |

Similar School (Current Billing Client)          LeTourneau

CONFIDENTIAL

OHRI 653975

## Damage Speedsheet

| Orchestrate NM Contract | 2012-2013 | | |
|---|---|---|---|
| | | Tiffin "XXUTRA" | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | unknown | |
| ACI/NAHGA Total number of Known Claims: | | unknown | |
| | | | |
| Total Known Claims dollars diverted from Vivature: | | unknown | |
| Total Known Claims diverted from Vivature: | | unknown | |
| | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | $ | 155,828.94 | $ 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 133 | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | $ | 80,010.51 | $ 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 51.3% | 45% |
| | | | |
| *Vivature Repriced Data* | | | |
| Number of Claims | | 1 | 1058 |
| Avg Billed Charge | $ | 142.16 | $ 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 71.08 | $ 28,426.74 |
| Vivature Avg % Savings | | 50% | 50% |
| | | | |
| Repricing fees owed to Vivature | $ | 17.77 | $ 92,159.99 |
| Network Fees | $ | 4.98 | $ 25,804.80 |
| Varible Cost Plus Commission | $ | 1.92 | $ 9,953.28 |
| Fees Due to Vivature | $ | 30.88 | $ 56,401.91 |
| | | | |
| **Payments Made** | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | | $ 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | | $ 19,791.70 |
| | | | |
| **Annual and Fixed Cost** | | | |
| Scanner Cost | $ | 150.00 | $ 1,350.00 |
| Ipad Cost | $ | 1,400.00 | $ 11,200.00 |
| Set Up Fee | $ | 3,000.00 | $ 48,000.00 |
| Annual NExTT Fee | $ | 3,500.00 | $ 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ |
| Damages before diversion Claims | $ | 8,060.88 | $ 11,451.91 |
| | | | |
| Estimated Lost Re-Pricing Savings | $ | 77,314.47 | $ 1,018,520.39 |
| Lost Repricing Revenue | $ | 19,478.62 | $ 754,082.46 |
| | | | |
| **Annual Damages** | $ | 27,539.00 | $ 417,334.31 |
| | | | |
| Projected Future Damages based on only 5 Years | $ | 50,535.88 | $ 1,008,032.55 |

| Revenue Generation Years | 2018-2019 | | |
|---|---|---|---|
| | | Tiffin | TOTAL |
| *School Division* | | Division II | |
| *# of Athletes* | | 250-350 | |
| *Football (YES/NO)* | | Yes | |
| | | | |
| Estimated Annual Billing Revenue | $ | 42,969.00 | $ 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ 202,500.00 |
| Annual Total | $ | 55,469.00 | $ 1,529,372.00 |
| *5 Year Billing Damages* | $ | 277,345.00 | $ 7,646,860.00 |
| *Re-Pricing Damages* | $ | 50,535.88 | $ 1,008,032.55 |
| *GRAND TOTAL DAMAGES* | $ | 327,880.88 | $ 8,654,892.55 |

Similar School (Current Billing Client)      NWMSU

CONFIDENTIAL

OHRI 653976

## Damage Speedsheet

| Orchestrate HR Contract | | 2012-2013 | | |
|---|---|---|---|---|
| | | Slippery Rock "NAHGA" | | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | unknown | | |
| ACI/NAHGA Total number of Known Claims: | | unknown | | |
| Total Known Claims dollars diverted from Vivature: | | unknown | | |
| Total Known Claims diverted from Vivature: | | unknown | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | $ | 49,597.00 | $ | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 27 | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | | 34,388.67 | $ | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 69.3% | | 45% |
| **Vivature Repriced Data** | | | | |
| Number of Claims | | 5 | | 1058 |
| Avg Billed Charge | $ | 871.40 | $ | 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 626.06 | $ | 28,426.74 |
| Vivature Avg % Savings | | 72% | | 50% |
| Repricing fees owed to Vivature | $ | 782.57 | $ | 92,159.99 |
| Network Fees | $ | 219.12 | $ | 25,804.80 |
| Varible Cost Plus Commission | $ | 84.52 | $ | 9,953.28 |
| Fees Due to Vivature | $ | 478.91 | $ | 56,401.91 |
| **Payments Made** | | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | 748.19 | $ | 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | | $ | 19,791.70 |
| **Annual and Fixed Cost** | | | | |
| Scanner Cost | $ | | $ | 1,350.00 |
| Ipad Cost | $ | | $ | 11,200.00 |
| Set Up Fee | $ | 3,000.00 | $ | 48,000.00 |
| Annual NExTT Fee | $ | - | $ | 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ | |
| Damages before diversion Claims | $ | 3,478.93 | $ | 162,451.91 |
| Estimated Lost Re-Pricing Savings | $ | 35,633.32 | $ | 1,010,520.59 |
| Lost Repricing Revenue | $ | 8,503.28 | $ | 254,882.40 |
| **Annual Damages** | $ | 12,387.21 | $ | 417,334.31 |
| Past and Future Damages calculating only 2 Years | $ | 22,078.07 | $ | 1,008,032.55 |

| Revenue Generation Years | | 2013-2018 | | |
|---|---|---|---|---|
| | | Slippery Rock | | TOTAL |
| **School Division** | | Division II | | |
| **# of Athletes** | | 250-350 | | |
| **Football (YES/NO)** | | Yes | | |
| Estimated Annual Billing Revenue | $ | 42,969.00 | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ | 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ | 202,500.00 |
| Annual Total | $ | 55,469.00 | $ | 1,529,372.00 |
| **5 Year Billing Damages** | $ | 277,345.00 | $ | 7,646,860.00 |
| **Re-Pricing Damages** | $ | 22,078.07 | $ | 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 299,423.07 | $ | 8,654,892.55 |

Similar School (Current Billing Client)  NWMSU

CONFIDENTIAL

OHRI 653977

# Damage Speedsheet

| Orchestrate HR Contract | | 012-201? | |
|---|---|---|---|
| | | Samford "NAHGA" | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | unknown | |
| ACI/NAHGA Total number of Known Claims: | | unknown | |
| | | | |
| Total Known Claims dollars diverted from Vivature: | | unknown | |
| Total Known Claims diverted from Vivature: | | unknown | |
| | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | $ | 83,400.86 | $ 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 49 | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | $ | 38,652.00 | $ 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 46.3% | 45% |
| **Vivature Repriced Data** | | | |
| Number of Claims | | 5 | 1058 |
| Avg Billed Charge | $ | 888.40 | $ 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 421.14 | $ 28,426.74 |
| Vivature Avg % Savings | | 47% | 50% |
| Repricing fees owed to Vivature | $ | 526.43 | $ 92,159.99 |
| Network Fees | $ | 147.40 | $ 25,804.80 |
| Varible Cost Plus Commission | $ | 56.85 | $ 9,953.28 |
| Fees Due to Vivature: | $ | 322.18 | $ 56,401.91 |
| **Payments Made** | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | | $ 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile | $ | | $ 19,791.70 |
| **Annual and Fixed Cost** | | | |
| Scanner Cost | | 150.00 | $ 1,350.00 |
| Ipad Cost | | 700.00 | $ 11,200.00 |
| Set Up Fee | | 3,000.00 | $ 48,000.00 |
| Annual NEXTT Fee | | 3,500.00 | $ 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ - |
| Damages before diversion Claims | $ | 7,672.19 | $ 162,451.91 |
| **Estimated Lost Re-Pricing Savings** | $ | 39,535.61 | $ 1,019,529.59 |
| **Lost Repricing Revenue** | $ | 9,883.90 | $ 254,882.40 |
| **Annual Damages** | $ | 17,556.08 | $ 417,334.31 |
| Past and future damage based on only 2 years | $ | 31,466.41 | $ 1,008,032.55 |

| Revenue Generation Years | | 2013-2018 | |
|---|---|---|---|
| | | Samford | TOTAL |
| *School Division* | | DIV I (FCS) | |
| *# of Athletes* | | 350-450 | |
| *Football (YES/NO)* | | Yes | |
| Estimated Annual Billing Revenue | $ | 65,606.00 | $ 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ 202,500.00 |
| Annual Total | $ | 78,106.00 | $ 1,529,372.00 |
| *5 Year Billing Damages* | $ | 390,530.00 | $ 7,646,860.00 |
| *Re-Pricing Damages* | $ | 31,466.41 | $ 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 421,996.41 | $ 8,654,892.55 |
| Similar School (Current Billing Client) | | SFA | |

CONFIDENTIAL

OHRI 653978

## Damage Speedsheet

| Orchestrate HR Contract | | 2012-2013 | | |
|---|---|---|---|---|
| | | Providence "NAHGA" | | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | unknown | | |
| ACI/NAHGA Total number of Known Claims: | | unknown | | |
| | | | | |
| Total Known Claims dollars diverted from Vivature: | | unknown | | |
| Total Known Claims diverted from Vivature: | | unknown | | |
| | | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | $ | 64,012.36 | $ | 1,902,346.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 30 | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | $ | 38,734.20 | $ | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 60.5% | | 45% |
| **Vivature Repriced Data** | | | | |
| Number of Claims | | | | |
| Avg Billed Charge | | 3 | | 1058 |
| Avg Repricing Savings achieved by Vivature | $ | 5,772.36 | $ | 56,561.81 |
| Vivature Avg % Savings | $ | 2,036.45 | $ | 28,426.74 |
| | | 35% | | 50% |
| **Repricing fees owed to Vivature** | $ | 1,509.03 | $ | 92,159.99 |
| Network Fees | $ | 422.53 | $ | 25,804.80 |
| Varible Cost Plus Commission | $ | 162.98 | $ | 9,953.28 |
| **Fees Due to Vivature** | $ | 923.53 | $ | 56,401.91 |
| **Payments Made** | | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | | $ | 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | | $ | 19,791.70 |
| **Annual and Fixed Cost** | | | | |
| Scanner Cost | $ | | $ | 1,350.00 |
| Ipad Cost | $ | | $ | 11,200.00 |
| Set Up Fee | $ | | $ | 48,000.00 |
| Annual NExTT Fee | $ | 3,500.00 | $ | 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ | - |
| **Damages before diversion Claims** | $ | 4,423.53 | $ | 162,451.91 |
| Estimated Lost Re-Pricing Savings | $ | 22,583.13 | $ | 1,019,529.59 |
| Lost Repricing Revenue | $ | 5,645.78 | $ | 254,882.40 |
| **Annual Damages** | $ | 10,069.31 | $ | 417,334.31 |
| **Past and Future Damages over 5 plus Years** | $ | 20,742.43 | $ | 1,008,032.55 |

| Revenue Generation Years | | 2012-2013 | | |
|---|---|---|---|---|
| | | Providence | | TOTAL |
| **School Division** | | Division I | | |
| **# of Athletes** | | 300-400 | | |
| **Football (YES/NO)** | | NO | | |
| Estimated Annual Billing Revenue | $ | 23,229.00 | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ | 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ | 202,500.00 |
| Annual Total | $ | 35,729.00 | $ | 1,529,372.00 |
| **5 Year Billing Damages** | $ | 178,645.00 | $ | 7,646,860.00 |
| **Re-Pricing Damages** | $ | 20,742.43 | $ | 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 199,387.43 | $ | 8,654,892.55 |

Similar School (Current Billing Client)                    Rider

CONFIDENTIAL

Pls.' App. 029

OHRI 653979

# Damage Speedsheet

| Orchestrate HF Contract | | 2012-2013 | | |
|---|---|---|---|---|
| | | Southern Methodist "NAHGA" | | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | | unknown | |
| ACI/NAHGA Total number of Known Claims: | | | unknown | |
| Total Known Claims dollars diverted from Vivature: | | | unknown | |
| Total Known Claims diverted from Vivature: | | | unknown | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | $ | 1,620.00 | $ | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 1 | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | $ | 900.00 | | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 55.6% | | 45% |
| **Vivature Repriced Data** | | | | |
| Number of Claims | | 53 | | 1058 |
| Avg Billed Charge | $ | 6,297.83 | $ | 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 4,176.25 | $ | 28,426.74 |
| Vivature Avg % Savings | | 66% | | 50% |
| Repricing fees owed to Vivature | $ | | $ | 92,159.99 |
| Network Fees | $ | | $ | 25,804.80 |
| Varible Cost Plus Commission | $ | | $ | 9,953.28 |
| **Fees Due to Vivature** | $ | | $ | 56,401.91 |
| **Payments Made** | | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | | $ | 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | | $ | 19,791.70 |
| **Annual and Fixed Cost** | | | | |
| Scanner Cost | $ | 150.00 | $ | 1,350.00 |
| Ipad Cost | $ | 4,900.00 | $ | 11,200.00 |
| Set Up Fee | $ | 3,000.00 | $ | 48,000.00 |
| Annual NExTT Fee | $ | 3,500.00 | $ | 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ | - |
| **Damages before diversion Claims** | $ | 11,350.00 | $ | 162,451.91 |
| Estimated Lost Re-Pricing Savings | $ | 1,074.26 | $ | 1,019,529.59 |
| Lost Repricing Revenue | $ | 268.57 | $ | 254,882.40 |
| **Annual Damages** | $ | 11,818.57 | $ | 417,334.31 |
| Past and Future Damages only 2 Years | $ | 70,922.44 | $ | 1,008,032.55 |

| Revenue Generation Years | | 2013-2018 | | |
|---|---|---|---|---|
| | | SMU | | TOTAL |
| **School Division** | | Division I (FBS) | | |
| **# of Athletes** | | 500 | | |
| **Football (YES/NO)** | | YES | | |
| Estimated Annual Billing Revenue | $ | 32,857.00 | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ | 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ | 202,500.00 |
| Annual Total | $ | 45,357.00 | $ | 1,529,372.00 |
| **5 Year Billing Damages** | $ | 226,785.00 | $ | 7,646,860.00 |
| **Re-Pricing Damages** | $ | 70,922.44 | $ | 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 297,707.44 | $ | 8,654,892.55 |

Similar School (Current Billing Client)                    TCU

CONFIDENTIAL

OHRI 653980

## Damage Speedsheet

| Orchestrate HR Contract | | 2012-2013 | |
|---|---|---|---|
| | | Christopher Newport "NAHGA" | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | unknown | |
| ACI/NAHGA Total number of Known Claims: | | unknown | |
| | | | |
| Total Known Claims dollars diverted from Vivature: | | unknown | |
| Total Known Claims diverted from Vivature: | | unknown | |
| | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | | 30,752.85 | $ 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 246 | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | | 18,966.50 | $ 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 61.7% | 45% |
| | | | |
| **Vivature Repriced Data** | | | |
| Number of Claims | | 38 | 1058 |
| Avg Billed Charge | $ | 318.22 | $ 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 55.50 | $ 28,426.74 |
| Vivature Avg % Savings | | 17% | 50% |
| Repricing fees owed to Vivature | $ | 527.22 | $ 92,159.99 |
| Network Fees | $ | 147.62 | $ 25,804.80 |
| **Varible Cost Plus Commission** | $ | 56.94 | $ 9,953.28 |
| Fees Due to Vivature | $ | 322.66 | $ 56,401.91 |
| | | | |
| **Payments Made** | | | |
| | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | - | $ 54,725.34 |
| | | | |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to | | | |
| claims. Need more info to reconcile. | $ | | $ 19,791.70 |
| | | | |
| **Annual and Fixed Cost** | | | |
| Scanner Cost | $ | 150.00 | $ 1,350.00 |
| Ipad Cost | $ | 700.00 | $ 11,200.00 |
| Set Up Fee | $ | 3,000.00 | $ 48,000.00 |
| Annual NExTT Fee | $ | 3,500.00 | $ 45,500.00 |
| **Claim funds fronted and owed to Vivature** | $ | - | $ - |
| Damages before diversion Claims | $ | 7,572.56 | $ 162,451.91 |
| | | | |
| Estimated Lost Re-Pricing Savings | $ | 5,363.23 | $ 1,019,529.59 |
| Lost Repricing Revenue | $ | 1,340.81 | $ 254,882.40 |
| | | | |
| **Annual Damages** | $ | 9,013.47 | $ 417,334.31 |
| | | | |
| Past and Future Damages based on ... | $ | 14,381.49 | $ 1,008,032.55 |

| Revenue Generation Years | | 2013-2018 | |
|---|---|---|---|
| | | Christopher Newport | TOTAL |
| **School Division** | | Division II | |
| **# of Athletes** | | 250-300 | |
| **Football (YES/NO)** | | Yes | |
| | | | |
| Estimated Annual Billing Revenue | $ | 42,969.00 | $ 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ 202,500.00 |
| Annual Total | $ | 55,469.00 | $ 1,529,372.00 |
| **5 Year Billing Damages** | $ | 277,345.00 | $ 7,646,860.00 |
| **Re-Pricing Damages** | $ | 14,381.49 | $ 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 291,726.49 | $ 8,654,892.55 |

Similar School (Current Billing Client)                         NWMSU

CONFIDENTIAL

OHRI 653981

## Damage Speedsheet

| Orchestrate HR Contract | 2012-2013 | | |
|---|---|---|---|
| | Davis and Elkins "NAHGA" | | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | unknown | | |
| ACI/NAHGA Total number of Known Claims: | unknown | | |
| | | | |
| Total Known Claims dollars diverted from Vivature: | unknown | | |
| Total Known Claims diverted from Vivature: | unknown | | |
| | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | 30,877.95 | $ | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | 51 | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | $ 8,999.79 | $ | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | 29.1% | | 45% |
| **Vivature Repriced Data** | | | |
| Number of Claims | 15 | | 1058 |
| Avg Billed Charge | $ 661.50 | $ | 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ 64.53 | $ | 28,426.74 |
| Vivature Avg % Savings | 10% | | 50% |
| Repricing fees owed to Vivature | $ 64.80 | $ | 92,159.99 |
| Network Fees | 18.14 | $ | 25,804.60 |
| Variable Cost Plus Commission | 7.00 | $ | 9,953.28 |
| Fees Due to Vivature | $ 88.66 | $ | 56,401.91 |
| **Payments Made** | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ 938.87 | $ | 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | $ | 19,791.70 |
| **Annual and Fixed Cost** | | | |
| Scanner Cost | $ 150.00 | $ | 1,350.00 |
| Ipad Cost | $ 700.00 | $ | 11,200.00 |
| Set Up Fee | $ 3,000.00 | $ | 48,000.00 |
| Annual NExTT Fee | $ 3,500.00 | $ | 45,500.00 |
| Claim funds fronted and owed to Vivature | $ - | $ | - |
| Damages before diversion Claims | $ 7,383.66 | $ | 162,451.91 |
| Estimated Lost Re-Pricing Savings | $ 3,012.18 | $ | 1,019,529.59 |
| Lost Repricing Revenue | $ 753.04 | $ | 254,882.40 |
| **Annual Damages** | $ 8,142.70 | $ | 417,334.31 |
| Past and Future Damages based on a 5 Years | $ 12,637.73 | $ | 1,008,032.55 |

| Revenue Generation Years | 2013-2018 | | |
|---|---|---|---|
| | Davis & Elkins | | TOTAL |
| **School Division** | Division II | | |
| **# of Athletes** | 250-350 | | |
| **Football (YES/NO)** | No | | |
| Estimated Annual Billing Revenue | $ 36,588.00 | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ 5,000.00 | $ | 110,000.00 |
| Annual Service Fee | $ 7,500.00 | $ | 202,500.00 |
| Annual Total | $ 49,088.00 | $ | 1,529,372.00 |
| *5 Year Billing Damages* | $ 245,440.00 | $ | 7,646,860.00 |
| *Re-Pricing Damages* | $ 12,637.73 | $ | 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ 258,077.73 | $ | 8,654,892.55 |

Similar School (Current Billing Client)          Newman

CONFIDENTIAL

OHRI 653982

## Damage Speedsheet

| Orchestrate HR Contract | | 2012/2013 | | |
|---|---|---|---|---|
| | | Rider "NAHGA" | | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | unknown | | |
| ACI/NAHGA Total number of Known Claims: | | unknown | | |
| | | | | |
| Total Known Claims dollars diverted from Vivature: | | unknown | | |
| Total Known Claims diverted from Vivature: | | unknown | | |
| | | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | $ | 56,886.91 | $ | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 32 | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | $ | 23,147.23 | $ | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 41.4% | | 45% |
| | | | | |
| **Vivature Repriced Data** | | | | |
| Number of Claims | | 1 | | 1058 |
| Avg Billed Charge | $ | 372.00 | $ | 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 282.74 | $ | 28,426.74 |
| Vivature Avg % Savings | | 76% | | 50% |
| Repricing fees owed to Vivature | $ | 70.69 | $ | 92,159.99 |
| Network Fees | $ | 19.79 | $ | 25,804.80 |
| Varible Cost Plus Commission | $ | 7.63 | $ | 9,953.28 |
| **Fees Due to Vivature** | $ | 43.28 | $ | 56,401.91 |
| | | | | |
| **Payments Made** | | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | | $ | 54,725.34 |
| | | | | |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to | | | | |
| claims. Need more info to reconcile. | $ | | $ | 19,791.70 |
| | | | | |
| **Annual and Fixed Cost** | | | | |
| Scanner Cost | $ | | $ | 1,350.00 |
| Ipad Cost | $ | | $ | 11,200.00 |
| Set Up Fee | $ | | $ | 48,000.00 |
| Annual NExTT Fee | $ | | $ | 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ | - |
| **Damages before diversion Claims** | $ | 43.28 | $ | 162,451.91 |
| | | | | |
| Estimated Lost Re-Pricing Savings | $ | 42,477.06 | $ | 1,019,529.59 |
| Lost Repricing Revenue | $ | 10,619.26 | $ | 254,882.40 |
| | | | | |
| **Annual Damages** | $ | 10,662.53 | $ | 417,334.31 |
| | | | | |
| **Past and Future Damages based on prior W/ Years** | $ | 21,352.48 | $ | 1,008,032.55 |

| Revenue Generation Years | | 2013-18 | | |
|---|---|---|---|---|
| | | | | TOTAL |
| **School Division** | | | | |
| **# of Athletes** | | | | |
| **Football (YES/NO)** | | | | |
| | | | | |
| Estimated Annual Billing Revenue | | | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | | | $ | 110,000.00 |
| Annual Service Fee | | | $ | 202,500.00 |
| Annual Total | $ | | $ | 1,529,372.00 |
| *5 Year Billing Damages* | $ | | $ | 7,646,860.00 |
| *Re-Pricing Damages* | $ | 21,352.48 | $ | 1,008,032.55 |
| ***GRAND TOTAL DAMAGES*** | $ | 21,352.48 | $ | 8,654,892.55 |

Similar School (Current Billing Client)

CONFIDENTIAL

OHRI 653983

# Damage Speedsheet

| Demonstrate HR Contract | | 2012-2013 | | |
|---|---|---|---|---|
| | | Univ of 5 Indiana "NAHGA" | | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | unknown | | |
| ACI/NAHGA Total number of Known Claims: | | unknown | | |
| Total Known Claims dollars diverted from Vivature: | | unknown | | |
| Total Known Claims diverted from Vivature: | | unknown | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | $ | 38,865.96 | $ | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 23 | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | $ | 24,746.00 | $ | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 64.0% | | 45% |
| **Vivature Repriced Data** | | | | |
| Number of Claims | | 4 | | 1058 |
| Avg Billed Charge | $ | 1,494.20 | $ | 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 541.32 | $ | 28,426.74 |
| Vivature Avg % Savings | | 36% | | 50% |
| Repricing fees owed to Vivature | $ | 541.32 | $ | 92,159.99 |
| Network Fees | $ | 151.57 | $ | 25,804.80 |
| Varible Cost Plus Commission | $ | 58.46 | $ | 9,953.28 |
| **Fees Due to Vivature** | $ | 771.29 | $ | 56,401.91 |
| **Payments Made** | | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | | $ | 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | | $ | 19,791.70 |
| **Annual and Fixed Cost** | | | | |
| Scanner Cost | $ | 150.00 | $ | 1,350.00 |
| Ipad Cost | $ | 700.00 | $ | 11,200.00 |
| Set Up Fee | $ | 3,000.00 | $ | 48,000.00 |
| Annual NExTT Fee | $ | 3,500.00 | $ | 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ | - |
| **Damages before diversion Claims** | $ | 2,921.29 | $ | 162,451.91 |
| Estimated Lost Re-Pricing Savings | | | | |
| Lost Repricing Revenue | $ | 14,007.94 | $ | 1,019,529.59 |
| | $ | 3,501.98 | $ | 254,882.40 |
| **Annual Damages** | $ | 11,183.27 | $ | 417,334.31 |
| Past Re-value Damages based on only 2 Years | $ | 18,726.58 | $ | 1,008,032.55 |

| Revenue Generation Years | | 2013-2018 | | |
|---|---|---|---|---|
| | | Univ of 5 Indiana | | TOTAL |
| **School Division** | | Division II | | |
| **# of Athletes** | | 300-400 | | |
| **Football (YES/NO)** | | NO | | |
| Estimated Annual Billing Revenue | $ | 19,604.00 | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ | 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ | 202,500.00 |
| Annual Total | $ | 32,104.00 | $ | 1,529,372.00 |
| **5 Year Billing Damages** | $ | 160,520.00 | $ | 7,646,860.00 |
| **Re-Pricing Damages** | $ | 18,726.58 | $ | 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 179,246.58 | $ | 8,654,892.55 |

Similar School (Current Billing Client)

Young Harris

CONFIDENTIAL

OHRI 653984

## Damage Speedsheet

| Orchestrate HR Contract | | 2013-2014 | | |
| --- | --- | --- | --- | --- |
| | | Univ of LA-Lafayette "ACI" | | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | unknown | | |
| ACI/NAHGA Total number of Known Claims: | | unknown | | |
| | | | | |
| Total Known Claims dollars diverted from Vivature: | | unknown | | |
| Total Known Claims diverted from Vivature: | | unknown | | |
| | | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | | | $ | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | | | | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | | | 45% |
| | | | | |
| *Vivature Repriced Data* | | | | |
| Number of Claims | | 177 | | 1058 |
| Avg Billed Charge | $ | 1,006.14 | $ | 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 373.63 | $ | 28,426.74 |
| Vivature Avg % Savings | | 37% | | 50% |
| Repricing fees owed to Vivature | $ | 1,041.44 | $ | 92,159.99 |
| Network Fees | $ | 291.60 | $ | 25,804.80 |
| Varible Cost Plus Commission | $ | 112.48 | $ | 9,953.28 |
| Fees Due to Vivature | $ | 637.36 | $ | 56,401.91 |
| | | | | |
| **Payments Made** | | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | 15,491.69 | $ | 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | 15,491.69 | $ | 19,791.70 |
| | | | | |
| **Annual and Fixed Cost** | | | | |
| Scanner Cost | $ | 150.00 | $ | 1,350.00 |
| Ipad Cost | $ | 700.00 | $ | 11,200.00 |
| Set Up Fee | $ | 3,000.00 | $ | 48,000.00 |
| Annual NExTT Fee | $ | 3,500.00 | $ | 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ | |
| Damages before diversion Claims | $ | 7,987.36 | $ | 162,451.91 |
| | | | | |
| Estimated Lost Re-Pricing Savings | $ | - | $ | 1,019,529.59 |
| Lost Repricing Revenue | $ | - | $ | 254,882.40 |
| **Annual Damages** | $ | 7,987.36 | $ | 417,334.31 |
| Past and Future Damages based on (five) Years | $ | 28,020.49 | $ | 1,008,032.55 |

| Revenue Generation Years | | 2013-2014 | | |
| --- | --- | --- | --- | --- |
| | | Univ of LA-Lafayette | | TOTAL |
| **School Division** | | Division I (FBS) | | |
| **# of Athletes** | | 400 | | |
| **Football (YES/NO)** | | YES | | |
| Estimated Annual Billing Revenue | $ | 43,740.00 | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ | 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ | 202,500.00 |
| Annual Total | $ | 56,240.00 | $ | 1,529,372.00 |
| **5 Year Billing Damages** | $ | 281,200.00 | $ | 7,646,860.00 |
| **Re-Pricing Damages** | $ | 28,020.49 | $ | 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 309,220.49 | $ | 8,654,892.55 |

Similar School (Current Billing Client)                UL Monroe

CONFIDENTIAL

OHRI 653985

## Damage Speedsheet

| Orchestrate HR Cannon I | 2011-2013 | | |
|---|---|---|---|
| | Oklahoma Baptist "ACI" | | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | $ 102,435 #1 | | |
| ACI/NAHGA Total number of Known Claims: | 93 | | |
| | | | |
| Total Known Claims dollars diverted from Vivature: | $ 100,778.41 | | |
| Total Known Claims diverted from Vivature: | 89 | | |
| | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | $ 9,123.08 | | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | 35 | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | $ 215.10 | $ | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | 2.4% | | 45% |
| | | | |
| **Vivature Repriced Data** | | | |
| Number of Claims | 73 | | 1058 |
| Avg Billed Charge | $ 821.39 | $ | 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ 502.92 | $ | 28,426.74 |
| Vivature Avg % Savings | 61% | | 50% |
| | | | |
| **Repricing fees owed to Vivature** | $ 264.53 | $ | 92,159.99 |
| Network Fees | $ 74.07 | $ | 25,804.80 |
| Varible Cost Plus Commission | $ 28.57 | $ | 9,953.28 |
| **Fees Due to Vivature** | $ 361.89 | $ | 56,401.91 |
| | | | |
| **Payments Made** | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | $ | 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | $ | 19,791.70 |
| | | | |
| **Annual and Fixed Cost** | | | |
| Scanner Cost | $ | $ | 1,350.00 |
| Ipad Cost | $ - | $ | 11,200.00 |
| Set Up Fee | $ | $ | 48,000.00 |
| Annual NExTT Fee | $ | $ | 45,500.00 |
| Claim funds fronted and owed to Vivature | $ - | $ | - |
| **Damages before diversion Claims** | $ 161.89 | $ | 162,451.91 |
| | | | |
| Estimated Lost Re-Pricing Savings | $ 5,585.87 | $ | 1,019,529.59 |
| Lost Repricing Revenue | $ 1,396.47 | $ | 254,882.40 |
| | | | |
| **Annual Damages** | $ 1,558.36 | $ | 417,334.31 |
| | | | |
| Past and Future Damages based on only 2 Years | $ 12,133.12 | $ | 1,008,032.55 |

| Revenue Generation Years | 2013-2014 | | |
|---|---|---|---|
| | Oklahoma Baptist | | TOTAL |
| **School Division** | Division II | | |
| **# of Athletes** | 250-350 | | |
| **Football (YES/NO)** | Yes | | |
| Estimated Annual Billing Revenue | $ 42,969.00 | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ 5,000.00 | $ | 110,000.00 |
| Annual Service Fee | $ 7,500.00 | $ | 202,500.00 |
| Annual Total | $ 55,469.00 | $ | 1,529,372.00 |
| **5 Year Billing Damages** | $ 277,345.00 | $ | 7,646,860.00 |
| **Re-Pricing Damages** | $ 12,133.12 | $ | 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ 289,478.12 | $ | 8,654,892.55 |
| Similar School (Current Billing Client) | NWMSU | | |

CONFIDENTIAL

OHRI 653986

# Damage Speedsheet

| Orchestrate HR Contract | 2011-2013 | |
| --- | --- | --- |
| | Maryland "ACI" | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | $ 97,153.05 | |
| ACI/NAHGA Total number of Known Claims: | 205 | |
| | | |
| Total Known Claims dollars diverted from Vivature: | $ 20,402.93 | |
| Total Known Claims diverted from Vivature: | 161 | |
| | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | 1,758.50 | $ 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | 157 | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | $ - | $ 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | 0.0% | 45% |
| | | |
| ***Vivature Repriced Data*** | | |
| Number of Claims | 99 | 1058 |
| Avg Billed Charge | $ 1,884.88 | $ 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ 693.41 | $ 28,426.74 |
| Vivature Avg % Savings | 37% | 50% |
| | | |
| **Repricing fees owed to Vivature** | $ - | $ 92,159.99 |
| Network Fees | $ | $ 25,804.80 |
| Varible Cost Plus Commission | $ | $ 9,953.28 |
| **Fees Due to Vivature** | $ - | $ 56,401.91 |
| | | |
| **Payments Made** | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | $ 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | $ 19,791.70 |
| | | |
| **Annual and Fixed Cost** | | |
| Scanner Cost | $ | $ 1,350.00 |
| Ipad Cost | $ | $ 11,200.00 |
| Set Up Fee | $ | $ 48,000.00 |
| Annual NExTT Fee | $ | $ 45,500.00 |
| Claim funds fronted and owed to Vivature | $ - | $ - |
| **Damages before diversion Claims** | $ - | $ 162,451.91 |
| | | |
| Estimated Lost Re-Pricing Savings | $ 646.92 | $ 1,019,529.59 |
| Lost Repricing Revenue | $ 161.73 | $ 254,882.40 |
| **Annual Damages** | $ 161.73 | $ 417,334.31 |
| | | |
| **Past and Future Damages based on only 2 Years** | $ 17,485.36 | $ 1,008,032.55 |
| | | |
| **Revenue Generation Years** | 2013-2018 | |
| | Maryland | TOTAL |

CONFIDENTIAL

OHRI 653987

OHRI 653987

| Orchestrate HR Contract | | 2011-2013 | | |
|---|---|---|---|---|
| | | Maryland "ACI"<br>Division I (FBS)<br>600-900<br>YES | | TOTAL |
| School Division<br># of Athletes<br>Football (YES/NO) | | | | |
| Estimated Annual Billing Revenue | $ | 171,816.00 | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ | 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ | 202,500.00 |
| Annual Total | $ | 184,316.00 | $ | 1,529,372.00 |
| 5 Year Billing Damages | $ | 921,580.00 | $ | 7,646,860.00 |
| Re-Pricing Damages | $ | 17,485.36 | $ | 1,008,032.55 |
| GRAND TOTAL DAMAGES | $ | 939,065.36 | $ | 8,654,892.55 |

Similar School (Current Billing Client)                                        Auburn

Pls.' App. 038

CONFIDENTIAL

OHRI 653988

OHRI 653988

# Damage Speedsheet

| Orchestrate HR Contract | 2011-2013 | | |
|---|---|---|---|
| | | Glenville "ACI" | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | $ | | |
| ACI/NAHGA Total number of Known Claims: | | 0 | |
| | | | |
| Total Known Claims dollars diverted from Vivature: | $ | | |
| Total Known Claims diverted from Vivature: | | 0 | |
| | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | | | $ 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | | | $ 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | | 45% |
| **Vivature Repriced Data** | | | |
| Number of Claims | | 15 | 1058 |
| Avg Billed Charge | $ | 3,460.22 | $ 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 801.68 | $ 28,426.74 |
| Vivature Avg % Savings | | 23% | 50% |
| Repricing fees owed to Vivature | $ | | $ 92,159.99 |
| Network Fees | $ | - | $ 25,804.80 |
| Varible Cost Plus Commission | $ | | $ 9,953.28 |
| **Fees Due to Vivature** | $ | - | $ 56,401.91 |
| **Payments Made** | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | - | $ 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | - | $ 19,791.70 |
| **Annual and Fixed Cost** | | | |
| Scanner Cost | $ | - | $ 1,350.00 |
| Ipad Cost | $ | - | $ 11,200.00 |
| Set Up Fee | $ | - | $ 48,000.00 |
| Annual NExTT Fee | $ | - | $ 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ - |
| **Damages before diversion Claims** | $ | - | $ 162,451.91 |
| Estimated Lost Re-Pricing Savings | $ | - | $ 1,019,529.59 |
| Lost Repricing Revenue | $ | - | $ 254,882.40 |
| **Annual Damages** | $ | - | $ 417,334.31 |
| Past and Future Damages based on only 2 Years | $ | 3,006.30 | $ 1,008,032.55 |
| Revenue Generation Years | 2013-2018 | | |
| | Glenville | | TOTAL |

CONFIDENTIAL

OHRI 653989

OHRI 653989

| Orchestrate HR Contract | 2011-2013 | | |
| --- | --- | --- | --- |
| | | Glenville "ACI" | TOTAL |
| **School Division** | | Division II | |
| **# of Athletes** | | 250-350 | |
| **Football (YES/NO)** | | Yes | |
| Estimated Annual Billing Revenue | $ | 42,969.00 | $ 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ 202,500.00 |
| Annual Total | $ | 55,469.00 | $ 1,529,372.00 |
| *5 Year Billing Damages* | $ | **277,345.00** | $ **7,646,860.00** |
| *Re-Pricing Damages* | $ | **3,006.30** | $ **1,008,032.55** |
| **GRAND TOTAL DAMAGES** | $ | **280,351.30** | $ **8,654,892.55** |
| Similar School (Current Billing Client) | | NWMSU | |

CONFIDENTIAL

OHRI 653990

OHRI 653990

# Damage Speedsheet

| Orchestrate HR Contract | 2011-2013 | | |
|---|---|---|---|
| | **Cleveland "ACI"** | | **TOTAL** |
| ACI/NAHGA Total Known Claim dollars: | | | |
| ACI/NAHGA Total number of Known Claims: | | | |
| | | | |
| Total Known Claims dollars diverted from Vivature: | $ | | |
| Total Known Claims diverted from Vivature: | | | |
| | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | | $ | 1,902,246.34 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | | 1045 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | | $ | 854,624.55 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | | 45% |
| **Vivature Repriced Data** | | | |
| Number of Claims | | 43 | 1058 |
| Avg Billed Charge | $ | 756.70 | $ | 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 365.78 | $ | 28,426.74 |
| Vivature Avg % Savings | | 48% | | 50% |
| **Repricing fees owed to Vivature** | $ | 367.17 | $ | 92,159.99 |
| Network Fees | $ | 102.81 | $ | 25,804.80 |
| Varible Cost Plus Commission | $ | 39.65 | $ | 9,953.28 |
| **Fees Due to Vivature** | $ | 224.71 | $ | 56,401.91 |
| **Payments Made** | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | | $ | 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | | $ | 19,791.70 |
| **Annual and Fixed Cost** | | | |
| Scanner Cost | $ | | $ | |
| Ipad Cost | $ | | $ | 1,350.00 |
| Set Up Fee | $ | | $ | 11,200.00 |
| Annual NExTT Fee | $ | | $ | 48,000.00 |
| Claim funds fronted and owed to Vivature | $ | | $ | 45,500.00 |
| **Damages before diversion Claims** | $ | • | $ | - |
| | $ | 224.71 | $ | 162,451.91 |
| Estimated Lost Re-Pricing Savings | $ | - | $ | 1,019,529.59 |
| Lost Repricing Revenue | $ | | $ | 254,882.40 |
| **Annual Damages** | $ | 224.71 | $ | 417,334.31 |
| **Past and Future Damages (base on 5 yr Years** | $ | 4,156.84 | $ | 1,008,032.55 |

| Revenue Generation Years | 2013-2018 | | |
|---|---|---|---|
| | **Cleveland SL** | | **TOTAL** |
| **School Division** | Division II | | |
| **# of Athletes** | 250-350 | | |
| **Football (YES/NO)** | No | | |
| Estimated Annual Billing Revenue | $ | 29,604.00 | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ | 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ | 202,500.00 |
| Annual Total | $ | 42,104.00 | $ | 1,529,372.00 |
| **5 Year Billing Damages** | $ | 210,520.00 | $ | 7,646,860.00 |
| **Re-Pricing Damages** | $ | 4,156.84 | $ | 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 214,676.84 | $ | 8,654,892.55 |

Similar School (Current Billing Client)          Young Harris

CONFIDENTIAL

OHRI 653991

## Damage Speedsheet

| Orchestrate HR Contract | 2011-2013 | | |
|---|---|---|---|
| | | Highpoint "ACI" | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | $ | | |
| ACI/NAHGA Total number of Known Claims: | | | |
| | | | |
| Total Known Claims dollars diverted from Vivature: | $ | | |
| Total Known Claims diverted from Vivature: | | | |
| | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | | | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | | | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | | 45% |
| | | | |
| *Vivature Repriced Data* | | | |
| Number of Claims | | 21 | 1058 |
| Avg Billed Charge | $ | 699.09 | $ 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 206.04 | $ 28,426.74 |
| Vivature Avg % Savings | | 29% | 50% |
| | | | |
| Repricing fees owed to Vivature | $ | - | $ 92,159.99 |
| Network Fees | $ | - | $ 25,804.80 |
| Varible Cost Plus Commission | $ | - | $ 9,953.28 |
| Fees Due to Vivature | $ | | $ 56,401.91 |
| | | | |
| **Payments Made** | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | | $ 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | | $ 19,791.70 |
| | | | |
| **Annual and Fixed Cost** | | | |
| Scanner Cost | $ | | $ 1,350.00 |
| Ipad Cost | $ | | $ 11,200.00 |
| Set Up Fee | $ | | $ 48,000.00 |
| Annual NExTT Fee | $ | | $ 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ - |
| Damages before diversion Claims | $ | | $ 162,451.91 |
| | | | |
| Estimated Lost Re-Pricing Savings | $ | - | $ 1,019,529.59 |
| Lost Repricing Revenue | $ | - | $ 254,882.40 |
| **Annual Damages** | $ | - | $ **417,334.31** |
| | | | |
| Projected 5 Year Damages - Estimated over 5 years | $ | 1,081.71 | $ 1,008,032.55 |

| Revenue Generation Years | 2013-2018 | | |
|---|---|---|---|
| | | Highpoint | TOTAL |
| *School Division* | | Division II | |
| *# of Athletes* | | 250-350 | |
| *Football (YES/NO)* | | No | |
| | | | |
| Estimated Annual Billing Revenue | $ | 19,604.00 | $ 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ 202,500.00 |
| Annual Total | $ | 32,104.00 | $ 1,529,372.00 |
| *5 Year Billing Damages* | $ | 160,520.00 | $ 7,646,860.00 |
| *Re-Pricing Damages* | $ | 1,081.71 | $ 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 161,601.71 | $ 8,654,892.55 |

Similar School (Current Billing Client)                    Young Harris

CONFIDENTIAL

Pls.' App. 042

OHRI 653992

# Damage Speedsheet

| Orchestrate HR Contract | 2011-2011 | | |
|---|---|---|---|
| | | Valdosta / ACI | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | | |
| ACI/NAHGA Total number of Known Claims: | | | |
| | | | |
| Total Known Claims dollars diverted from Vivature: | | | 0 |
| Total Known Claims diverted from Vivature: | | | 0 |
| | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | | $ | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | | $ | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | | 45% |
| **Vivature Repriced Data** | | | |
| Number of Claims | | 33 | 1058 |
| Avg Billed Charge | $ | 1,155.44 | $ 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 762.46 | $ 28,426.74 |
| Vivature Avg % Savings | | 66% | 50% |
| **Repricing fees owed to Vivature** | $ | - | $ 92,159.99 |
| Network Fees | $ | - | $ 25,804.80 |
| Varible Cost Plus Commission | $ | - | $ [illegible] |
| **Fees Due to Vivature** | $ | - | $ 56,401.91 |
| | | | |
| **Payments Made** | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | | $ 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | | $ 19,791.70 |
| | | | |
| **Annual and Fixed Cost** | | | |
| Scanner Cost | $ | | $ 1,350.00 |
| Ipad Cost | $ | | $ 11,200.00 |
| Set Up Fee | $ | | $ 48,000.00 |
| Annual NExT Fee | $ | | $ 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ |
| **Damages before diversion Claims** | $ | - | $ 162,451.91 |
| Estimated Lost Re-Pricing Savings | $ | | $ 1,019,529.59 |
| Lost Repricing Revenue | $ | | $ 254,882.40 |
| **Annual Damages** | $ | - | $ 417,334.31 |
| Past and Future Damages based on only 2 Years | $ | 6,290.30 | $ 1,008,032.55 |

| Revenue Generation Years | 2013-2018 | |
|---|---|---|
| | Valdosta St | TOTAL |
| **School Division** | Division II | |
| **# of Athletes** | 250-350 | |
| **Football (YES/NO)** | Yes | |
| Estimated Annual Billing Revenue | $ 36,600.00 | $ 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ 5,000.00 | $ 110,000.00 |
| Annual Service Fee | $ 7,500.00 | $ 202,500.00 |
| Annual Total | $ 49,100.00 | $ 1,529,372.00 |
| **5 Year Billing Damages** | $ 245,500.00 | $ 7,646,860.00 |
| **Re-Pricing Damages** | $ 6,290.30 | $ 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ 251,790.30 | $ 8,654,892.55 |

Similar School (Current Billing Client)    West Georgia

CONFIDENTIAL

OHRI 653993

# Damage Speedsheet

| Orchestrate 191 Contract | | 2012-2013 | |
|---|---|---|---|
| | | Union "ACF" | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | unknown | |
| ACI/NAHGA Total number of Known Claims: | | unknown | |
| | | | |
| Total Known Claims dollars diverted from Vivature: | | unknown | |
| Total Known Claims diverted from Vivature: | | unknown | |
| | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | | | 1,902,346.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | | | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | | 45% |
| **Vivature Repriced Data** | | | |
| Number of Claims | | 38 | 1058 |
| Avg Billed Charge | $ | 2,039.24 | $ 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 583.67 | $ 28,426.74 |
| Vivature Avg % Savings | | 29% | 50% |
| Repricing fees owed to Vivature | $ | 5,252.37 | $ 92,159.99 |
| Network Fees | $ | 1,470.66 | $ 25,804.80 |
| Varible Cost Plus Commission | $ | 567.26 | $ 9,953.28 |
| **Fees Due to Vivature** | $ | 3,214.45 | $ 56,401.91 |
| **Payments Made** | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | | $ 54,725.34 |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | | $ 19,791.70 |
| **Annual and Fixed Cost** | | | |
| Scanner Cost | $ | | $ 1,350.00 |
| Ipad Cost | $ | | $ 11,200.00 |
| Set Up Fee | $ | 3,000.00 | $ 48,000.00 |
| Annual NExTT Fee | $ | 3,500.00 | $ 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | | $ - |
| **Damages before diversion Claims** | $ | 9,714.45 | $ 162,451.91 |
| Estimated Lost Re-Pricing Savings | $ | | $ 1,019,529.59 |
| Lost Repricing Revenue | $ | | $ 254,882.40 |
| **Annual Damages** | $ | 9,714.45 | $ 417,334.31 |
| **Past and Future Damages based on only 2 Years** | $ | 18,759.32 | $ 1,008,032.55 |

| Revenue Generation Chart | | 2013-2018 | |
|---|---|---|---|
| | | Union | TOTAL |
| **School Division** | | Division II | |
| **# of Athletes** | | 250-350 | |
| **Football (YES/NO)** | | Yes | |
| Estimated Annual Billing Revenue | $ | 42,969.00 | $ 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ 202,500.00 |
| Annual Total | $ | 55,469.00 | $ 1,529,372.00 |
| **5 Year Billing Damages** | $ | 277,345.00 | $ 7,646,860.00 |
| **Re-Pricing Damages** | $ | 18,759.32 | $ 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 296,104.32 | $ 8,654,892.55 |
| Similar School (Current Billing Client) | | NWMSU | |

CONFIDENTIAL

OHRI 653994

## Damage Speedsheet

| Orchestrate HR Contract | | 2012-2011 | | |
|---|---|---|---|---|
| | | Cuesta "NAGHA" | | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | unknown | | |
| ACI/NAHGA Total number of Known Claims: | | unknown | | |
| | | | | |
| Total Known Claims dollars diverted from Vivature: | | unknown | | |
| Total Known Claims diverted from Vivature: | | unknown | | |
| | | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | $ | 20,794.00 | $ | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 20 | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | $ | 4,579.00 | $ | 864,624.56 |
| ACI/NAGHA Percent savings off of Diverted Gross Charges | | 22.0% | | 45% |
| | | | | |
| *Vivature Repriced Data* | | | | |
| Number of Claims | | 0 | | 1058 |
| Avg Billed Charge | $ | | $ | 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | | $ | 28,426.74 |
| Vivature Avg % Savings | | 0% | | 50% |
| | | | | |
| **Repricing fees owed to Vivature** | $ | - | $ | 92,159.99 |
| Network Fees | $ | - | $ | 25,804.80 |
| Varible Cost Plus Commission | $ | - | $ | 9,953.28 |
| **Fees Due to Vivature** | $ | | $ | 56,401.91 |
| | | | | |
| **Payments Made** | | | | |
| | | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | | $ | 54,725.34 |
| | | | | |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | | $ | 19,791.70 |
| | | | | |
| **Annual and Fixed Cost** | | | | |
| Scanner Cost | $ | | $ | 1,350.00 |
| Ipad Cost | $ | | $ | 11,200.00 |
| Set Up Fee | $ | | $ | 48,000.00 |
| Annual NExTT Fee | $ | | | 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ | - |
| **Damages before diversion Claims** | $ | | $ | 162,451.91 |
| | | | | |
| Estimated Lost Re-Pricing Savings | $ | 10,450.61 | $ | 1,019,529.59 |
| Lost Repricing Revenue | $ | 2,612.65 | $ | 254,882.40 |
| | | | | |
| **Annual Damages** | $ | 2,612.65 | $ | 417,334.31 |
| | | | | |
| **Past and Future Damages Based on only 2 Years** | $ | 5,225.31 | $ | 1,008,032.55 |

| Revenue Generation Fees | | 2013-2018 | | |
|---|---|---|---|---|
| | | Cuesta | | TOTAL |
| **School Division** | | California CC | | |
| **# of Athletes** | | 200-300 | | |
| **Football (YES/NO)** | | No | | |
| | | | | |
| Estimated Annual Billing Revenue | $ | 34,289.00 | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ | 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ | 202,500.00 |
| Annual Total | $ | 46,789.00 | $ | 1,529,372.00 |
| *5 Year Billing Damages* | $ | 233,945.00 | $ | 7,646,860.00 |
| *Re-Pricing Damages* | $ | 5,225.31 | $ | 1,008,032.55 |
| | | | | |
| *GRAND TOTAL DAMAGES* | $ | 239,170.31 | $ | 8,654,892.55 |

Similar School (Current Billing Client)          LeTourneau

CONFIDENTIAL

OHRI 653995

## Damage Speedsheet

| Orchestrate HR Contract | | Peralta "NAGHA" | Peralta "NAGHA" | | TOTAL |
|---|---|---|---|---|---|
| ACI/NAHGA Total Known Claim dollars: | | unknown | unknown | | |
| ACI/NAHGA Total number of Known Claims: | | unknown | unknown | | |
| | | | | | |
| Total Known Claims dollars diverted from Vivature: | | unknown | unknown | | |
| Total Known Claims diverted from Vivature: | | unknown | unknown | | |
| | | | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | $ | 167,330.47 | $ 394,754.94 | $ | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | 84 | 149 | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | $ | 52,311.59 | $ 245,317.68 | $ | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | 31.3% | 62.1% | | 45% |
| | | | | | |
| ***Vivature Repriced Data*** | | | | | |
| Number of Claims | | 0 | 0 | | 1058 |
| Avg Billed Charge | $ | $ | | $ | 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | $ | | $ | 28,426.74 |
| Vivature Avg % Savings | | 0% | 0% | | 50% |
| | | | | | |
| **Repricing fees owed to Vivature** | $ | $ | | $ | 92,159.99 |
| **Network Fees** | $ | - | $ | $ | 25,804.80 |
| **Varible Cost Plus Commission** | $ | - | $ | $ | 9,953.28 |
| **Fees Due to Vivature** | $ | $ | | $ | 56,401.91 |
| | | | | | |
| **Payments Made** | | | | | |
| | | | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | $ | | $ | 54,725.34 |
| | | | | | |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to | | | | | |
| claims. Need more info to reconcile | $ | $ | | $ | 19,791.70 |
| | | | | | |
| **Annual and Fixed Cost** | | | | | |
| Scanner Cost | $ | $ | | $ | 1,350.00 |
| Ipad Cost | $ | $ | | $ | 11,200.00 |
| Set Up Fee | $ | $ | | $ | 48,000.00 |
| Annual NExTT Fee | $ | $ | | $ | 45,500.00 |
| **Claim funds fronted and owed to Vivature** | $ | $ | | $ | - |
| **Damages before diversion Claims** | $ | $ | | $ | 162,451.91 |
| | | | | | |
| **Estimated Lost Re-Pricing Savings** | $ | 84,096.66 | $ 198,395.26 | $ | 1,019,529.59 |
| **Lost Repricing Revenue** | $ | 21,024.16 | $ 49,598.81 | $ | 254,882.40 |
| | | | | | |
| **Annual Damages** | $ | 21,024.16 | $ 49,598.81 | $ | 417,334.31 |
| | | | | | |
| Past and Future Damages based on only 2 years | $ | 42,048.33 | $ 99,197.63 | $ | 1,008,032.55 |

| Revenue Generation Years | | Peralta | Peralta | | TOTAL |
|---|---|---|---|---|---|
| ***School Division*** | | | California CC | | |
| ***# of Athletes*** | | | 200-300 | | |
| ***Football (YES/NO)*** | | | No | | |
| | | | | | |
| Estimated Annual Billing Revenue | $ | | $ 34,289.00 | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | | $ 5,000.00 | $ | 110,000.00 |
| Annual Service Fee | $ | | $ 7,500.00 | $ | 202,500.00 |
| Annual Total | $ | | $ 46,789.00 | $ | 1,529,372.00 |
| ***5 Year Billing Damages*** | $ | - | $ 233,945.00 | $ | 7,646,860.00 |
| ***Re-Pricing Damages*** | $ | 42,048.33 | $ 99,197.63 | $ | 1,008,032.55 |
| ***GRAND TOTAL DAMAGES*** | $ | 42,048.33 | $ 333,142.63 | $ | 8,654,892.55 |

Similar School (Current Billing Client)                    LeTourneau

CONFIDENTIAL

OHRI 653996

## Damage Speedsheet

| Orchestrate HR Contract | | 2012-2013 | | |
|---|---|---|---|---|
| | | Arkansas Pine Bluff "ACI" | | TOTAL |
| ACI/NAHGA Total Known Claim dollars: | | unknown | | |
| ACI/NAHGA Total number of Known Claims: | | unknown | | |
| | | | | |
| Total Known Claims dollars diverted from Vivature: | | unknown | | |
| Total Known Claims diverted from Vivature: | | unknown | | |
| | | | | |
| Total Known Claim Dollars Elig for Re-Pricing - Diverted from Vivature | | | $ | 1,902,246.24 |
| Total Known Claims Elig for Re-Pricing - Diverted from Vivature | | | | 1645 |
| Total Known savings by ACI/NAGHA on claims diverted from Vivature | | | $ | 864,624.56 |
| ACI/NAHGA Percent savings off of Diverted Gross Charges | | | | 45% |
| | | | | |
| *Vivature Repriced Data* | | | | |
| Number of Claims | | 27 | | 1058 |
| Avg Billed Charge | $ | 1,279.22 | $ | 56,561.81 |
| Avg Repricing Savings achieved by Vivature | $ | 491.06 | $ | 28,426.74 |
| Vivature Avg % Savings | | 38% | | 50% |
| Repricing fees owed to Vivature | $ | 3,188.78 | $ | 92,159.99 |
| Network Fees | $ | 892.86 | $ | 25,804.80 |
| Varible Cost Plus Commission | $ | 344.39 | $ | 9,953.28 |
| **Fees Due to Vivature** | $ | 1,951.33 | $ | 56,401.91 |
| | | | | |
| **Payments Made** | | | | |
| | | | | |
| Checks received from ACI/NAHGA paid to Vivature | $ | 125.88 | $ | 54,725.34 |
| | | | | |
| Payment Vivature received from ACI/NAHGA that could not be reconciled to claims. Need more info to reconcile. | $ | | $ | 19,791.70 |
| | | | | |
| **Annual and Fixed Cost** | | | | |
| Scanner Cost | $ | 150.00 | $ | 1,350.00 |
| Ipad Cost | $ | 700.00 | $ | 11,200.00 |
| Set Up Fee | $ | 3,000.00 | $ | 48,000.00 |
| Annual NExTT Fee | $ | 3,500.00 | $ | 45,500.00 |
| Claim funds fronted and owed to Vivature | $ | - | $ | - |
| **Damages before diversion Claims** | $ | 9,301.13 | $ | 162,451.91 |
| | | | | |
| Estimated Lost Re-Pricing Savings | $ | - | $ | 1,019,529.59 |
| Lost Repricing  Revenue | $ | - | $ | 254,882.40 |
| | | | | |
| **Annual Damages** | $ | 9,301.53 | $ | 417,334.31 |
| | | | | |
| Balance future Damage  based on only 7 Year | $ | 16,116.19 | $ | 1,008,032.55 |

| Revenue Generation Years | | 2013-2018 | | |
|---|---|---|---|---|
| | | Arkansas Pine Bluff | | TOTAL |
| *School Division* | | DIV I (FCS) | | |
| *# of Athletes* | | 350-450 | | |
| *Football (YES/NO)* | | Yes | | |
| | | | | |
| Estimated Annual Billing Revenue | $ | 65,606.00 | $ | 1,216,872.00 |
| Commission on Primary/Short-Term Medical | $ | 5,000.00 | $ | 110,000.00 |
| Annual Service Fee | $ | 7,500.00 | $ | 202,500.00 |
| Annual Total | $ | 78,106.00 | $ | 1,529,372.00 |
| *5 Year Billing Damages* | $ | 390,530.00 | $ | 7,646,860.00 |
| *Re-Pricing Damages* | $ | 16,116.19 | $ | 1,008,032.55 |
| **GRAND TOTAL DAMAGES** | $ | 406,646.19 | $ | 8,654,892.55 |

Similar School (Current Billing Client)                          SFA

CONFIDENTIAL

OHRI 653997

# EXHIBIT 3

Pls.' App. 048

Pls.' App. 049

|  | 10 yrs. Or Greater |  | 5 - 10 yrs. | less than 5 yrs. | less than 2 yrs. |  | Total |
|---|---|---|---|---|---|---|---|
| Cumulative Clients | 1,746 |  | 3,682 | 2,487 | 716 |  | 8,631 |
| Clients Lost in past 24 months |  |  |  |  | 103 |  |  |

CONFIDENTIAL

OHRI0085493

# EXHIBIT 4

141

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ORCHESTRATE HR, INC., and       )
VIVATURE, INC.,                 )
              Plaintiff,        )
                                )
     vs.                        )CIVIL ACTION NO.
                                )3:13-CV-2110-P
ANTHONY L. TROMBETTA and THE    )
BORDEN-PERLMAN INSURANCE AGENCY,)
INC., KELLY MYERS, and          )
DAVE ICENHOWER,                 )
              Defendants.       )

ORAL AND VIDEOTAPED DEPOSITION

TIMOTHY R. LENGLE

VOLUME II

MARCH 31, 2016

ORAL AND VIDEOTAPED DEPOSITION OF TIMOTHY R. LENGLE, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on March 31, 2016, from 1:57 p.m. to 4:45 p.m., before Elizabeth M. Kondor, CCR, in and for the State of New Jersey, reported by machine shorthand, at the Bart Luedeke Center, Multicultural Purpose Room, Rider University, 2083 Lawrence Road, Lawrence, New Jersey, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record.

Pls.' App. 051

142

APPEARANCES

FOR THE PLAINTIFF:

Mr. José M. Portela
(appearing telephonically)
THE BECKHAM GROUP
3400 Carlisle, Suite 550
Dallas, Texas 75204
214-965-9300
josé@beckham-group.com

FOR THE DEFENDANTS:
Mr. Bradley K. Douglas
NAMAN, HOWELL, SMITH & LEE, PLLC
8310 North Capital of Texas Highway
Suite 490
Austin, Texas 78731
512-479-0300
bdouglas@namanhowell.com

FOR RIDER UNIVERSITY AND THE WITNESS:

Mr. Mark Solomon
Associate Vice President for Legal
Affairs and General Counsel
2083 Lawrenceville Road
Lawrenceville, New Jersey 08648-3099
609-895-5653
Masolomon@rider.edu

ALSO PRESENT:
DAVID B. ICENHOWER, JR.

BARRY FORMAN,
Legal Video Specialist

143

INDEX

Appearances.................................... 143

TIMOTHY R. LENGLE
Continued examination by Mr. Douglas...... 145
Examination by Mr. Portela............... 216
Further examination by Mr. Douglas........ 248
Further examination by Mr. Portela........ 250

Signature and Changes.......................... 252

Reporter's Certificate......................... 254

EXHIBITS
LENGLE   DESCRIPTION                 PAGE
Exhibit 15.....................................182
   1/20/14 e-mail to D. Icenhower from
   T. Lengle with attachment
Exhibit 16.....................................184
   E-mail string OHRI 484051 - 51

Exhibit 17.....................................196
   12/13/12 e-mail exchange,
   BP_ORCHESTRATE0018804

Exhibit 18.....................................198
   12/13/12 e-mail, BP_ORCHESTRATE0015083
Exhibit 19.....................................200
   2/19/13 e-mail exchange,
   OHRI 081616 - 18
Exhibit 20.....................................203
   E-mail string, OHRI 11235 - 40

Exhibit 21.....................................205
   E-mail string,
   BP_ORCHESTRATE0026789 - 91

Exhibit 22.....................................250
   6/18/13 e-mail exchange,
   BP_ORCHESTRATE0044306 - 07

144

VIDEOGRAPHER:  Today is Thursday, March 31, 2016.  We are back on the video record at 57 minutes after one o'clock.  This is the continuation of the deposition of Timothy Lengle.  The witness is still under oath.

You may resume, sir.

MR. DOUGLAS:  Thank you.

TIMOTHY R. LENGLE, having been previously sworn, testified as follows;

CONTINUED EXAMINATION BY MR. DOUGLAS:

Q.    Mr. Lengle, I wanted to thank you for working with our scheduling issues this morning and I'll try to be as quick as I can, okay?

A.    Thank you.

Q.    It doesn't mean it's going to be over in a jiff, but let's get going.

When we last were gathered yesterday afternoon, I had been visiting with you about a couple of paragraphs on your affidavit, which has been marked as Exhibit 1, correct?

A.    Yes.

Q.    And do you still have that in front of you?

A.    Yes, I do.

Q.    And I believe you testified yesterday

145

that all of the Rider athletes -- student athletes are required to have primary insurance?

A.    Correct.

Q.    Do they all have primary insurance?

A.    There are some circumstances where they do not have primary coverage.  International student athletes won't have adequate coverage in the United States.  Some student athletes' insurance lapses without their knowledge, and there are circumstances where Rider's athletic insurance would foot the entire bill.

Q.    What percentage, in your best estimate, of the student athletes have primary insurance?

MR. PORTELA:  Objection; form.

A.    I would estimate probably 85 to 90 percent have primary insurance.

Q.    And has that been the case since 2012?

A.    Give or take, you know, some fluctuations, I would say yes.

Q.    Okay.  And we were visiting about -- well, first of all, if a claim is submitted under the primary insurance for those student athletes that have the primary insurance, are those sent out for repricing?

2  (Pages 142 to 145)

Pls.' App. 052

230

A.   Yes, you did.

Q.   Is that still a true and accurate statement by you today?

A.   Yes.

Q.   Okay.  And this, we know, is an absolute false statement by Kelly Myers, correct?

MR. DOUGLAS:  I object to form.  It's leading.

A.   Yes.

MR. PORTELA:  Okay.  We're going to have leading and this is nonsense.

Q.   Is this a false statement by Kelly Myers; yes or no?

A.   Yes.

Q.   Okay.  Because Rider, in fact -- tell me, is it doing really well on billing or really poorly?

A.   I would say really well.

Q.   Great.

18, "As a result of the statements made by Borden-Perlman, Rider stopped doing re-pricing and certain insurance related business with Vivature."

Did I read that correctly?

A.   You did.

231

Q.   Okay.  And do you remember that yesterday at the start of your deposition, Mr. Douglas accused you of making a false statement in paragraph 18?

A.   I do.

Q.   Okay.  Let's talk about that for a second.

Claim forms, those are part of the insurance-related business with Vivature, correct?

A.   Correct.

Q.   All right.  And as a result of what Borden-Perlman did, you had to stop using the claim form process that Vivature was providing, correct?

A.   Correct.

Q.   Therefore, claim forms would be one of the insurance-related businesses that you had to stop using with Vivature as a result of the statements made by Borden-Perlman?

A.   I would have to agree with that.

Q.   Okay.  Also, international insurance, individual primary policies, do you know what those terms that I just used are?

A.   Yes.

Q.   Okay.  Is it true or not that you were in negotiation with Vivature to purchase

232

international insurance through primary individual policies before these comments by Borden-Perlman?

A.   There were preliminary discussions about purchasing that kind of insurance, yes.

Q.   Yes.

And that is also insurance-related business that Rider could have done with Vivature, correct?

A.   I would have to agree with that.

Q.   Okay.  And so I believe that after these comments by Borden-Perlman, when they moved you away from Vivature, you stopped pursuing the international insurance, is that correct, through Vivature, I should say?

A.   I would say that we did stop pursuing that option, yes.

Q.   Okay.  All right, sir.  So now that you've been given a little space and Mr. Douglas isn't raising his voice at you like he was yesterday, is paragraph 18 still true and correct?

MR. DOUGLAS:  I object to form.

A.   After reviewing it, yes, I believe it's correct.

Q.   And true?

A.   And true.

233

Q.   All right.  So in recap, even after the accusations made by Mr. Douglas yesterday, your entire affidavit is true and correct; yes?

A.   Yes.

Q.   Even after the accusations made by Mr. Myers this morning that you made false statements in your affidavit, your affidavit is true and correct; yes?

A.   Yes.

Q.   Even after Dave Icenhower's deposition testimony, where he said you made multiple false statements in your affidavit, your affidavit is still true and correct, correct?

A.   Yes.

Q.   Sorry, I didn't hear that last one.

A.   Yes.

Q.   Thank you.

Okay.  Let me ask you, are you very familiar with the sports medicine medical claims history since you started as the head athletic trainer?

A.   I would say yes.

Q.   All right.  Certainly, familiar with the years '12/'13, '13/'14, '14/'15 and '15/'16?

A.   Yes.

DepoTexas, Inc.

# EXHIBIT 5

Pls.' App. 054

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ORCHESTRATE HR, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:13 CV-2110-P |
| | § | |
| ANTHONY L. TROMBETTA and THE | § | |
| BORDEN-PERLMAN INSURANCE | § | |
| AGENCY, INC. | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF TIM LENGLE

| | |
|---|---|
| STATE OF NEW JERSEY | § |
| | § |
| COUNTY OF _Meroca_ | § |

BEFORE ME, the undersigned notary, on this day appeared **Tim Lengle**, and after being duly sworn, did state as follows:

1.   My name is Tim Lengle.  I am over eighteen (18) years of age, am under no civil disabilities, and am in all respects competent to make this affidavit.  Each of the statements made in this affidavit is made from my personal knowledge, and is true and correct.

2.   I am the head athletic trainer at Rider University.

3.   Around January of 2013, Rider University entered into a contract with Vivature Inc.. As part of that contract, Rider University agreed to send all of its sports related medical claims to Vivature for re-pricing.

4.   On approximately March 19, 2013, Dave Icenhower, a Borden-Perlman employee, called me. I remember this date because I was at the NCAA wrestling tournament at the time.

AFFIDAVIT OF TIM LENGLE                                                                  PAGE 1

5. Although Borden-Perlman had previously talked very well of Vivature and suggested that Rider University enter into the contract with Vivature, Dave went on and on about how bad Vivature was.

6. Dave told me that Borden-Perlman was no longer recommending that any school use Vivature for any services, including repricing. He told me that Vivature was not doing a good job on re-pricing of claims. He said they were not only not getting anywhere near the discounts that Vivature said they would get but that Vivature was the sole cause of a delay in claims getting paid.

7. Dave also told me that Rider should get out of its contract with Vivature immediately and that AIG, the insurance company that Rider had its contract with, was refusing to accept any claims which were re-priced by Vivature.

8. After that conversation, I had numerous other conversations where Dave continued to say negative things about Vivature and try to get Rider to stop doing business with Vivature. Dave also said that Vivature was not providing claim forms.

9. I also had several conversations with Kelly Myers from Borden-Perlman. He basically said the same bad things that Dave did about Vivature. I asked Kelly to provide me with a letter from AIG where AIG confirmed that it would not accept any claims re-priced by Vivature. I asked for this several times and no one from Borden-Perlman ever provided it.

10. I was very clear with Dave and Kelly that Rider had a contract with Vivature and that I wanted all claims to go Vivature. At no time did they tell me that they were going to re-direct Rider's claims or that they would allow this to happen. I knew what they were asking Rider to do was a breach of the agreement between Rider and Vivature and I told them this.

11. I even told them that even if Vivature did not get as good of re-pricing on every single claim, it was still a huge savings to Rider because Vivature was willing to re-price all claims whereas the re-pricer that Borden-Perlman had recommended, Occunet, would only re-price large claims.

12. I also talked to Dave and Kelly at the NATA convention that year. Once again, they repeated similar negative comments to me about Vivature.

13. In July of 2013, Kelly and Dave came to Rider to meet with me and Don Harnum. I wanted to ensure that Rider lived up to its contract with Vivature and was able to use Vivature's software, re-pricing, and have Vivature start billing for Rider.

AFFIDAVIT OF TIM LENGLE                                                          PAGE 2

14. Both Dave and Kelly continued to tell us that we needed to stop doing business with Vivature and that they could bring in new parties, who they would make money from, who could do everything Vivature was doing and offering to do. At this meeting, Kelly told us that the numbers that Vivature had discussed with Rider on potential savings were fabricated.

15. I also asked Kelly about how Rider would pay for its software if Rider did end up moving away from Vivature. Kelly told me that Borden-Perlman would pay for the software and cut Rider a check for $3,500.

16. After this meeting I did follow up with Dave about paying for that software and he asked that I send him an invoice. I did this on around February 1, 2014. I did not receive payment, so had to keep following up. Finally Dave said it would look bad if Borden-Perlman paid for the Vivature. So instead of directly paying an invoice for that software, he told me he was going to send me a $3,500 check and call it a donation and we could deposit it into the Athletic Booster Fund. He did exactly that.

17. Kelly also told me that no way would Vivature ever be able to set up billing for Rider.

18. As a result of the statements made by Borden-Perlman, Rider stopped doing re-pricing and certain insurance related business with Vivature.


**FURTHER, AFFIANT SAITH NOT.**

Tim Lengle

**SUBSCRIBED AND SWORN TO** before me by Tim Lengle on April $\underline{10}$, 2015, to which witness my hand and official seal of office.

_____
Notary Public in and for the State of New Jersey

My commission expires:

_____
11/20/17

I:\EDH\BP\Pleadings 3 13-cv-02110\affidavit Tim 040815.doc

DOROTHY L DEFEO
Notary Public
State of New Jersey
My Commission Expires Nov 20, 2017

**AFFIDAVIT OF TIM LENGLE**                                                          PAGE 4

Pls.' App. 058

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ORCHESTRATE HR, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:13 CV-2110-P |
| | § | |
| ANTHONY L. TROMBETTA and THE | § | |
| BORDEN-PERLMAN INSURANCE | § | |
| AGENCY, INC. | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF THOMAS C. SHELTON

| | |
|---|---|
| STATE OF ARKANSAS | § |
| | § |
| COUNTY OF JEFFERSON | § |

BEFORE ME, the undersigned notary, on this day appeared **Thomas C. Shelton**, and after being duly sworn, did state as follows:

1. My name is Thomas C. Shelton. I am over eighteen (18) years of age, am under no civil disabilities, and am in all respects competent to make this affidavit. Each of the statements made in this affidavit is made from my personal knowledge, and is true and correct.

2. I am the head athletic trainer at The University of Arkansas Pine Bluff.

3. In April of 2013, I was on a phone call with Kelly Myers from Borden Perlman.

4. During that call, Kelly Myers advised that Borden Perlman had been directing the school's claims away from Vivature to be re-priced at ACI's direction.

5. Kelly also stated that no insurance company would do business with Vivature.

AFFIDAVIT OF THOMAS C. SHELTON PAGE 1

6.  Kelly stated that Vivature was the cause of all of the school's claims being handled slowly.

7.  Kelly said that Vivature was not cooperating with ACI and denied ACI access to the NExTT software.

8.  Kelly claimed that the NExTT software was not good and did not do what had been promised and that the new software would be much better.

9.  Kelly told us that Vivature had to be a licensed TPA to write checks for schools, and that since it was not, it was not legal for Vivature to do what it was doing for the school.

10. Kelly advised that the other schools that were doing business with Vivature were leaving them because of all of Vivature's problems.

11. Kelly said we had to stop working with Vivature.

12. When Kelly asked me to move the school's business away from Vivature, Kelly stated that Borden Perlman would pay for new injury tracking software.

13. Because of Kelly's statements, we stopped doing re-pricing and certain insurance business with Vivature.

**FURTHER, AFFIANT SAITH NOT.**

Thomas C. Shelton

SUBSCRIBED AND SWORN TO before me by Thomas C. Shelton on December 9th, 2014, to which witness my hand and official seal of office.



Notary Public in and for the State of Arkansas

My commission expires: 8/26/2018

**AFFIDAVIT OF THOMAS C. SHELTON**                                    **PAGE 2**

AFFIDAVIT OF THOMAS C. SHELTON                                                        PAGE 3

Pls.' App. 061



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ORCHESTRATE HR, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | CIVIL ACTION NO. 3:13 CV-2110-P |
| v. | § | |
| | § | |
| ANTHONY L. TROMBETTA and THE | § | |
| BORDEN-PERLMAN INSURANCE | § | |
| AGENCY, INC. | § | |
| | § | |
| Defendants. | § | |

## AFFIDAVIT OF DAVID MALDONADO

| | |
|---|---|
| STATE OF ARIZONA | § |
| | § |
| COUNTY OF _Maricopa_ | § |

BEFORE ME, the undersigned notary, on this day appeared **David Maldonado**, and after being duly sworn, did state as follows:

1.  My name is David Maldonado. I am over eighteen (18) years of age, am under no civil disabilities, and am in all respects competent to make this affidavit. Each of the statements made in this affidavit is made from my personal knowledge, and is true and correct.

2.  In 2013, I was the head athletic trainer at The University of Southern Indiana.

3.  In the spring of 2013, I was on a phone call with Dave Icenhower. In that call, Dave was talking poorly about Vivature and trying to convince me to move the school's business away from Vivature.

4.  He said that Vivature's re-pricing discounts were not as promised, were not good, and that NAHGA would not even accept re-pricing from Vivature. He told me that if the school continued to use Vivature that NAHGA would not accept the EOB.

AFFIDAVIT OF DAVID MALDONADO                                                                 PAGE 1

Pls.' App. 063

5. He stated that Vivature's automated claim forms did not work and that Vivature was the cause of the school's claims being delayed.

6. He told me that if the school continued to do business with Vivature that Borden Perlman would no longer pay for the NExTT software.

7. Dave informed me that NAHGA would now only accept hand-written and physically signed claim forms and would no longer accept any electronic versions of the claim form from Vivature.

8. He also said that the other schools doing business with Vivature were leaving them because of Vivature's problems.

9. Because of Dave's statements, we stopped doing all business with Vivature.

**FURTHER, AFFIANT SAITH NOT.**

David Maldonado

**SUBSCRIBED AND SWORN TO** before me by David Maldonado on December 10, 2014, to which witness my hand and official seal of office.

Notary Public in and for the State of Arizona

ALLISON R. DYKSTRA
Notary Public - Arizona
Maricopa County
My Comm. Expires Mar 23, 2017

Allison R Dykstra
My commission expires:
3/23/17

AFFIDAVIT OF DAVID MALDONADO

PAGE 2

# TAB B

Pls.' App. 065

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ORCHESTRATE HR, INC.,          )
                               )
              Plaintiff,       )
                               )
VS.                            )   CIVIL ACTION
                               )
ANTHONY L. TROMBETTA and       )   NO.: 3:13 CV-2110-P
THE BORDEN-PERLMAN            )
INSURANCE AGENCY, INC.,        )
                               )
              Defendants.      )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIDENTIAL
ORAL AND VIDEOTAPED DEPOSITION OF

ANTHONY L. TROMBETTA

SEPTEMBER 16, 2013

VOLUME 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF ANTHONY L.

TROMBETTA, produced as a witness at the instance of the

Plaintiff, and duly sworn, was taken in the above-styled

and numbered cause on September 16, 2013, from 8:59 a.m.

to 5:57 p.m., before Lisa C. Hundt, CSR, RPR, CLR in and

for the State of Texas, reported by machine shorthand, at

the law offices of Gruber, Hurst, Johansen, Hail, &

Shank, located at 1445 Ross Avenue, Suite 2500, Dallas,

Texas, in accordance with the Federal Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.

Pls.' App. 066

A P P E A R A N C E S

FOR THE PLAINTIFF:

        Mr. Blake L. Beckham
        And
        Mr. Jose M. Portela
        THE BECKHAM GROUP
        3400 Carlisle
        Suite 550
        Dallas, Texas 75204
        214.965.9300
        214.965.9301 Fax)
        blake@beckham-group.com
        jose@beckham-group.com

FOR THE DEFENDANTS:

        Mr. Mark A. Shank
        And
        Mr. Greg P. McAllister
        GRUBER, HURST, JOHANSEN, HAIL & SHANK
        1445 Ross Avenue
        Suite 2500
        Dallas, Texas   75202
        214.855.6800
        214.855.6808 (Fax) (Fax)
        mshank@ghjhlaw.com
        gmcallister@ghjhlaw.com


ALSO PRESENT:   Mr. Muzzy Bass
                Mr. Lance Wilson
                Mr. Kelly Myers
                Mr. Michael Barnes, Videographer

Pls.' App. 067

A. ADS.

Q. All right. And did you have an employment agreement?

A. With?

Q. Anybody after you left Trustway.

A. Yes.

Q. Who did you have an employment agreement with?

A. Orchestrate HR.

Q. Okay. So you're telling me you didn't work for Orchestrate, but you had a contract with them?

A. My understanding was ADS was part of Orchestrate.

Q. Okay. So you're not saying, A, I get to trick Orchestrate because I really didn't work for them, my -- my noncompete, my nonsolicit is no good, correct?

A. I don't believe there's a noncompete.

Q. All right. Well, but you're not saying because I worked for -- for ADS, my contract with Orchestrate is no good, correct?

A. Correct.

Q. Okay. Here's Exhibit 2.

MR. BECKHAM: Mark, would you like a copy of this?

MR. SHANK: I would.

MR. BECKHAM: What tab is that?

Pls.' App. 068

MR. PORTELA: 13.

Q. (BY MR. BECKHAM) Just take a minute and refresh yourself on that.

(Witness reviewed document.)

Q. (BY MR. BECKHAM) Have you read that recently, sir?

A. Yes.

Q. Is -- is there anything in that contract that you contend is not valid?

A. No.

Q. Okay. And is Borden-Perlman in competition with Orchestrate?

A. I don't believe so.

Q. Okay. I'm interested -- it's interesting to me that you have to qualify that with "I don't believe" as opposed to just an absolute yes or no. I mean, you certainly have as much facts as anybody as what Orchestrate does for their business and what Borden-Perlman does for its business, right?

A. Yes.

Q. You've been a salesman for both?

A. Yes.

Q. Okay. Selling very similar products for both, right?

A. Different products.

Pls.' App. 069

Anthony L. Trombetta - Confidential

day and they won't tell the truth about something.

Okay.  Now, kind of following up on where we were earlier, I told you I'd give you a chance to talk to me about it, I heard threads of your argument that BP may not be in competition with Orchestrate, et cetera.

Now, I know BP has other lines of insurance, but as they -- as they apply to the colleges and the universities that we're going to be talking about today, is it your contention that BP is only in the secondary insurance market?

A.    No.

Q.    Okay.  And why don't we outline a couple of areas today.  I mean, generally, when you were working with Orchestrate, you were going and talking with -- with athletic trainers, trying to sell different insurance products to universities; is that fair?

A.    Yes.

Q.    Okay.  And are you doing that at BP?  Are you going to universities, meeting with athletic trainers and trying to sell them insurance products?

A.    Yes.

Q.    And the insurance products are typically set up to insure athletes against injuries, either on the practice or playing field or illnesses or injuries that they would have not related to athletics, right?

Pls.' App. 070

A.    Yes.

Q.    And that would -- and I asked you a poor question.  What I just asked you, that's what -- that's part of what you were doing at Orchestrate is selling insurance products to -- to universities through their athletic trainers to insure against injuries and illnesses of student athletes at Orchestrate, right?

A.    Yes.

Q.    And you're doing precisely the same thing at BP, right?

A.    Yes.

(Sotto voce conversation.)

Q.    Okay.  And -- and you know -- you know that you are doing the same thing at BP and at Orchestrate both as the corporate rep and yourself personally, right?

A.    Can you repeat that question?

Q.    Well, you know that as the corporate rep; you know -- you know what you're doing, right?

MR. SHANK:   What corporate topic are we on?

MR. BECKHAM:   Jose, what corporate topic are we on?

MR. SHANK:   I think we'll have to -- well, we'll just see what happens.  It needs to be clear on the record what topic we're dealing with.

Pls.' App. 071

Q.   Okay.   But we have a very finite and limited market of 2,500 universities -- colleges and universities, right?

A.   Yes.

Q.   And some of those don't have any athletic programs, right?

A.   Some don't.

Q.   Okay.   And those probably wouldn't be in the target -- in Tony Trombetta's target --

A.   Correct.

Q.   -- TTT?

Okay.   And so the -- the target market that Tony Trombetta had at Orchestrate is precisely the same target market as Tony Trombetta has at Borden-Perlman, correct?

A.   Correct.

Q.   Okay.   And the contact people that Tony Trombetta needs to talk to, the important decision-makers, are precisely the same as they were at Orchestrate as they are at Borden-Perlman, correct?

A.   Yes.

Q.   And the type of information that would be important to know -- loss history, census, the desires of the trainers, the desires of the athletic director -- all of that information that a salesman would want to know,

Pls.' App. 072

A.   Athletic departments at colleges or universities.

Q.   Okay.  Okay.  And can we just use athletic departments and understand that we're talking about colleges and universities only?

A.   Sure.

Q.   Okay.  And so have you ever worked in other parts of the insurance business?  Have you ever sold life insurance?  Have you ever sold casualty?  Have you ever sold property?

A.   No.

Q.   Okay.  Do -- do you know of any aspect of the insurance business within Borden-Perlman's portfolio that has a more narrow market than 2,500 potential clients in the world?

A.   No.

Q.   Okay.  Same thing for Orchestrate, this is the narrowest market that you know of for Orchestrate or all of the Muzzy Bass related companies, right?

A.   Correct.

Q.   Okay.  And so spreading rumors in an extremely narrow market would be very -- would be much more damaging than in the life insurance market for the United States, right?

A.   Yes.

Pls.' App. 073

the Athletic Department Market, would he understand that term?

A.  Yes.

Q.  Okay.  And so the Athletic Department Market we're defining today as the approximately 2,500 colleges and universities in the United States that have athletic departments and to which both BP and Orchestrate sell insurance products, correct?

MR. SHANK:  Objection; compound question.

Q.  (BY MR. BECKHAM)  I'll break it down.  We're defining the Athletic Department Market to mean the approximately 2,500 colleges and universities in the United States that have athletic departments, right?

A.  Yes.

Q.  And Tony Trombetta's target market at Orchestrate was the Athletic Department Market?

A.  Yes.

MR. BECKHAM:  And I'm asking the court -- madam court reporter to capitalize from this point forward Athletic Department Market, initial cap when we use that --

THE REPORTER:  Yes, sir.

MR. BECKHAM:  -- as a defined term.  Thank you.

Q.  (BY MR. BECKHAM)  And Tony Trombetta's target

Pls.' App. 074

Anthony L. Trombetta - Confidential                                    41

market at Borden-Perlman is the very same Athletic Department Market, right?

A.   Yes.

Q.   Okay.  And within the Athletic Department Market, what insurance products when you were at Orchestrate did Orchestrate attempt to sell in that market, insurance or insurance-related products?

A.   In the secondary athletic insurance for the first year -- and my first year was the '11/'12 was the year that that was taken over by -- that Trustway was taken over.

Q.   Keep going.

A.   Also, short-term medical plans --

(Exhibit Number 3 was marked.)

Q.   (BY MR. BECKHAM)  I'll tell you what, I'm going to make this an exhibit, and so I want to make sure I get your words down right just so if I have to look back I don't have to trust my notes.  So you're talking about the 2011 and 2012-year.  Did I write that down right?

A.   Yes.

Q.   Okay.  And this is Orchestrate -- I guess I should know how to spell it.

Okay.  So I wrote up here on the top Orchestrate's products in Athletic Department Market, right?

Pls.' App. 075

correct?

A.    Yes.

Q.    Okay.   So that's change number 3, because you just said under oath I didn't know, right?

A.    I didn't know that some of those documents were confidential.

Q.    There ain't nothing you can take.   You didn't know your client list was -- you're making it worse.   You ought to just say I stated it wrong and stop, but now you're compounding it, sir.   Okay, let's go through it.

Are you stating you didn't know the client list was confidential?

MR. SHANK:   Don't answer that question.

MR. BECKHAM:   I withdraw the question.

MR. SHANK:   Okay.

Q.    (BY MR. BECKHAM)   Are you stating that under oath that you didn't know that the client list was confidential?

A.    No.

Q.    Okay.   So you knew for a fact the client list was confidential and you took it, right?

A.    Yes.

Q.    Okay.   So now you need to change your earlier answer that I didn't take any confidential documents, right?

Anthony L. Trombetta - Confidential

MR. SHANK:   That isn't what he said.

Objection; asked and answered,

mischaracterizing the prior testimony.

MR. BECKHAM:   That's what he said, Mark.

That's the beauty of a court reporter.

Q.   (BY MR. BECKHAM)   I said, and you knew at the

time that was a violation of your contract, and you said,

I did not.   So that was a false answer, sir, correct?

You need to change that so the record is correct?

MR. SHANK:   Objection.   The witness has

not been given the context of the conversation.

MR. BECKHAM:   Okay.   Well, that's an

objection.   That's like an improper impeachment in trial.

Q.   (BY MR. BECKHAM)   Here it is:   You knew for a

fact you violated that part of the contract on that

document and several others; on that document, yes.   Do

you remember that about three minutes ago?

A.   Yes.

Q.   And see that's where you kind of skittered and

just said on that document and I said several others, so

I -- I nailed you again; several others, too.   You walked

out with way more than that.   Then you told the truth, I

walked out with other documents.

Am I reading that correctly so far?

A.   Yes.

Pls.' App. 077

Anthony L. Trombetta - Confidential

106

Q. Is Borden-Perlman paying your attorney, Mr. Shank, and his firm for representing you today?

A. Yes.

Q. Okay. 100 percent?

A. Yes.

Q. Okay. And why is it that you don't know whether they're going to satisfy any judgment against you for attorneys' fees now that you've admitted you violated your contract?

A. We've never had that conversation.

Q. Okay. Tell me all of the confidential documents that you know of that you failed to honor your contract and turn them in at the time you left.

A. There was a client list. There were a significant amount of commission statements. There were some revenue charts.

(Sotto voce conversation.)

A. A few internal e-mails about getting out of the secondary insurance business.

(Sotto voce conversation.)

Q. (BY MR. BECKHAM) Did you make off with some loss ratio data as well?

A. Loss ratio data?

Q. Uh-huh.

A. I don't believe so.

Pls.' App. 078

107

Q.    Okay.  No loss data whatsoever, no history?

A.    Not that I know of.

Q.    And you're certainly not telling the court that all of these documents you took, all of them Borden-Perlman already had?

A.    Correct.

Q.    Okay.  And every salesman that I've ever deposed that left with his client list has the same answer to this question, why did you take it, because I wanted to talk to those clients in the future.  Is that the same for you, sir?

A.    It was to know which clients that I had worked on, because we had some issues in the past about commissions.

Q.    Say that again.

A.    So I was hired at Orchestrate in July of --

Q.    Just say the last part.  I don't need the whole history.  You're saying the only reason you took it because of commissions?

A.    So -- so that I could line up where my commissions came from.

Q.    Okay.  Not -- not -- but you certainly gave a copy of it to your new employer.  You know that, right?

A.    The client list?

Q.    Yeah.

Pls.' App. 079

Anthony L. Trombetta - Confidential

312

STATE OF TEXAS )

COUNTY OF DALLAS )

I, LISA C. HUNDT, a Certified Shorthand Reporter in and for the State of Texas, hereby certify that, pursuant to the agreement hereinbefore set forth, there came before me on the 16th day of September, A.D, 2013, at 8:59 a.m., at the office of Gruber, Hurst, Johansen, Hail, & Shank, located at 1445 Ross Avenue, Suite 2500, Dallas, Texas, the following named person, to-wit: ANTHONY L. TROMBETTA, who was by me duly cautioned and sworn  to testify to the truth, the whole truth, and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; and that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that the deposition is a true record of the testimony given by the witness, same to be sworn and subscribed by said witness before any Notary Public, pursuant to the agreement of the parties; and that the amount of time used by each party at the deposition is as follows:

Mr. Beckham - 6 hours, 6 minutes,

Mr. Shank - 0 hours, 0 minutes,

Mr. Portela - 0 hours, 0 minutes,

Mr. McAllister - 0 hours, 0 minutes;

Pls.' App. 080

Anthony L. Trombetta - Confidential

313

I further certify that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

I further certify that before the completion of the deposition, ___X___ the Deponent, and/or _____ the Plaintiff/Defendant, ___X___ did _____ did not request to review the transcript.

In witness whereof, I have hereunto set my hand and affixed my seal this _____ day of _____, A.D. 2013.


LISA C. HUNDT, CSR, RPR, CLR
Texas CSR No. 6533
Expiration Date:  12/31/14

HUNDT REPORTING, LLC
Firm Registration No. 347
6500 Greenville Avenue, Suite 445
Dallas, Texas 75206
214.220.1122


Taxable Cost:        $ _____

Pls.' App. 081

## EMPLOYMENT AGREEMENT

This agreement, between ORCHESTRATEHR, a Texas Corporation, (hereinafter "Company"), and ___Anthony Crombeak___, an employee of Company (hereinafter Employee/Consultant"), is offered for the purpose of establishing an employment relationship between the Employee and the Company as well as establish any post-employment ownership of all of the Company's clients marketed, sold and serviced by the Company or Employee/Consultant during the course of their employment with the agency.

For valuable consideration, including, but not limited to, employment, salary, sales/service experience and training, the Employee/Consultant explicitly agrees to the following:

- All of the Company's clients are the property of the Company, including all commissions, residuals, bonuses or other compensation received from the client or any insurer for the sale or servicing of the client as well as any accumulated good will between the Employee/Consultant and the client resulting from the Employee/Consultant's work as an employee of the Company.

- Company clients remain a part of the Company's book of business following the Employee/Consultant's voluntary or involuntary termination of employment with the Company and shall not be considered as a potential prospect or pursued as a client, directly or indirectly, by the Employee/Consultant or the Employee/Consultant's future employers for a period of three (3) years following the Employee/Consultant's termination of employment with the Company. Specifically prohibited is a direct or indirect attempt to change agreement between the client, agency and any insurer by the agent.

  In the event that any client terminates their business relationship with the Company within three (3) years of the Employee/Consultant's termination of employment with the agency and becomes, directly or indirectly, a client of the agent or of the agent's future employer, the agent agrees to purchase the client from the agency and compensate the agency a sum no less than three times the annual commission or other compensation paid by the client or any insurer to the agency during the 12 months prior to the client's termination with the agency. This compensation may be paid either in one lump sum or on a monthly basis by the agent to the agency as directed by the agency.

- All files, notes, electronic memoranda or other information about any agency client maintained by the agency or by the agent in the course of their employment with the agency remain the sole, exclusive property of the agency and shall not removed from the agency or copied for any purpose unrelated to the agent's employment with the agency without the express, written consent of the agency.

- In the event that any files, notes, electronic memoranda or other information concerning agency clients are removed from the agency or copied for a purpose unrelated to agency business, the agent acknowledges that they may be subject to legal action to reclaim the



agency's property and responsible for reimbursing the agency for the cost to recover lost information, including any legal costs incurred by the agency and time spent in investigating and restoring files, notes, electronic memoranda or other information concerning the agency's clients.

* To not solicit, sell or service any insurance product to any individual or group within the agency's market area for direct compensation or for another agency during the course of the agent's employment with the agency.

Violation will result in immediate termination and the Employee/Consultant agrees that any group or individual sold an insurance product in violation of this paragraph entitles the Company to seek compensation as if they were a client of the agency.

This agreement does not, in any way, limit the agent's ability to sell, service, market or solicit new clients who were not already clients of the agency following the end of their employment with the agency. Further this agreement does not limit the agent's ability to compete with the agency following the end of their employment with the agency, for prospective new clients who were not already clients of the agency.

AGREED, this ___13___ day of ___July___ ,20_11_.


___Anthony Trombetto___
Employee


___Morgan Bing Jr.___
_____ for OrchestrateHR

| | |
|---|---|
| Abraham Baldwin Agricultural College | GA |
| Adams College | CO |
| Alabama A&M University | AL |
| Albany State | GA |
| American River College | CA |
| Anderson University (SC) | SC |
| Appalachian State University | NC |
| Arizona Cardinals | AZ |
| Armstrong Atlantic State University | GA |
| Atlanta Falcons | GA |
| Auburn University | AL |
| Baltimore Ravens | MD |
| Barton College | NC |
| Baylor University | TX |
| Berry College | GA |
| Bethune Cookman College | AL |
| Blinn College | TX |
| Bowie State | NJ |
| Bowling Green University | OH |
| Brewton Parker College | TN |
| Brigham Young University | UT |
| Brockport SUNY | NY |
| Buffalo Bills | NY |
| Butler University | IN |
| California Baptist University | CA |
| Campbell University | SC |
| Carilion Clinic | CA |
| Carrollton Farmers Branch HS | TX |
| Cedarville University | CA |
| Centennial High School | TX |
| Central State University | OH |
| Charlotte Bobcats | NC |
| Chassell High School | MI |
| Christopher Newport University | VA |
| Clemson University | SC |
| Cleveland State University | OH |
| College of the Desert | CA |
| College of the Sequoias | CA |
| Colorado College | CO |
| Columbus State University | GA |
| Consumnes College | CA |
| Creighton University | NE |
| Cuesta College Basic | CA |



EXHIBIT 5

Deponent Trombette
Date 9.16.13

Pls.' App. 084

| | |
|---|---|
| Davis & Elkins | WV |
| Delta State University | MS |
| Denison University | OH |
| Dollar Bay High School | MI |
| Duke University | NC |
| Eastern Illinois University | IL |
| Eastern Kentucky University | KY |
| Eckerd College (JockDoc) | FL |
| Fairleigh Dickinson University I | VA |
| Fairleigh Dickinson University III | VA |
| Farmingdale SUNY | NY |
| Faulkner University | AL |
| Finlandia University | MI |
| First & 10 Sports Medicine | AL |
| Florida Atlantic University | FL |
| Florida International University | FL |
| Folsom Lake College | CA |
| Fort Hayes State University | KS |
| Franklin & Marshall | WV |
| Georgia College and State | GA |
| Georgia Military | GA |
| Georgia Southern University | GA |
| Georgia State University | GA |
| Georgia Tech University | GA |
| Glenville State University | WV |
| Gonzaga University | WA |
| Hancock High School | MI |
| Herndon Clinic | KS |
| High Point University | NC |
| Houghton High School | MI |
| Houston Rockets | TX |
| Huntingdon College | AL |
| Indiana Pacers | IN |
| Jacksonville University | FL |
| Jeffers High School | MI |
| Kennesaw State | GA |
| Kent State University | OH |
| LaGrange College | GA |
| Lewis and Clark College | OR |
| Liberty High School | TX |
| Lindenwood University | CA |
| Lone Star High School | TX |
| Louisiana Tech University | LA |

| | |
|---|---|
| McNeese State University | LA |
| Merced Community College | CA |
| Metropolitan State College of Denver | CO |
| Michigan Tech | MI |
| Midwestern State University | TX |
| Mississippi College | MS |
| Missouri Valley College | MO |
| New Jersey Nets | NJ |
| Newman University | KS |
| Nicholls State University | LA |
| North Carolina Central | NC |
| North Carolina State University | NC |
| Northern Kentucky University | KY |
| Northridge HS | UT |
| Northwest Missouri State University | MO |
| Northwestern Nazarene University | ID |
| Ohio Dominican University | OH |
| Oklahoma Baptist University | OK |
| Oklahoma City Thunder | OK |
| Otterbein College | CT |
| Peralta CCD Basic | CA |
| Philadelphia 76ers | PA |
| Portage Health | MI |
| Providence College | RI |
| Redlands Community College | CA |
| Rider University | NJ |
| Rutgers University | NJ |
| Sacramento City College | CA |
| Sacred Heart University | CT |
| Sam Houston State University | TX |
| Samford University | AL |
| San Francisco 49ers | CA |
| San Joaquin Delta | CA |
| Savannah State | GA |
| Seton Hall University | NJ |
| Slippery Rock University | PA |
| Southern Methodist University | TX |
| Southern Oregon | OR |
| Southwest Oklahoma State University | OK |
| Southwestern College (KS) | KS |
| Southwestern University (TX) | TX |
| Spring Hill College | NC |
| St John Fischer University | NY |

| | |
|---|---|
| St. Louis Rams | MO |
| Stephen F Austin | TX |
| Swarthmore College | PA |
| Tennessee State University | TN |
| Tennessee Titans | TN |
| Texas A & M - Kingsville | TX |
| Texas A&M - College Station | TX |
| Texas Christian University | TX |
| Texas Tech University | TX |
| Texas Woman's University | TX |
| Thomas More College | KY |
| Thomas University | GA |
| Tiffin University | PA |
| Toledo University | OH |
| Towson University | MD |
| Trinity College | OH |
| Troy University | AL |
| Truman State University | NJ |
| Tusculum College | TN |
| UHSAA | UT |
| Union College | KY |
| University of Alabama Birmingham | AL |
| University of Arkansas | AR |
| University of Arkansas Pine Bluff | AR |
| University of California Fresno | CA |
| University of Central Florida | FL |
| University of Central Missouri | MO |
| University of Connecticut | CT |
| University of Dallas | TX |
| University of Detroit Mercy | MI |
| University of Georgia | GA |
| University of Hawaii | HI |
| University of Houston | TX |
| University of Louisiana - Lafayette | LA |
| University of Louisiana - Monroe | LA |
| University of Mary | CA |
| University of Maryland | MD |
| University of Mass - Dartmouth | MA |
| University of Memphis | TN |
| University of Miami | FL |
| University of Minnesota Duluth | MN |
| University of Mississippi | MS |
| University of Missouri - Kansas City | MO |

Pls.' App. 087

| | |
|---|---|
| University of Nebraska | NE |
| University of New Mexico | NM |
| University of North Carolina - Chapel Hill | NC |
| University of North Texas | TX |
| University of Oklahoma | OK |
| University of Oregon | OR |
| University of Richmond | VA |
| University of South Carolina - Aiken | SC |
| University of South Carolina - Upstate | SC |
| University of South Florida | FL |
| University of Southern Indiana | IN |
| University of Southern Mississippi | MS |
| University of Tennessee - Chattanooga | TN |
| University of Tennessee - Martin | TN |
| University of Texas - Arlington | TX |
| University of Texas El Paso | TX |
| University of Toledo | OH |
| University of Utah | UT |
| University of West Alabama | AL |
| University of Wisconsin Stout | WI |
| University of Wyoming | WY |
| UT Health Science Center | TX |
| Valdosta State University | GA |
| Vanguard University | CA |
| Virginia Commonwealth University | VA |
| Wakeland High School | TX |
| Washington & Lee University | PA |
| Western Kentucky University | KY |
| Western New England University | MA |
| Western New Mexico | NM |
| Willamette University | OR |
| Wingate University | NC |
| Winston Salem State | NC |
| Wofford College | NC |
| Youngstown State | OH |

# TAB C

Pls.' App. 089

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ORCHESTRATE HR, INC.,                )
                                     )
            Plaintiff,               )
                                     )
VS.                                  ) CIVIL ACTION
                                     )
ANTHONY L. TROMBETTA and             ) NO.: 3:13 CV-2110-P
THE BORDEN-PERLMAN                   )
INSURANCE AGENCY, INC.,              )
                                     )
            Defendants.              )

*****************************************************

CONFIDENTIAL
ORAL AND VIDEOTAPED DEPOSITION OF

KELLY MYERS

SEPTEMBER 18, 2013

VOLUME 1

*****************************************************

ORAL AND VIDEOTAPED DEPOSITION OF KELLY MYERS,

produced as a witness at the instance of the Plaintiff,

and duly sworn, was taken in the above-styled and

numbered cause on September 18, 2013, from 9:17 a.m. to

6:30 p.m., before Lisa C. Hundt, CSR, RPR, CLR in and for

the State of Texas, reported by machine shorthand, at the

law offices of Gruber, Hurst, Johansen, Hail, & Shank,

located at 1445 Ross Avenue, Suite 2500, Dallas, Texas,

in accordance with the Federal Rules of Civil Procedure

and the provisions stated on the record or attached

hereto.

Pls.' App. 090

A P P E A R A N C E S

FOR THE PLAINTIFF:

        Mr. Blake L. Beckham
        And
        Mr. Jose M. Portela
        THE BECKHAM GROUP
        3400 Carlisle
        Suite 550
        Dallas, Texas 75204
        214.965.9300
        214.965.9301 Fax)
        blake@beckham-group.com
        jose@beckham-group.com

FOR THE DEFENDANTS:

        Mr. Mark A. Shank
        And
        Mr. Greg P. McAllister
        GRUBER, HURST, JOHANSEN, HAIL & SHANK
        1445 Ross Avenue
        Suite 2500
        Dallas, Texas  75202
        214.855.6800
        214.855.6808 (Fax) (Fax)
        mshank@ghjhlaw.com
        gmcallister@ghjhlaw.com

ALSO PRESENT:   Mr. Muzzy Bass
                Mr. Lance Wilson
                Mr. Anthony Trombetta
                Mr. Michael Barnes, Videographer

Pls.' App. 091

Kelly Myers - Confidential

40

whole testimony. You're skittering.

A.    I don't remember.

Q.    I asked you on direct competition if you remember that he testified --

A.    I don't remember what he testified.

Q.    Okay.  And he said there were -- Borden-Perlman and Orchestrate were direct competitors on international insurance and they were direct competitors in repricing. Do you remember that now?

A.    No, but --

Q.    Do you remember us working up this exhibit --

A.    I do.

Q.    -- Exhibit 3 at great length?

A.    I do.  I do.

Q.    And Exhibit 3 at great length?

A.    I do, but I didn't see it.

Q.    Okay.  And so you agree that Borden-Perlman is a direct competitor of Orchestrate's -- well, first of all, you remember the definition of Athletic Department Market, right?

A.    I remember your definition.

Q.    Well, Tony agreed to it, right?

A.    I don't remember that.

        (Sotto voce conversation.)

Q.    Okay.  And -- and Tony testified that there's

Pls.' App. 092

41

approximately 2,500 colleges and universities in the United States that had athletic departments, right?

A.    He did.  I remember that.

Q.    Okay.  Is that true?

A.    I -- I think it's probably more.

Q.    How many more?

A.    I -- you know, I don't know exactly, but I'd say maybe 1,500 more.

Q.    And he testified that compared to most lines of insurance, that this was a very narrow and finite market. You'd agree with that, right?

A.    I'd agree the market's narrow, yes.

Q.    And finite?

A.    Yes.

Q.    Okay.  And you would agree --

          (Sotto voce conversation.)

Q.    (BY MR. BECKHAM)  And you would agree, sir, that it's a highly competitive environment?

A.    Sure.

Q.    The Athletic Department Market?

A.    Yes.

Q.    Okay.  And Borden-Perlman is in the highly competitive Athletic Department Market, as we've defined it, right?

A.    You'd have to tell me your definition of how

Kelly Myers - Confidential

42

you defined it.  I -- I don't know.

Q.    Colleges and universities that have an athletic department.  You don't remember that from Monday?

A.    We are in that market, yes.

Q.    Okay.  And it's a highly competitive market, right?

A.    Yes, it is.

Q.    And Orchestrate's in that market, right?

A.    They sell to those schools, yes.

Q.    They're in that market?

A.    Yes, yes.

Q.    So you're both in the same highly competitive market, right?

A.    No.

Q.    Oh, wow.

A.    We --

Q.    And you both sell the exact same product, repricing, in that highly competitive market, right?

A.    [No verbal response.]

Q.    Sir, how can you even think?  You just handed me a document that says repricing revenue on it.  Why would you have to think.  Let me -- I'll withdraw the question?

Is Exhibit 17 the brand-new document that you didn't know who typed, does it show repricing

Pls.' App. 094

Kelly Myers - Confidential

43

revenue?

A.   I told you who typed this document.

Q.   Does it say --

A.   And yes, it does.

Q.   Okay.  So 17 shows repricing -- and that's to Borden-Perlman from the Athletic Department Market, right?

A.   Yes, it is.

Q.   Okay.  And Orchestrate earns lots of money for repricing in the highly competitive Athletic Department Market, right?

A.   I don't know that.

Q.   Do they earn a dime, sir?

A.   I don't know what they earn.

Q.   Okay.  So -- so you don't know anything about Orchestrate?

A.   I didn't say that.

Q.   You don't even know if they earn money -- you're testifying under oath you don't know if they earn money in repricing in the Athletic Department Market?

A.   I don't know what money they earn.

Q.   I didn't ask you that.  Quit skittering.  You couldn't admit that you're both in the same market, sir. I asked you that and you couldn't answer it.  Let's try it again, the second time.

Pls.' App. 095

Kelly Myers - Confidential

44

Borden-Perlman and Orchestrate are both in the highly competitive and finite market of selling insurance products to athletic departments, right?

A.   We sell different products.

Q.   Answer my question.  You both sell repricing, right?

A.   We do.

Q.   Okay.  You compete, Borden-Perlman and Orchestrate compete for -- on repricing in the highly competitive and finite market of selling to athletic departments, right?

A.   We could be at times, yes.

Q.   No --

A.   Yes.

Q.   -- unequivocally?

A.   Yes.

Q.   Okay.  You realize you just changed your testimony under oath?

A.   No, I don't think I did.

Q.   Okay.  So you don't remember saying you didn't compete on repricing not two minutes ago?

A.   What I'm thinking --

Q.   No.  Do you remember saying that?  That's all I asked you.  No speech.

A.   I don't remember what I said.

Pls.' App. 096

Kelly Myers - Confidential

45

Q.   That's the problem with saying things that aren't true.   You've got to remember them.

Okay.   So now you admit Orchestrate and BP are competitors, right?

A.   We are competitors.

Q.   Okay.   Do you remember testifying two minutes ago you weren't?

A.   Sir we're competitors on --

Q.   Sir, no.   Answer --

A.   -- certain things; we are not competitors -- we're not competitors in the same way on the same products.

Q.   Do you remember -- you are competitors in the same way on the same product of repricing, right?

A.   I don't agree with that.

Q.   Is it the same product?

A.   No.

Q.   Repricing is two different products?

A.   The way we do the product is different than what they do.   It's a different product.

Q.   That's Ford and Chevy, pal.

A.   Well, that's what it is.   That's my answer.

Q.   Okay.   So Ford and Chevy don't compete?

A.   I'm not --

Q.   Do Ford and Chevy compete?

Pls.' App. 097

A.   We had verbal agreements on what the revenue split would be.

Q.   (BY MR. BECKHAM)   On software?

A.   No, not on -- I don't believe so on software.

Q.   Did you ever tell any of the colleges or universities that had purchased software that you, on behalf of Borden-Perlman, agreed to -- to pay for the software to Orchestrate?

A.   I don't -- I don't understand the question. Did we ever --

Q.   And I'm asking on this one, not just Borden-Perlman, you saying it on behalf -- not that Kelly was going to pay out of his own pocket --

A.   Right.

Q.   -- but Borden-Perlman would pay for the software.

A.   Did we ever tell clients -- can you just repeat -- I want to understand the question.

Q.   Yeah.  Did you ever say that Borden-Perlman would pay for the software that the clients purchased from Orchestrate?

A.   There are some clients that we told that.

Q.   Okay.  And have you paid for it?

A.   No.

Q.   Okay.

Pls.' App. 098

A.   Not -- not -- no.

Q.   Okay.   What clients did you tell -- you, Kelly, tell, on behalf of Borden-Perlman that Borden-Perlman would pay their bill for software to Orchestrate?

A.   Two.

Q.   Okay.   And this was -- if I say "the rift," do you know what I'm talking about, before the time you decided to no longer do business?

A.   Uh-huh.

Q.   Can we use that as a term today?

A.   Yes.

Q.   Okay.   And your representations, your promises to these clients that Borden-Perlman would pay for the software bill to Orchestrate, that was before the rift or after the rift?

A.   After the rift.

Q.   Okay.   And which --

A.   I can't define when the date of the rift, but I'm saying it was after the rift.

Q.   Do you remember roughly when that was?

MR. PORTELA:   Well, it can't be after, because --

Q.   (BY MR. BECKHAM)   And who were the two that you told after?

A.   You're talking about me personally?

Pls.' App. 099

Q.   Yeah.

A.   Rider and Providence.

Q.   Okay.  And what --

A.   I believe that was it, yeah.

Q.   Why did you tell Rider and Providence that you would pay the software bill?

A.   Because we recommended Orchestrate there, we recommended them for the software product there.

Q.   Okay.  Well, didn't you recommend Orchestrate on lots of clients of software?

A.   I don't know what "lots" is, but we did recommend other clients.

Q.   Okay.  Why didn't you make the same offer to them?

A.   Well, you asked me what I did personally.

Q.   I know, and I'm asking why you didn't to the others?

A.   Because I didn't talk to them.

Q.   Okay.  And it's your sworn testimony that you never committed -- did you ever commit conditionally, like, well, if you don't make enough money out of the -- the repricing savings, we'll pay -- Borden-Perlman will pay for the software?  First of all, do you understand the words I've said?

A.   I do.  I don't believe I did that.

Q.     (BY MR. BECKHAM)   Borden-Perlman made negative comments to existing contractual customers of Orchestrate about Orchestrate, and Borden-Perlman was selling those same clients insurance products and ancillary services, correct?

A.     I'd have to see the -- I need to see the comments that we made.  I don't know that we made those negative comments.  What particular client are you talking about?

MR. PORTELA:  He's the corporate rep, Mark.

MR. BECKHAM:  Yeah.

MR. PORTELA:  On this very issue, on comments about repricing and Orchestrate.  I think it's Topic 9.  It couldn't be anymore clear.  9, comments about repricing to clients.

MR. SHANK:  Is there a question pending?

MR. BECKHAM:  Of course there is.  Were you listening?

Q.     (BY MR. BECKHAM)   Sir, when you say you have to see the comments, you were careful to make the negative comments verbally so they'd be harder to track down, right?

A.     No, sir.

Q.     Most of the negative comments that you made

about Orchestrate were verbal, right?

A.   No, sir.

Q.   Most of them were written?

A.   I don't -- I don't -- no, I'm not admitting any negative comments.

Q.   So you're now saying you made no negative comments about Orchestrate?

A.   I'm not saying that, sir.  I said --

Q.   You just said, I'm not admitting to any negative comments.  I don't know what else you could possibly mean.

MR. SHANK:  Let him finish his answer, please.

MR. BECKHAM:  He did.  He said I'm not admitting to any negative comments.

MR. SHANK:  No.  Then he had another -- he --

MR. BECKHAM:  That was the next question.

Q.   (BY MR. BECKHAM)  Sir, are you admitting to making negative comments about Orchestrate?

A.   No.

Q.   And are you admitting that Borden-Perlman made negative comments about Orchestrate?

A.   No.

MR. BECKHAM:  Mark, why are we taking this

Kelly, Myers - Confidential

185

with --

Q.   I didn't ask you that, sir.  You're skittering again.  Do you think I asked you if you had a contract with Orchestrate?  Of course you didn't.  Please stop doing that.  Can you answer my question?

A.   Ask it again.

Q.   Certainly Borden-Perlman was aware of the existence of the contracts between --

MR. BECKHAM:  Are we off again, Mark, on this -- are you off on the software, too?

(Sotto voce conversation.)

MR. BECKHAM:  Should I just hit "try to connect again" if I'm froze up?

(Sotto voce conversation.)

MR. BECKHAM:  Can you type and let me see if I'm live?

(Sotto voce conversation.)

Q.   (BY MR. BECKHAM)  Certainly Borden-Perlman was aware of the existence of contracts between Orchestrate and many of the universities and colleges that Orchestrate and Borden-Perlman were -- were serving jointly?

A.   I don't know if a contract existed.  I know that Orchestrate was doing repricing on those schools.  I haven't seen the contracts.  I don't know.

they were quality.

Q. Right. And you were extremely impressed with Orchestrate's ability to have that when you started doing business with them, right?

A. I wouldn't characterize it that way.

Q. What way would you characterize it, sir? Impressed, not extremely?

A. I would say I was impressed with the model, the entry point to repricing.

Q. And you were impressed?

A. I wasn't impressed.

Q. Did you come to Orchestrate and see everything they had going on in their office and their big large TPA arm and all the innovative products and services they were offering?

A. Yes, I came to their office.

Q. Very impressive, wasn't it?

A. It was okay.

Q. Okay. You guys can't even afford your software product. Orchestrate has state of the art software, right?

A. I -- I guess they have state of the art software.

Q. Does anybody else have kiosks where the athlete walks in, swipes their thumb, it pops up, enters some

information and the bill is automatically sent?

A.    I don't know --

Q.    Yeah.   You certainly don't know anybody that has anything remotely approaching that?

A.    I don't know.

Q.    In fact, the company that you guys recommend got hacked and were shut down by -- by hackers, couldn't operate for a week, right?

A.    I don't -- we didn't recommend a company.

Q.    Oh, but on March 20th, you and Icenhower and Trombetta didn't go out and tell multiple Orchestrate software clients to stop using the NExTT software on March 20th?

A.    I don't -- I don't believe -- I don't think so.

Q.    So your answer is, I don't know?

A.    I don't think we did.

Q.    Did you ever ask -- did -- do you know why several software clients on the same day quit using the software?

A.    I don't know who quit using what software.

Q.    Do you know that -- you were here in the deposition when Mr. Trombetta admitted e-mailing himself to a secret e-mail address confidential corporate documents, right?   Just two short days ago, sir.   He was sending e-mails to himself on March 20th.   Do you

Q.   We're going to scratch each other's backs, but we're not going to pick each other's wallets, right?

A.   Yes.

Q.   Okay. 'And so there was an understanding that if Muzzy brought you a client and let's say they did international, that you -- you weren't going to try to beat him on the international?

A.   That is correct.

Q.   Okay. And if they brought you a client with international and wanted -- and you wanted them to do repricing, that Muzzy was not going to try to take your international away?

A.   Yes.

Q.   Okay. So the deal was on these joint clients that were going to honor the existing contractual, whether verbal or written arrangements, that the other partner had and not try to interfere, correct?

A.   Yes.

Q.   Okay. And you relied on that agreement, right?

A.   I'm sorry?

Q.   You relied on that agreement, right?

A.   Yes.

Q.   Okay. And -- and you certainly wouldn't have done a deal with Muzzy if he said, hey, buddy, you bring me in, but every single piece of business you got, I'm

coming after it.  That would have been foolish, right?

A.    Yes.

Q.    Okay.  And you certainly intended for Muzzy to be able to rely on your word as a representative of Borden-Perlman, right?

A.    Sure.

Q.    Okay.  So then Dave writes back and says, on page 122, Dave says, "New" -- meaning new client -- "Orchestrate wrote it last year with Arch" [as read].

Did I read that correctly?

A.    You did.  He's paraphrasing a bit, but yes.

Q.    And says, "Did you get a bill?"

Deeter says, "Yes.  Is this an Orchestrate account?" [as read].

Right?

A.    Uh-huh.

Q.    You need to answer verbally.

A.    Yes.

Q.    And so when he says "did you get a bill," that means did you get a claim to reprice?

A.    Yes.

Q.    The bill would be to provide the bill?

A.    Yes, yes.

Q.    Okay.  So we know right now before we read anything else we've got a problem, because Deeter's not

STATE OF TEXAS )

COUNTY OF DALLAS   )

I, LISA C. HUNDT, a Certified Shorthand Reporter in and for the State of Texas, hereby certify that, pursuant to the agreement hereinbefore set forth, there came before me on the 18th day of September, A.D, 2013, at 9:17 a.m., at the office of Gruber, Hurst, Johansen, Hail, & Shank, located at 1445 Ross Avenue, Suite 2500, Dallas, Texas, the following named person, to-wit:  KELLY MYERS, who was by me duly cautioned and sworn  to testify to the truth, the whole truth, and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; and that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that the deposition is a true record of the testimony given by the witness, same to be sworn and subscribed by said witness before any Notary Public, pursuant to the agreement of the parties; and that the amount of time used by each party at the deposition is as follows:

Mr. Beckham - 5 hours, 7 minutes,

Mr. Shank - 0 hours, 0 minutes,

Mr. Portela - 0 hours, 0 minutes,

Mr. McAllister - 0 hours, 0 minutes;

I further certify that I am neither attorney nor

Kelly Myers - Confidential

284

counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

I further certify that before the completion of the deposition, ___X___ the Deponent, and/or _____ the Plaintiff/Defendant, ___X___ did _____ did not request to review the transcript.

In witness whereof, I have hereunto set my hand and affixed my seal this _____ day of _____, A.D. 2013.

_____
LISA C. HUNDT, CSR, RPR, CLR
Texas CSR No. 6533
Expiration Date:  12/31/14

HUNDT REPORTING, LLC
Firm Registration No. 347
6500 Greenville Avenue, Suite 445
Dallas, Texas 75206
214.220.1122

Taxable Cost:      $_____

**From:** Dave Icenhower <EXG5/EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/RECIPIENTS/DICENHOWER10642>
**To:** 'deeter.prater@occupationalnetworks.com'
**Subject:** Re: Tiffin U

**Sent:** 2/1/2013 8:55:37 PM +00:00

I'd rather you have it. Need to run it by km though because I want him to deal with orchestrate if they catch on. I doubt they will though

**From:** Deeter Prater [mailto:deeter.prater@occupationalnetworks.com]
**Sent:** Friday, February 01, 2013 02:51 PM
**To:** Dave Icenhower
**Subject:** Re: Tiffin U

We did a few. I'm cool with keeping it. Could care less who's account it is. You?

Sent from my IPhone

On Feb 1, 2013, at 2:02 PM, Dave Icenhower <dicenhower@bordenperlman.com> wrote:

I'm addressing it with nahga. No clue how you got it I'm trying to find out. What do you want to do?

**From:** Deeter Prater [mailto:deeter.prater@occupationalnetworks.com]
**Sent:** Friday, February 01, 2013 01:58 PM
**To:** Dave Icenhower
**Subject:** RE: Tiffin U

How do we get bills on it then? Do we need to send them back to NAHGA?

**From:** Dave Icenhower [mailto:dicenhower@bordenperlman.com]
**Sent:** Friday, February 01, 2013 1:52 PM
**To:** 'deeter.prater@occupationalnetworks.com'
**Subject:** Re: Tiffin U

Yep they brought to us.

**From:** Deeter Prater [mailto:deeter.prater@occupationalnetworks.com]
**Sent:** Friday, February 01, 2013 01:40 PM
**To:** Dave Icenhower
**Subject:** RE: Tiffin U

Yeah – is this an orchestrate account?



**From:** Dave Icenhower [mailto:dicenhower@bordenperlman.com]
**Sent:** Friday, February 01, 2013 1:36 PM
**To:** 'deeter.prater@occupationalnetworks.com'
**Subject:** Re: Tiffin U

New. Orchestrate wrote it last year w arch. Did you get a bill?

**From:** Deeter Prater [mailto:deeter.prater@occupationalnetworks.com]
**Sent:** Friday, February 01, 2013 01:33 PM
**To:** Dave Icenhower
**Subject:** RE: Tiffin U

New or old?  They go to the same ortho another of your schools.

**From:** Dave Icenhower [mailto:dicenhower@bordenperlman.com]
**Sent:** Friday, February 01, 2013 1:01 PM
**To:** 'deeter.prater@occupationalnetworks.com'
**Subject:** Re: Tiffin U

Yep

**From:** Deeter Prater [mailto:deeter.prater@occupationalnetworks.com]
**Sent:** Friday, February 01, 2013 08:44 AM
**To:** Dave Icenhower
**Subject:** Tiffin U

Is this school yours?

*Deeter Prater*

# TAB D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ORCHESTRATE HR, INC.,            )
                                 )
            Plaintiff,           )
                                 )
VS.                              ) CIVIL ACTION
                                 )
ANTHONY L. TROMBETTA and         ) NO.: 3:13 CV-2110-P
THE BORDEN PERLMAN              )
INSURANCE AGENCY, INC.,          )
                                 )
            Defendants.          )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

KELLY MYERS

MARCH 19, 2015

VOLUME 2

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF KELLY MYERS,
produced as a witness at the instance of the Plaintiff,
and duly sworn, was taken in the above-styled and
numbered cause on March 19, 2015, from 8:24 a.m. to 5:01
p.m., before Lisa C. Hundt, CSR, RPR, CLR in and for the
State of Texas, reported by machine shorthand, at the
law offices of Naman Howell Smith & Lee, located at 306
West 7th Street, Suite 405, Fort Worth, Texas, in
accordance with the Federal Rules of Civil Procedure and
the provisions stated on the record or attached hereto.

Pls.' App. 113

A P P E A R A N C E S

FOR THE PLAINTIFF:

        Mr. Blake L. Beckham
        And
        Mr. Jose M. Portela
        THE BECKHAM GROUP
        3400 Carlisle
        Suite 550
        Dallas, Texas 75204
        214.965.9300
        214.965.9301 Fax)
        blake@beckham-group.com
        jose@beckham-group.com

FOR DEFENDANT THE BORDEN PERLMAN INSURANCE AGENCY, INC.:

        Mr. Grant Liser
        NAMAN HOWELL SMITH & LEE
        306 West 7th Street
        Suite 405
        Fort Worth, Texas   76102
        817.509.2025
        817.509.2060 (Fax)
        gliser@namanhowell.com

FOR DEFENDANT ANTHONY L. TROMBETTA:

        Mr. James M. Stanton
        And
        Ms. Anastasia L. Villescas
        STANTON LAW FIRM
        4350 Beltway Drive
        Addison, Texas 75001
        972.233.2300
        972.692.6812 (Fax)
        Stanton@stantontrialfirm.com
        avillescas@stantontrialfirm.com

ALSO PRESENT:    Mr. Muzzy Bass
                 Mr. Anthony Trombetta
                 Mr. David Icenhower
                 Mr. Michael Barnes, Videographer

Pls.' App. 114

418

issued a directive, right? Because the last thing you do is go snake their clients behind their back without telling them. That would make you guys a bunch of scum bags, right?

MR. LISER: Objection to the question, form.

A. I don't agree with that.

Q. (BY MR. BECKHAM) Okay. Well, let's break it down. You guys, at this time, were calling yourselves partners with Orchestrate and Vivature, right?

A. I -- I don't know what time you're talking about, so...

Q. The day before the alleged directive.

A. I wouldn't use the word "partners."

Q. You did at the time, right?

A. I -- I don't remember.

Q. Okay. Corporation doesn't remember, so y'all will have no position on that at trial, right? You're not going to magically remember something later, are you?

A. I -- I don't believe so.

Q. Okay. You were working cooperatively to pursue common clients and benefit each other, right?

A. Yes.

Q. Okay. And you had agreements not to snake the other side's clients, right?

419

MR. LISER: Objection to the form of the question.

A. Yes.

Q. (BY MR. BECKHAM) And do you know what I mean by "snake a client"?

A. Yes, sir.

Q. Okay. What is that? Take something that doesn't belong to you, right?

A. That's -- yes, sir.

Q. Okay. And so whether or not you were partners, you were both working together for the common good; you had each other's backs. Right? Before Dave got mad.

MR. LISER: Objection to the form of the question.

Q. (BY MR. BECKHAM) Right?

MR. LISER: Compound.

A. I don't know.

Q. (BY MR. BECKHAM) You were both protecting --

A. I don't understand the question.

Q. -- each other's confidential information, right?

A. Yes.

Q. Okay. You were both trying to help the other, right?

A. Yes.

420

Q.    You both expected to be able to trust the other?

A.    Yes.

Q.    Yeah.  And in your prior deposition, you answered -- you called him partners in your last deposition, didn't you, the one that you read yesterday?

A.    I -- I may have called them partners early on, but I --

Q.    Okay.  Look --

A.    I don't remember.

Q.    Look at page 212, line 14.  This is talking about a deal between Borden Perlman and Orchestrate and Vivature.  "So the deal was that on these joint clients that we were going to honor the existing contractual, whether verbal or written, arrangements that the other partner had and not try to interfere, correct?" [as read].

And you said?

A.    Yes.

Q.    Okay.  And you agree -- that's true today, right?

A.    Yes.

Q.    That's not something you've forgotten?

A.    That's correct.

Q.    Okay.  So when you found out allegedly that

Pls.' App. 117

644

STATE OF TEXAS )

COUNTY OF DALLAS )

I, LISA C. HUNDT, a Certified Shorthand Reporter in and for the State of Texas, hereby certify that, pursuant to the agreement hereinbefore set forth, there came before me on the 19th day of March, A.D, 2015, at 8:24 a.m., at the office of Naman Howell Smith & Lee, located at 306 West 7th Street, Suite 405, Fort Worth, Texas, the following named person, to-wit:  KELLY MYERS, who was by me duly cautioned and sworn  to testify to the truth, the whole truth, and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; and that he was thereupon carefully examined upon his oath and his examination reduced to writing under my supervision; that the deposition is a true record of the testimony given by the witness, same to be sworn and subscribed by said witness before any Notary Public, pursuant to the agreement of the parties; and that the amount of time used by each party at the deposition is as follows:

        Mr. Beckham - 3 hours, 15 minutes,

        Mr. Liser - 0 hours, 0 minutes,

        Mr. Portela - 3 hours, 32 minutes,

        Mr. Stanton - 0 hours, 0 minutes,

        Ms. Villescas - 0 hours, 0 minutes;

Pls.' App. 118

645

I further certify that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

I further certify that before the completion of the deposition, ___X___ the Deponent, and/or _____ the Plaintiff/Defendant, ___X___ did _____ did not request to review the transcript.

In witness whereof, I have hereunto set my hand and affixed my seal this 26th day of March, A.D. 2015.

_____
LISA C. HUNDT, CSR, RPR, CLR
Texas CSR No. 6533
Expiration Date:   12/31/16

DEPOTEXAS / SUNBELT REPORTING
Firm Registration No. 459 / 301
6500 Greenville Avenue, Suite 445
Dallas, Texas 75206
214.373.4977

TAB E

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ORCHESTRATEHER, INC.,
and VIVATURE, INC.,                    )
                                       ) Civil Action No.:
          Plaintiffs,                  ) 3:13 CV-2110-P
                                       )
   vs.                                 )
                                       )
ANTHONY L. TROMBETTA,                  )
THE BORDEN-PERLMAN                     )
INSURANCE AGENCY,INC.,                 )
KELLY MYERS, and                       )
DAVE ICENHOWER,                        )
                                       )
          Defendants.                  )

30(b)(6) DEPOSITION OF:  NAHGA via

JENNIFER PARK, taken before Michelle R.

Feliccitti, RPR, Notary Public in and for

the State of Maine, pursuant to notice, at

the offices of Murray, Plumb & Murray,

75 Pearl Street, Portland, Maine, on

July 9, 2015, commencing at 9:29  a.m.


Michelle R. Feliccitti, RPR
DepoTexas
6500 Greenville, Suite 445
Dallas TX  75206
214-373-4977

A P P E A R A N C E S

For the Plaintiffs:

Blake L. Beckham, Esq.
The Beckham Group
3400 Carlisle Avenue, Suite 550
Dallas, Texas 75204
214-965-9300
blake@beckham-group.com

Jose M. Portela, Esq.
The Beckham Group
3400 Carlisle Avenue, Suite 550
Dallas, Texas 75204
214-965-9300
Jose@beckham-group.com

For the Defendants:

Sandra Liser, Esq.
Naman Howell Smith & Lee, PLLC
Fort Worth Club Building
306 West 7th Street, Suite 405
Fort Worth, TX   761-4911
817-509-2025
sliser@namanhowell.com

Anastaisia Villescas, Esq.
Stanton Law Firm, PC
9400 N. Central Expressway, Suite 1304
Dallas, Texas 75231
972-233-2300
avillescas@stantontrialfirm.com

For NAHGA:

Michael Traister, Esq.
Murray, Plumb & Murray
75 Pearl Street
Portland, ME   04104
207-773-5651
mtraister@mpmlaw.com

ALSO PRESENT:

Pls.' App. 122

A.   -- NAHGA is concerned.

Q.   Okay.  All right.  Just as an example, on contracts, did -- did you have copies -- do you know whether or not Orchestrate -- we did this yesterday with several witnesses.  Do you --- do you call them Orchestrate or Vivature?

A.   I use them interchangeably because I never understood the difference.

Q.   Okay.  And do you have an understanding of the difference now?

A.   No.  I -- again, use them interchangeably.  I think of them as one in the same.

Q.   Were you ever curious back at the time what the difference was or what they did differently?

A.   No.

Q.   Okay.  Did you have some -- let's -- let's lay out who all the players are.  Do you know how BP and Vivature -- and I'll just say Vivature for the most part, okay?  Do you know how Vivature and BP got together?

A.   No.

Q.   Okay.  Does it matter to you?

A.   No.

do for me.

Q. You think it would have been helpful if you attended the training you had been offered?

A. I wouldn't be able to answer to what kind of training it was, whether it would be helpful or not. But our login didn't work.

Q. You're saying you were never trained on the software?

A. Blue Ocean, NExTT?

Q. Yeah.

A. No.

Q. Okay.

A. Not that I recall.

Q. Well, you know, any -- any new software package is going to be difficult and challenging until you've been trained on it, right?

A. It's difficult if you can't log in.

Q. Maybe you could answer my question.

Any new software is difficult or challenging if you haven't been trained on it?

A. Oftentimes I can log in and figure things out, myself, but I'm sure it would have been helpful. But, again, we couldn't log in.

Q. And so is there a reason that you didn't go to

the training?

A.   I honestly don't remember.

Q.   Okay.

A.   I don't remember being offered it.  I don't remember --

Q.   I'll hand you --

A.   -- whether I was out, not there.  I have no idea.

Q.   I'll hand you a copy of Exhibit 65.

(E-mail Chain

Exhibit No. 65 marked for identification.)

Q.   Is that your e-mail address?

A.   Yes.  Yes.

Q.   Okay.  Do you -- does it show that there was a meeting set up?  You're shown as a required attendee for the demonstration and training on the NExTT software and that you declined to do the training?

A.   Yes.  And I see, "Sorry, I cannot make Thursday."

Q.   Okay.

A.   Yes.

Q.   And now do you remember being offered training?

A.   This doesn't mean I remember it.  This is -- I

should try to understand the new software before you give up on it?

A. I don't know that I ever give -- I can't answer that because I don't know that I ever gave up on the software because I can't even tell you what the software would have done for me. Like, that's how little I know about this software.

Q. Okay.

A. It was not communicated to me what the software was going to do. So I can't answer whether it would have been helpful or not.

Q. All right. Did you know whether or not there was -- that you'd been contacted with -- if you have anyone -- if there's someone that has a problem with repricing, this is the person to contact at the Vivature companies?

A. At one -- I think her name was Janie --

Q. Okay.

A. -- that -- we were going to Lance, I believe, because that was the contact that we had. And then eventually -- eventually I was told to send certain questions to -- I can't even think -- it was Janie, but she had a different e-mail address. She was somewhere else, or it

get them lined up for training?

A.   I believe that's probably true.

Q.   Okay.

(E-mail

Exhibit No. 78 marked for identification.)

BY ATTY. BECKHAM:

Q.   Here is Exhibit 78.

Were you aware that Lance had sought out Kate Shackford for next training?

A.   I don't remember.  I knew at the time.

Q.   Okay.  Did -- we had heard some discussion that that employees never received login IDs.

Have -- have you heard that anecdotally from any NAHGA employees that they did not receive logins?

A.   No.  I believe we received them, but they didn't work.

Q.   Okay.  And so is it -- and do have you any e-mails -- we haven't seen any e-mails where someone said, Our login does not work.  We looked for those.

Have you have you seen any?

A.   I don't recall.

Q.   Okay.  Here's a -- for example, here's an e-mail to Buffy B.  She's a NAHGA employee,

Pls.' App. 127

**From:** Jen Park <jenp@nahgaclaims.com>
**Sent:** Tuesday, February 25, 2014 10:56 AM
**To:** 'Lance Wilson'
**Subject:** Declined: FW: GoToMeeting Invitation - NExTT Demo - NAHGA

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

User Jen Park (jenp@nahgaclaims.com) has refused the invitation.

**Subject:** FW: GoToMeeting Invitation - NExTT Demo - NAHGA
**Location:** Web Meeting
**When:** 2012-10-18, 11:00 - 12:00 GMT -4:00 (60 minutes)
**Organizer:** 'Lance Wilson' (lwwilson@vivature.com)
**Required Attendees:** Jen Park (jenp@nahgaclaims.com)

Sorry, I cannot make Thursday.

I'll send the invite to the adjusters.

Thanks,



1

**From:** Kate Shackford <kates@nahgaclaims.com>
**Sent:** Tuesday, October 16, 2012 7:54 AM
**To:** Lance Wilson
**Subject:** Accepted: FW: GoToMeeting Invitation - NExTT Demo - NAHGA



DEPOSITION EXHIBIT
28

302

I, NAHGA (JENNIFER PARK), do hereby certify that the foregoing testimony taken on July 9, 2015, is true and accurate to the best of my knowledge and belief.

DATE                          NAHGA (JENNIFER PARK)

At                        in said County of        , this day of                    , 2015 personally appeared NAHGA (JENNIFER PARK), and she made oath to the truth of the foregoing answers by her subscribed.

Before me,                                   , a Notary Public

My Commission Expires:

Pls.' App. 130

303

STATE OF MAINE

I, Michelle R. Feliccitti, a Notary Public in and for the State of Maine, do hereby certify that pursuant to notice there came before me on July 9, 2015, the following-named person to wit: NAHGA (JENNIFER PARK), who was duly sworn to testify to the truth and nothing but the truth; that she was thereupon carefully examined upon her oath and her examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

IN WITNESS WHEREOF, I have hereunto set my hand this        day of                  , 2015.


                              Michelle R. Feliccitti, RPR

My Commission Expires:
March 9, 2017

# TAB F

Brian Haas

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ORCHESTRATE HR, INC.          )
                              )
                              )
          Plaintiff,          )  Civil Action No.
                              )  3:13CV-2110-P
VS.                           )
                              )
ANTHONY L. TROMBETTA,         )
and THE BORDEN-PERLMAN        )
INSURANCE AGENCY, INC.,       )
KELLY MYERS, AND DAVE         )
ICEHOWER,                     )
                              )
          Defendants.         )

ORAL (AND VIDEOTAPED) DEPOSITION

BRIAN HAAS

September 17, 2015

ORAL DEPOSITION OF BRIAN HAAS, 30(b)(6) witness on behalf of Arch Insurance Company, at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on September 17, 2015,from 10:18 a.m. to 8:45 p.m., before Eileen Mulvenna, CSR/RMR/CRR and Notary Public in and for the State of New York, reported by machine shorthand, at the offices of Wilson Elser Moskowitz Edelman & Dicker, LLP, pursuant to the Texas Rules of Civil Procedure

Brian Haas

and the provisions stated on the record.

Pls.' App. 134

Brian Haas

117

cc's to the one I want the information passed along to.  Can you tell from reading this, was this primarily addressed to you or to Rich?  Or you don't know?

MS. CANNON:  Objection; speculation.

THE WITNESS:  I'm sorry, which --

BY MR. BECKHAM:

Q.     The first e-mail, which is the lowest one.

A.     Oh.  The one on the bottom-bottom?

Q.     Yeah.

A.     Okay.

Q.     I'll try to always start at the bottom and work forward unless I tell you otherwise.

A.     Okay.

(Witness peruses the exhibit.)

A.     I would say that was addressed primarily to myself --

Q.     Okay.

A.     -- with Steve Rich more or less cc'd.

Q.     Now, earlier, I think it might have been in response to Sandy's questions, she asked you who advised Arch that the aggs were pierced.

Brian Haas

118

And I'm not sure if you remembered, but when you look at this e-mail, do you now remember that the first time you had a report that the aggregate was pierced was from the broker Borden-Perlman?

A.   I'm not seeing where this e-mail is applicable to that, but --

Q.   If you look at paragraph 1, the second page, the middle of that paragraph. "Kelly believed that two cases have pierced the agg."

Did I read that correctly?

A.   Yes, you did.  So this is Denise letting us know that, but I believe that Mr. Myers had told us that in -- verbally prior to this.

Q.   Prior to November?

A.   I believe he called first, let us know, and then he put in it writing.

Q.   Are you saying a day or two before this or some substantial period before?

A.   I can't answer that.  I don't know.

Q.   Okay.  And I may be -- I'm not arguing with you on this question.  I may be wrong.  I -- I have seen from the documents that I looked at that -- that you and -- were getting

Pls.' App. 136

really involved in the February, March time frame with some serious concerns.

I didn't see a big flurry around November saying, what in the heck, how come we already have an agg pierced by November.

Did you see any documents in your review where you got Arch jumped into action in November or even December?

A.     I would say December, but not --

Q.     Okay.   That was more just curiosity. We'll come back to that.

A.     Okay.

Q.     Okay.  So typically you would expect if an agg had been pierced, you would be advised by Arch's TPA?

A.     Correct.

Q.     And I believe you said it was kind of standard operating procedure that if you got into the red zone, 80 percent or more, you'd like to have a heads-up at that point?

MS. CANNON:  Objection; mischaracterizes the prior testimony.

THE WITNESS:  I think it was --

MR. BECKHAM:  What was the mischaracterization?

Brian Haas

120

MS. CANNON:  He did not say 80 percent.  I believe he said --

THE WITNESS:  50 and 75.

MR. BECKHAM:  Okay.  I thought I saw an e-mail in here that said 80.

BY MR. BECKHAM:

Q.     Did you see an e-mail in your review that --

A.     I saw an e-mail that said 75, but there's still a -- it is a courtesy that when the TPA is asking for more funding from the policyholder, that they give a heads-up to the carrier.

Q.     Okay.  So -- and how well do you understand the allegations and the counter allegations in this lawsuit?

A.     Just peripherally.

Q.     Okay.  And you do know that -- after the audits, that neither University of Maryland or Youngstown State pierced?

MS. CANNON:  Objection.

THE WITNESS:  I would have to check my records.  I'm not sure.  There's still a number of the schools that the audits are outstanding.  I think Maryland still has a

Brian Haas

121

few thousand dollars in outstanding claims.

BY MR. BECKHAM:

Q. Okay. And do you know whether or not Maryland had authorized Orchestrate/Vivature to pay claims for their athletes that would not ordinarily be covered under the Arch insurance? Have you been told that?

A. I know about that now --

Q. Okay.

A. -- but I did not know that at the time.

Q. Right.

And that's certainly 100 percent Maryland's prerogative; correct?

MS. CANNON: Objection to form.

THE WITNESS: Can you restate the question?

BY MR. BECKHAM:

Q. Sure.

Arch can't tell Maryland that their starting quarterback can't have glasses; right?

A. Correct.

Q. Okay. And I'm not arguing with you. This is a jury trial. It would be ridiculous for Arch to tell its insured that they can't pay

MS. CANNON:   No.   This is the way I am every morning.

MR. BECKHAM:   I'll pray for you.

MS. CANNON:   I'm praying for you.

BY MR. BECKHAM:

Q.   Well, let's just take -- let's just take your counsel's word for it right now that the decision was made sometime in January and come back to it.

But what I'm trying to establish is that the Arch decision to terminate Orchestrate/Vivature -- we're just going to call that Arch's decision to terminate, fair enough, so I don't have to repeat the whole thing?

A.   Yes.

Q.   And at this point in time, you believe it was sometime in January.  I'm not going to hold you to the date right now.

A.   Right.

Q.   Okay.  But you know it wasn't in December of 2012.

A.   It was not.

Q.   Okay.  So now --

A.   I would probably recharacterize it as it was discussed as an option in January.

Pls.' App. 140

Brian Haas

131

Q.      Okay.  Well, now you're disagreeing with your counsel.  When was the decision made?

A.      I don't know exactly when it was made.

Q.      Okay.  Well, I want to use the "Arch's Decision" as a defined term.

MR. BECKHAM:  And I'd like the court reporter, every time I say "Arch's Decision," put a capital D.

Q.      So you understand what I'm talking about when I say "Arch's Decision"?

A.      Uh-huh.

Q.      Verbal.

A.      Yes.

Q.      Okay.  And was that -- and I'm not fussing with you.

Was that a decision Brian can make on his own, or did he have to get Dick involved?

A.      That was a decision that -- my recommendation went to Richard Richiski.

Q.      And that almost answers my question. Sometimes people have the authority, but they go upstairs just to be sure.

What I want to know, is that something Brian could have done on his own?

Pls.' App. 141

Brien Haas

132

A.      I don't believe so.

Q.      Fair enough.  All right.

Now, let's go back.  And I'm going to state it for you again because we've had a lot of talking in between.  But I told you I was going to make a statement and ask if you understood it, and then I was going to ask you some more questions.

The statement that I made so -- you said you understood it then, but I want to refresh you.

What I said was Orchestrate/Vivature's contention is that the evidence will show that the University of Maryland instructed Orchestrate/Vivature to pay medical claims for items that would not be covered under the terms of the accident policy.

A.      I understand those words.

Q.      You understand those words.

And you told me earlier that it would be silly for Arch to tell a university that it did not have the discretion, that it could not make that decision; right?

A.      I don't know if I used the term "silly."  I don't think it's my responsibility --

Brian Haas

it's not my place to tell a university, or Arch, what they can pay and what they can't pay.

Q.      Arch has absolutely no authority to tell a school like the University of Maryland that they could not use discretionary funds to pay medical claims for student athletes which would not be covered; right?

A.      Correct.

Q.      It's none of Arch's business; correct?

A.      Correct.

Q.      Okay.  Now, the item that I said that you understood -- you told me that you knew today that that condition existed, that is Maryland instructed Orchestrate and Vivature to pay medical claims that were not covered under Arch's accident policies.

MS. CANNON:  Objection.

Q.      My question is, you and Arch did not know that Maryland was so instructing Orchestrate/Vivature at the time Arch made its decision to terminate Orchestrate/Vivature; correct?

A.      That is a correct statement.

Q.      Okay.  And you know now that the

Brian Haas

134

information provided to you by Kelly Myers that Maryland had pierced its agg, which he told you in November of 2015 [sic], you know Kelly Myers was wrong?

MS. LISER: Objection; misstates the facts, argumentative.

Q.     They hadn't pierced in November.

A.     But the fact is wrong. It had not pierced.

Q.     Right.

And so when Ms. Liser was asking you, you know, did -- did Kelly control Arch's decision, you said no; did Kelly influence Arch's decision, you said no. And I think, sir, you were answering pretty quickly. Let me ask you a slightly different question.

A.     Okay.

Q.     The information that Kelly told you was an important part of Arch's decision making; true?

A.     True.

Q.     Okay. And let's knock out two or three of the most important things you heard, and let me ask you to rank them for me.

The statement that Orchestrate and

Brian Haas
145

advise you -- let me back up.

Does Arch Insurance Company make it a habit to tortiously interfere with contracts?

MS. CANNON:  Objection; calls for a legal conclusion.

BY MR. BECKHAM:

Q.    You can answer.

I would hope not.

A.    I would say no, but I can't --

Q.    Okay.  And --

A.    -- speaking on --

Q,    Right.

Does Brian, working for -- for Arch, ever go out and tell people, you need to violate your contract with that other company?

A.    No.

Q.    Okay.  And Brian's a smart guy.  You don't get to be a senior executive at an insurance company without being smart; right?

A.    Uh-huh.  Yes.

Q.    Okay.  And if Brian knew that the words he was signing in a letter would cause interference with contracts, before you'd sign the letter, you'd say, you know, I need to get legal involved in this; right?

A.    If I knew I was breaking a contract, then, yes, I would get legal involved.

Q.    Great.

Or if you knew you might break a contract; right?

A.    Yes.

Q.    Or if you knew that you were telling a school, I want you to break a contract with somebody else, you wouldn't dare write the letter unless you talked to legal; right?

A.    Yes.

Q.    Okay.  And so when Borden-Perlman came and made these complaints about Orchestrate/Vivature, they never told you that Orchestrate/Vivature had a written contract for repricing services with each and every university they served; correct?

MS. CANNON:  Objection.

MS. LISER:  Objection; misstates facts.

THE WITNESS:  They didn't.

BY MR. BECKHAM:

Q.    Okay.  And you would have expected Borden-Perlman to give you the accurate information and the facts before they provided

you information upon which to make the decision?

A.    Yes.

Q.    And if, in fact, Orchestrate and Vivature had written contracts for repricing services with every school that they dealt with, you'd be critical of Borden-Perlman for failing to provide you that information?

A.    Yes.

Q.    Okay.  So now we know of at least two things that you're critical of Borden-Perlman for not telling you at the time -- I'm using the defined term -- that Arch made the Decision, capital D, Decision, to terminate Orchestrate/Vivature.

The first was, they didn't tell me -- well, sorry.

The first was, they gave me misleading information about Maryland piercing the agg in November.

A.    Okay.

Q.    Okay?

A.    Yes.

Q.    I'm handing you what's been marked as Exhibit 100.  And will you just read what I wrote there so far so we can put it in context.

Brian Haas

148

(Exhibit 100, No Bates numbers, Handwritten Notes, marked for identification.)

THE WITNESS:  "Brian Haas/Arch critical of Borden-Perlman for the following items he was told before he/Arch made the decision to terminate Orchestrate/Vivature."

BY MR. BECKHAM:

Q.    Right.

Can you hand that back to me.  And that wasn't a question.  I was just asking you to read something.

So you saw that's marked as Exhibit 100?

A.    Yes.

Q.    So what I'd like to do here is, during the deposition today, any time -- and you told me this so far twice, that "I was critical of Borden-Perlman or Kelly Myers," I'd just like to write them down here.  And I'm going to write it and make sure you agree with the way I wrote them.

So do you -- if this could be called a question, I want to get a list of the things

Q.     Okay.   This e-mail was November 5th, so that would be the month of August, September and October.   So when you hear that an agg is pierced three months into a policy year, that's quite a fire alarm; right?

MS. LISER:   Objection; misstates the facts.

THE WITNESS:   At this point in time, I don't know which years he was notifying us had pierced.

BY MR. BECKHAM:

Q.     Okay.

A.     At this point in time, we had '11-'12 and '12-'13 on the books.

Q.     So number 1, can you read that from here?   Read what I wrote on number 1.

A.     "Misinformation in" --

Q.     "Exhibit 88."

A.     -- "Exhibit 88 about two schools piercing agg."

Q.     Okay.   So that's the first thing that we've listed that you were critical of Borden-Perlman for giving you information upon which Arch based its decision to terminate; right?

Pls.' App. 149

Brian Haas

152

MS. LISER:  Objection; misstates the facts.

MS. CANNON:  Mischaracterizes prior testimony.

THE WITNESS:  If -- if indeed there was a misrepresentation.  As I said before, there's still audits outstanding.  I can't -- I can't tell you if Maryland pierced or didn't pierce.

BY MR. BECKHAM:

Q.    If it was -- if it was misinformation, you're critical of them; right?

A.    If it was misinformation, I certainly would be critical.

Q.    Okay.  I'll put "if" with an asterisk right above the mis- -- misrepresentation.

A.    Yes.

Q.    Okay.  Number 2, you're critical of Borden-Perlman for not advising you that University of Maryland had discretionary funds that they paid -- that they had Orchestrate pay medical bills that were not covered under Arch's accident policy?

MS. CANNON:  Objection; assumes

Brian Haas

153

facts not in evidence.

Go ahead and answer.

THE WITNESS:  I would like to have known that information.

BY MR. BECKHAM:

Q.      Because at some point, Arch is saying, wait a minute, they paid claims on the flu?  What kind of idiots are Orchestrate and Vivature?  That's not covered.

Right?

A.      I wouldn't use that kind of inflammatory statement, but --

Q.      Well, you did, let's give Muzzy a hurtin'.

A.      Well --

Q.      Sir, here's the point:  You wouldn't ordinarily use those types of inflammatory statements against Muzzy Bass and his company --

A.      I would not.

Q.      -- but because of all the things you were told, eventually you did; correct?

A.      Correct.

Q.      And the things that you were told primarily came from Borden-Perlman; correct?

MS. LISER:  Objection; misstates the

Brian Haas

154

facts.

THE WITNESS:  They primarily came verbally from Borden-Perlman, but at that time in time, we had started to audit the claims and were having a great amount of difficulty getting the data we needed.

So it wasn't -- I want to make it very clear that Kelly picking up the phone and calling us didn't cause us just to end the relationship.  There was a lot --

BY MR. BECKHAM:

Q.    Right.  We're going to get back to that.

MS. LISER:  Let the witness finish the answer.

MR. BECKHAM:  I thought he was.

THE WITNESS:  There's a lot that goes into a decision like this.

BY MR. BECKHAM:

Q.    Okay.  And one of the -- one of the big things was that NAHGA said they couldn't get the information when they were auditing, or ACI said they couldn't; right?

A.    Yes.

MS. CANNON:  Objection.

Brian Haas

155

Q.      Okay.   Now, do you remember -- have you ever looked at -- at Orchestrate's website?

A.      I have not.

Q.      We'll come back to that.

Okay.   So the second item, "BP's failure to fully inform Arch that University of Maryland instructed" --

A.      When we're done with this line, can we take lunch?

Q.      Sure.

A.      Okay.

Q.      Okay.   The next item, "Borden-Perlman's failure to fully inform Arch that University of Maryland instructed Orchestrate/Vivature to pay non-covered claims which was University of Maryland's right."

MS. CANNON:   Objection; mischaracterizes the prior facts in evidence.

MR. BECKHAM:   Let's back up and go through it.

BY MR. BECKHAM:

Q.      It was University of Maryland's right to pay --

A.      Right.

Brian Haas
156

Q.      -- with its own discretion claims that were not covered under Arch's accident policy?

A.      Uh-huh.

Q.      Yes?

A.      Correct.

Q.      And Borden-Perlman never told you, at the time Arch made the decision to terminate Orchestrate/Vivature, that University of Maryland had so instructed Orchestrate/Vivature; correct?

MS. CANNON:  Objection; assumes facts not in evidence.

If you had the contract to show us, he can answer, but --

MR. BECKHAM:  Okay.  He already said he knew -- he found out later that Maryland was doing that.

BY MR. BECKHAM:

Q.      Correct?

MS. CANNON:  Objection.  I objected to that question.  He does not know that. You probably told him --

MR. BECKHAM:  Hold on.  You've got to stop the talking objections.  This judge has already sanctioned this firm once, and

Brian Haas

157

it's going to happen again.

BY MR. BECKHAM:

Q.    You have been advised that University of Maryland was paying non-covered claims on their own discretion?

A.    Through the reading of the depositions I learned that.

Q.    Okay.  All right.  And that is something that you would have much rather known at the time?

A.    Uh-huh.

Q.    Yes?

A.    Yes.

      And I just want to say that in the deposition I read, it didn't specifically say University of Maryland; it said Orchestrate clients.

Q.    Okay.

A.    So when you say --

Q.    I'll represent to you as an officer of the court that that's precisely what happened at University of Maryland.

A.    Okay.

Q.    Okay.

      MS. LISER:  Objection; sidebar,

Brian Haas

158

misstates the evidence.

BY MR. BECKHAM:

Q.     Okay.  We'll put on number 2 the same "if" with the asterisk.  If that happened, then you're critical; right?

A.     Correct.

Q.     Okay.  Did you ask me when I finished Exhibit 100 if we want to take a lunch, or do you want to take one right now?

A.     The next few minutes would be fine.

Q.     Okay.  All right.  Let's keep going a little bit.

A.     Yes.

(Discussion off the record.)

Q.     Do you have Exhibit 99 over there?

A.     I got 99.

Q.     Hand it over here for a second.

A.     (Handing.)

MR. BECKHAM:  I'm good to take a lunch break now.

MS. CANNON:  Let's take it now.

THE VIDEOGRAPHER:  The time is 1:37 p.m.  We're off the record.

(Luncheon recess from the record.)

Brian Haas

159

A F T E R N O O N   S E S S I O N

THE VIDEOGRAPHER:   The time is 2:28 p.m. and we're back on the record.

BRIAN HAAS,

having been previously sworn, resumed the stand and testified further as follows:

EXAMINATION (Cont'd.)

BY MR. BECKHAM:

Q.   All right, sir.   Right before we took the lunch break, I had started with the third item on Exhibit 100 and we took the break.

You had -- you had testified earlier that BP had never advised Arch that Orchestrate/Vivature had repricing contracts with the universities.

Do you remember that testimony?

A.   Yes.

Q.   Okay.   And if that's true, if they had contracts before you wrote the -- the letter attached as Exhibit B or before you made the Decision, as we've defined it, in roughly January, you would have wanted to know that the universities had written contracts with Orchestrate/Vivature; correct?

A.   I'd like to know that information,

Brian Haas

160

yes.

Q. All right. And had you known that information, you would -- had you known that there were contracts between Vivature and the universities before you made any decision which would, in effect, interfere with those contracts, you would have asked for copies of them, probably want to talk to the universities, have your legal involved before things got out of hand; fair?

A. Yes.

Q. Okay. All right. And on each of Items 1, 2 and 3 on this list, I'm going to -- on the left side of the page, you see where I've drawn a line? And I'm going to ask you if Kelly Myers or anyone at Borden-Perlman came back and clarified or gave you new information at any point in time.

A. Uh-huh.

Q. Do you understand the question?

A. Yes.

Q. Okay. So on number 1, the only way you found out about -- that the two schools hadn't pierced the agg, that was from the audit; right? That wasn't from Borden-Perlman.

A. Again, the initial notification was

Brian Haas

243

positioning statements?

MS. CANNON:  Objection --

Q.  Your e-mail said that?

MS. LISER:  Objection; misstates the testimony.

THE WITNESS:  That's my opinion.  I don't believe that my e-mail stated that.

BY MR. BECKHAM:

Q.  It said -- you said positioning, Kelly's positioning.  Okay.  It's your opinion that Kelly will come up with positions to protect NAHGA?

A.  That he would prefer to do business with NAHGA than ACI.

Q.  And that you and Rich and Dick are skeptical of the things Kelly says; right?

A.  Some things, yes.

Q.  Skeptical means you don't always believe him; right?

A.  Don't believe it's the full truth.

Q.  Yes.  The full truth, that's perfect.

And so it wouldn't surprise you at all that -- if the things that Kelly told you, upon which you based your decision to terminate

Brian Haas

264

THE WITNESS:  Again, I'm not sure that someone would come to me and say who we're using as a repricer.

BY MR. BECKHAM:

Q.    I know, but when you're getting ready to fire them for doing repricing without authorization, it would have been nice if someone said, hey, boss, they've been doing it and we knew it --

MS. CANNON:  Objection; mischaracterizes --

Q.    -- right?

That is something you would have liked to know?

MS. CANNON:  Objection; mischaracterizes the record, assumes facts not in evidence.

THE WITNESS:  That would be part of the -- part of the information-gathering process, that they were doing repricing for us already.

BY MR. BECKHAM:

Q.    Is that a yes, I sure would have liked to have known that my own company knew about this repricing before I terminated them for

Brian Haas

265

repricing?

MS. CANNON:   Objection; assumes facts not in evidence, mischaracterizes the evidence.

You can answer.

THE WITNESS:   Yes.

BY MR. BECKHAM:

Q.    Okay.   Now, let's go back and see if Arch did anything else unfair.

Do you remember when I told you that -- as part of the software, that they would get -- Orchestrate/Vivature would get HIPAA releases signed by the student athletes and scanned into the system?

A.    I don't remember it specifically, but I'll take your word that you discussed that before.

Q.    Okay.   And then a question arose whether there had to be a new claim form signed on claim submissions.   And when that happens, the appropriate thing to do is for the TPA to check with Arch.   Hey, we got a HIPAA question.   Do we have to get a new signed form on everyone, or can we do it with electronic?   That would be an Arch question that the TPA should check; right?

Brian Haas

287

Q. Okay. And you are in a unique position in the country, being the top -- or the head of this division on intercollegiate sports, to know what's out there in this very narrow, niche market; right?

A. I don't know what everybody has --

Q. I won't say you're unique, but like you said, you got more knowledge than the average bear on intercollegiate sports injury-tracking TPA services. You know what's out there. You guys sell the insurance; right?

A. Correct.

Q. Okay. And you've never heard of a system that does what NAHGA says that it does; right?

A. Again, Muzzy had told me about the system, so I had some very skeletal --

Q. Okay. So when Dave Icenhower gets in the system and runs reports and tells Kelly in November that the aggs pierced, you really don't know whether Dave knew how to look at the reports or interpret them; right?

A. Right.

Q. And you already know that the information provided to you on these schools

Brian Haas

288

piercing the agg was inaccurate?  You haven't gotten all of the audits done, but you know that some of the information given to you by Borden-Perlman was inaccurate; right?

A.    I would say, based on where the schools are now, some of the schools have not pierced.

Q.    So the information given to you by Borden-Perlman about the agg piercing was inaccurate?

A.    Yes.

Q.    Okay.  And whose responsibility is it if Borden-Perlman -- have you ever heard of the slogan "garbage in, garbage out"?

A.    Of course.

Q.    Okay.  That means if you start with bad data, your conclusions are going to be bad; right?

A.    Yes.

Q.    And so if you have a guy who doesn't understand how to run reports correctly and he pulls a fire alarm in November and waves a red flag and says, oh, my goodness, the sky is falling, is that Vivature's fault?

A.    I don't know whose fault it is.

Brian Haas

350

we don't have the authority to tell them," that's the schools, "who would handle their funded claims.  I think that was Arch's position at the time."

A.     At the time --

Q.     Do you understand those words?

A.     I understand the words.  I don't know what time you're speaking about.

Q.     At the beginning -- what else could it mean?  You don't say, at the time it was our position, meaning today.  No one says that, right, unless it's somebody positioning?

A.     I would interpret that that once we were notified that Orchestrate had started taking over the claims intake and payment process, that we were also notified that it was the school's money and that we had no authority to tell them not to use Orchestrate.

Q.     Great.  Finally you've admitted it. It's taken me all day.

When you found out, you said Arch doesn't have the authority to tell the schools who handles their money --

MS. CANNON:  Objection; mis- --

Q.     -- right?

BRIAN HAAS / ARCH CRITICAL OF

BORDEN PERLMAN FOR:

THE FOLLOWING ITEMS HE

WAS TOLD AND BEFORE HE / ARCH

MADE "THE DECISION" to TERMINATE

ORCHESTRATE / VIVATURE

BP
COERCING   (TE)*
INTO
1VO   1. Misinformation in ex 88 about
(TF)*   two Schools piercing agg.
NO   2. BP's failure to fully inform ARCH
that U of MARYLAND instructed Orchestrate/
Vivature to pay non-covered Claims —
which was U of Maryland's Right.
NO   3. BP's failure to inform Arch that
Orchestrate/Vivature had contracts w/the Universities
4. BP's ravaluated O-chestrates Repricing's
Efforts

EXHIBIT  100
WIT.
DATE:
E. Mulvenna, CSR/RMR/CRR

## Cannon, Cathlynn

**From:** Richiski, Richard
**Sent:** Monday, November 05, 2012 12:33 PM
**To:** Rich, Stephen; Beck, Denise; Haas, Brian
**Cc:** Adams, Carol
**Subject:** RE: Borden Perlman - Orchestrate and Occunet

Steve: Thanks. I would be happy to explain to Kelly how things work. One example could be our discontinued use of Occunet in favor of PHX. Brian, I am not sure how you want to handle. Steve, if you have a copy of Kelly's letter, please forward so that I can personally respond. Lastly, we should ask claims to do an in depth audit of Occunet and determine their value and how they calculate a percentage of savings.

**From:** Rich, Stephen
**Sent:** Monday, November 05, 2012 1:25 PM
**To:** Richiski, Richard; Beck, Denise; Haas, Brian
**Cc:** Adams, Carol
**Subject:** RE: Borden Perlman - Orchestrate and Occunet

Kelly has indicated in writing that he is the decision maker on who becomes the TPA even though this is not the guidelines we agreed to with him. On the aggregate cases he pays the TPA fee and I believe NAGHA is a point or two lower than ACI thus giving him further incentive to move business there.

Stephen Rich
Senior Underwriter
300 Plaza Three
Jersey City, NJ 07311
(201)743-4603 Office
(201)936-3862 Cell
srich@archinsurance.com

**From:** Richiski, Richard
**Sent:** Monday, November 05, 2012 12:33 PM
**To:** Beck, Denise; Haas, Brian; Rich, Stephen
**Cc:** Adams, Carol
**Subject:** RE: Borden Perlman - Orchestrate and Occunet

Denise: Thanks for the email. My response to the first question would be that Orchestrate would have to produce documentation that they are authorized to process claims on our behalf, not the other way around. The larger issue has to do with aggregate only plans. ACI would need the claims information from the TPA chosen by the College to adjudicate Arch's liability. This has been a concern of mine from the time we first agreed to offer an agg. only plan. Arch has no influence in the selection of that TPA. We do, however through ACI, have the right to audit to determine our liability similar to ESL.
Second, Borden-Perlman is getting a percentage of savings from Occunet. Therefore, a component of that should be given to ACI until an automated process is in place. I am not sure what is delaying the automation process. Again, I am concerned that B-P unilaterally moved accounts from ACI to NAHGA. Prior to next year's renewal process, we will need to have written protocols to govern the move from one claims administrator to another. This is not a B-P decision.

**From:** Beck, Denise
**Sent:** Monday, November 05, 2012 12:10 PM
**To:** Haas, Brian; Rich, Stephen

2/10/2014

EXHIBIT 88
WIT: _____
DATE: _____
E. _____ CSR/RMR/CRR

Arch 03094

**Cc:** Adams, Carol; Richiski, Richard
**Subject:** Borden Perlman – Orchestrate and Occunet

Kelly called two issues:

1) He is looking for documentation that Orchestrate HR is not authorized to process claims on our behalf. I told him that ACI should be processing all claims and that ACI will need to process the claims to calculate what is applied to the aggregate deductible. Kelly believes that two cases have pierced the aggregate deductible (University of MD and Youngstown State). I told Kelly that the sooner ACI gets the claims from Orchestrate, the sooner we will know if there are any issues.

2) Kelly is getting pressure from ACI to be compensated for working with Occunet. I told Borden Perlman that was between him and ACI. He did bring up that NAHGA does provide this service and doesn't charge a fee.

Denise Beck
Arch Insurance Group, Accident & Health Division
dbeck@archinsurance.com
Phone (215) 606-1665
Cell (215) 990-3829

Arch 03095

2/10/2014

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ORCHESTRATE HR, INC.           )
                               )
                               )
                               )
         Plaintiff,            )   Civil Action No.
                               )   3:13CV-2110-P
VS.                            )
                               )
ANTHONY L. TROMBETTA,          )
and THE BORDEN-PERLMAN         )
INSURANCE AGENCY, INC.,        )
KELLY MYERS, AND DAVE          )
ICEHOWER,                      )
                               )
         Defendants.           )

REPORTER'S CERTIFICATE
ORAL (VIDEOTAPED) DEPOSITION OF BRIAN HAAS
SEPTEMBER 17, 2015

I, EILEEN MULVENNA, CSR/RMR/CRR and Notary

Public in and for the State of New York, do

hereby certify to the following:

That the witness, BRIAN HAAS, was duly sworn

and that the transcript of the deposition is a

true record of the testimony given by the

witness;

That review and signature of the witness to

the deposition transcript was waived by the

witness and agreement of the parties at the time

of the deposition;

461

That the original deposition was delivered to

_____, custodial

attorney;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record and timestamps indicate the amount of time used by each party present at the time of the deposition;

That a copy of this certificate was served on all parties shown herein on _____ and filed with the Clerk pursuant to Rule 203.30.

I further certify that I am either counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of this action.

Certified to by me on this 29th day of September, 2015.

EILEEN MULVENNA, CSR/RMR/CRR
DepoTexas - Firm Registration No. 95
Sunbelt Reporting - Firm Registration No. 300
13101 Northwest Freeway, Suite 210
Houston, Texas  77040
281-469-5580